CIVIL ACTION NO. 3:22-cv-30041

| | | |
|---|---|---|
| STEPHEN FOOTE, et al. | ) | |
| Plaintiffs | ) | |
| | ) | |
| vs. | ) | **Leave to File Granted August 1, 2022** |
| | ) | |
| LUDLOW SCHOOL COMMITTEE, et al. | ) | |
| Defendants | ) | |

## <u>DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>

Now come the defendants in the above-captioned action and respectfully submit this memorandum of law in support of defendants' motion to dismiss plaintiffs' Amended Complaint for Injunctive Relief, Declaratory Judgment, and Damages ("Amended Complaint"). "The proudest moments of the federal judiciary have been when we affirm the burgeoning values of our bright youth, rather than preserve the prejudices of the past." *Grimm v. Gloucester Cnty. Sch. Bd.,* 972 F.3d 586, 620 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2878 (2021). Parents have the constitutional right to determine which schools their children attend but they do not have the right to prior notice of and an exemption from their children's gender identity, or to prior notice and an exemption from a school district's intent (and obligation) to not discriminate against a transgender student. Plaintiffs' Amended Complaint rests on an assertion of these rights and should be dismissed.

## <u>FACTS</u>

Solely for purposes of defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), defendants accept as true the facts, as opposed to conclusions, alleged in plaintiffs' Amended Complaint. Defendants note that both the conclusory and factual allegations

contained in the Amended Complaint are inaccurate and misleading. Defendants only accept the factual allegations in the Amended Complaint to the extent that they must do so for the limited purposes of this motion.

The Amended Complaint alleges that the Town of Ludlow, through its school committee has adopted a "Protocol" that "parents are not to be informed of their child's transgender status and gender-affirming social transition . . . unless the child, of any age, consents." Amended Complaint at ¶ 36. It alleges that the children of plaintiffs, Stephen Foote ("Foote") and Marissa Silvestri ("Silvestri"), "G.F." and "B.F.," were 11 and 12 years old, respectively, at the time of the alleged events. See Amended Complaint at ¶¶ 58, 93, 97, 111.

On February 28, 2021, without the knowledge of their parents, "B.F." sent an email to defendants Foley and Gazda, and teachers at "B.F.'s" middle school, asserting:

> Hello everyone, If you are reading this you are either my teacher or guidance counselor. I have an announcement to make and I trust you guys with this information. I am genderqueer. Basically, it means I use any pronouns (other than it/its). This also means I have a name change. My new name will be R****. Please call me by that name. If you deadname[1] me or use any pronouns I am not comfortable with I will politely tell you. I am telling you this because I feel like I can trust you. A list of pronouns you can use are: she/her he/him they/them fae/faerae/aer  ve/ver xe/xem ze/zir. I have added a link so you can look at how to say them. Please only use the ones I have listed and not the other ones. I do not like them. Thank you. R*** F***.

Amended Complaint at ¶ 81.

"B.F.'s" sibling, "G.F." also asserted their gender identity. See *Id.* at 115. Defendants accepted "B.F." and "G.F.'s" assertions of their gender identities. See, e.g., Amended Complaint at ¶¶ 79, 83, 85. "B.F." and "G.F." requested that their parents not be told of their gender identities

---

[1] Merriam-Webster defines "deadname" as "the name that a transgender person was given at birth and no longer uses upon transitioning." https://www.merriam-webster.com/dictionary/deadname (last visited July 29, 2022).

and that their birth names and corresponding pronouns be used in communications with their

parents.  See *Id*.  Defendants complied.  See *Id*.

## STANDARD OF REVIEW

A.    Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(1).

It is well-established that "[t]he party invoking federal court jurisdiction bears the burden

of proving its existence."  *Pejepscot Indus. Park v. Me. Cent. R.R. Co.*, 215 F.3d 195, 200 (1st Cir.

2000) (citation omitted).  Further:

> It is black-letter law that "federal courts are courts of limited jurisdiction, and thus
> must take pains to act only within the margins of that jurisdiction." *Cumberland
> Farms, Inc. v. Me. Tax Assessor*, 116 F.3d 943, 945 (1st Cir. 1997). Hence, the
> preferred -- and often the obligatory -- practice is that a court, when confronted with
> a colorable challenge to its subject-matter jurisdiction, should resolve that question
> before weighing the merits of a pending action. See *Berner v. Delahanty*, 129 F.3d
> 20, 23 (1st Cir. 1997); see also *Steel Co. v. Citizens for a Better Environment*, 523
> U.S. 83, 94, 140 L. Ed. 2d 210, 118 S. Ct. 1003 (1998).

*Feliciano v. Rullan*, 303 F.3d 1, 6 (1st Cir. 2002).   In determining whether subject matter

jurisdiction exists, a court accepts all well-pleaded facts as true.  *McCloskey v. Mueller*, 446 F.3d

262, 266 (1st Cir. 2006).

B.    Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6).

The standard of review announced by the Supreme Court of the United States in *Bell

Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and confirmed by *Ashcroft v. Iqbal*, 556 U.S. 662,

677-678 (2009) requires that:

> To state a claim, the complaint must "contain sufficient factual matter, accepted as
> true, to 'state a claim to relief that is plausible on its face,'" *Ashcroft v. Iqbal*, 129
> S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*,
> 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)); "'naked assertions
> devoid of further factual enhancement'" need not be accepted, *Maldonado v.
> Fontanes*, 568 F.3d 263, 266 (1st Cir. 2009) (quoting *Iqbal*, 129 S. Ct. at 1949);
> and "[i]f the factual allegations in the complaint are too meager, vague, or
> conclusory to remove the possibility of relief from the realm of mere conjecture,
> the complaint is open to dismissal," *Tambone*, 597 F.3d at 442.

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 771 (1st Cir. 2011). In analyzing whether a complaint states a plausible claim for relief, "[t]o begin, the court must strip away and discard the complaint's conclusory legal allegations. Next, the court must determine whether the remaining factual content permits the reasonable inference that the defendant is liable for the misconduct alleged." *Shay v. Walters*, 702 F.3d 76, 82 (1st Cir. 2012) (citations omitted; internal quotation marks omitted).

In deciding the motion, the Court should "eschew any reliance on bald assertions, unsupportable conclusions, and 'opprobrious epithets.'" *Chongris v. Bd. of Appeals of Town of Andover*, 811 F.2d 36, 37 (1st Cir. 1987), quoting *Snowden v. Hughes,* 321 U.S. 1, 10 (1944).

In determining whether a complaint states a claim upon which relief can be granted, the Court may consider documents relied on or attached to a complaint and matters of public record. See *Lydon v. Local 103, Int'l. Bhd. of Elec. Workers*, 770 F.3d 48, 53 (1st Cir. 2014); *Trans-Spec Truck Serv. v. Caterpillar Inc.*, 524 F.3d 315, 321 (1st Cir. 2008); *Watterson v. Page*, 987 F.2d 1, 3-4 (1st Cir. 1993).

## **ARGUMENT**

I.  <u>Plaintiffs, Jonathan Feliciano and Sandra Salmeron's, Claims Should Be Dismissed for Lack of Standing</u>.

Plaintiffs, Jonathan Feliciano ("Feliciano") and Sandra Salmeron's ("Salmeron"), claims are, at best, speculative and should be dismissed pursuant to Rule 12(b)(1). "[A]t the pleading stage, the plaintiff bears the burden of establishing sufficient factual matter to plausibly demonstrate his standing to bring the action. Neither conclusory assertions nor unfounded speculation can supply the necessary heft." *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 731 (1st Cir. 2016). "[S]tanding is not dispensed in gross." *Id*. at 733, quoting *Lewis v. Casey,* 518

U.S. 343, 358 n. 6 (1996). "The appropriate inquiry must be 'whether each particular plaintiff is entitled to have a federal court adjudicate each particular claim that he asserts.'" *Id*., quoting *Pagán v. Calderón,* 448 F.3d 16, 26 (1st Cir.2006). The Amended Complaint does not allege facts that plausibly demonstrate Feliciano and Salmeron's standing to bring any claim.

The Amended Complaint provides almost no information regarding Feliciano or Salmeron, or their children. It alleges that Feliciano and Salmeron are the parents of two children who attend Ludlow public schools. See Amended Complaint at ¶ 13. It does not provide the children's ages or the school(s) they attend. Plaintiffs do not allege that Feliciano and Salmeron's children are transgender. There is no allegation that Feliciano or Salmeron or their children have had any interaction with any of the defendants. Their claims depend on the allegations that:

> 132. Because the intent of the Protocol is to conceal information from parents, Plaintiffs Feliciano and Salmeron are deliberately hindered from ascertaining whether their children are being secretly socially transitioned, *i.e.*, being provided mental health treatment, without their knowledge or consent. . . .

> 256. Defendants' actions have caused a direct and immediate conflict with Plaintiffs' religious beliefs by prohibiting them from being informed of mental health issues their children <u>are or might be</u> experiencing and by denying them the opportunity to seek counseling and guidance for their children in a manner that is consistent with the beliefs sincerely held by their family instead of the government.

Amended Complaint at ¶¶ 132, 256 (emphasis added). Feliciano and Salmeron's fear that their children may be transgender, that the defendants may know of it, and that defendants may be respecting their children's possible wishes that their parents not be told is insufficient to support standing.

As pled, there is no "case or controversy" within the meaning of Article III of the United States Constitution for this Court to adjudicate. See *Warth v. Seldin*, 422 U.S. 490, 498 (1975). In order to have standing, each plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a

favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). See also, *Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*, 958 F.3d 38, 47 (1st Cir. 2020), *cert. denied sub nom. Dantzler, Inc. v. S2 Servs. Puerto Rico, LLC*, 141 S. Ct. 2624 (2021).

The Amended Complaint does not allege sufficient facts to plausibly demonstrate Feliciano and Salmeron suffered an injury in fact. Showing an injury in fact requires each plaintiff to show that he or she "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo,* 578 U.S. at 339, quoting, *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). An injury is concrete only when it "actually exist[s]." *Id.* (citations omitted; internal quotation marks omitted). See also, *Dantzler*, 958 F.3d at 47 ("An injury is 'concrete' if it is real, and not abstract").

> The particularization requirement is a different matter: it necessitates that a plaintiff has been affected "in a personal and individual way" by the injurious conduct. [*Spokeo*, 136 S.Ct.] at 1548 (quoting *Lujan,* 504 U.S. at 560 n. 1, 112 S.Ct. 2130).
>
> The particularization element of the injury-in-fact inquiry reflects the commonsense notion that the party asserting standing must not only allege injurious conduct attributable to the defendant but also must allege that he, himself, is among the persons injured by that conduct. *See Lujan,* 504 U.S. at 563, 112 S.Ct. 2130. The requirement that a plaintiff must adduce facts demonstrating that he himself is adversely affected guarantees that "the decision as to whether review will be sought [is] in the hands of those who have a direct stake in the outcome," *Sierra Club v. Morton,* 405 U.S. 727, 740, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), and ensures that disputes are settled "in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action," *Valley Forge Christian Coll. V. Ams. United for Separation of Church & State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).

*Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 731–32 (1st Cir. 2016) (emphasis added). The Amended Complaint will not support an inference that Feliciano and Salmeron suffered a "concrete and particularized" injury as a result of defendants' alleged conduct. As alleged, they have not suffered an injury in fact and they lack standing to pursue their claims.

The Amended Complaint also fails to satisfy the second element of the standing inquiry. "The 'traceability' or causation element 'requires the plaintiff to show a sufficiently direct causal connection between the challenged action and the identified harm' . . . That connection 'cannot be overly attenuated.'" *Dantzler*, 958 F.3d at 47, quoting *Katz v. Pershing, LLC*, 672 F.3d 64, 71 (1st Cir. 2012). There are no facts pled in the Amended Complaint that could support the element of causation. Therefore, Feliciano and Salmeron have failed to demonstrate standing.

Finally, because Feliciano and Salmeron's claims rest on, if anything, speculation and factually unsupported fears, the Amended Complaint does not plausibly establish redressability. "[T]he redressability element of standing requires that the plaintiff allege 'that a favorable resolution of [its] claim would likely redress the professed injury' . . . This means that it cannot be merely speculative that, if a court grants the requested relief, the injury will be redressed." *Id.*, quoting *Katz*, 672 F.3d at 72. There are no facts from which it can be inferred that a positive outcome for plaintiffs in this matter will have any impact on Feliciano and Salmeron whatsoever. Feliciano and Salmeron lack standing and all of their claims should be dismissed. To hold otherwise would open the floodgates to all parents to file preemptive litigation in response to public school policies with which they disagree. Contrast, *Norris on behalf of A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 29 (1st Cir. 2020), and cases cited ("The Supreme Court has repeatedly emphasized the necessary discretion school officials must exercise and the attendant deference owed to many of their decisions").

II.     <u>The Amended Complaint Does Not State Claims Upon Which Relief Can Be Granted</u>.

Without waiving the foregoing, all of plaintiffs' claims should be dismissed pursuant to Rule 12(b)(6), as set forth below.

At the outset, defendants note that the conclusion on which all of plaintiffs' claims rest, that being transgender is a mental health condition, is used in the Amended Complaint as an epithet and is not entitled to a presumption of truth.  See *Chongris*, 811 F.2d at 37.

Plaintiffs' conclusion is foreclosed by M.G.L. c. 112, § 275, which prohibits gender conversion therapy for patients under eighteen years old.  Specifically, it prohibits "sexual orientation and gender identity change efforts," defined as "any practice by a health care provider that attempts or purports to impose change of an individual's sexual orientation or gender identity." See M.G.L. c. 112, § 275.  Pursuant to the statute:

> (b) A health care provider shall not advertise for or engage in sexual orientation and gender identity change efforts with a patient who is less than 18 years of age.
>
> (c) A health care provider who violates this section shall be subject to discipline by the appropriate licensing board. Such discipline may include suspension or revocation of license.
>
> (d) A violation of this section by a health care provider shall be a violation of section 2 of chapter 93A. Such a claim brought under this section shall be subject to sections 5A and 7 of chapter 260.

M.G.L. c. 112, § 275.  The conclusion that being transgender is a mental health condition in children is not entitled to a presumption of truth and is strongly contradicted by Massachusetts law.

The conclusion that being transgender is a mental illness is also implausible based on the growing judicial recognition of the nature of transgender identity.  See *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 522-524 (3d Cir. 2018), cert. denied, 139 S. Ct. 2636;

*Grimm v. Gloucester County School Board,* 972 F.3d 586, 594-597 (4th Cir. 2020), *cert. denied* 141 S. Ct. 2878.

The Fourth Circuit has found that "[j]ust like being cisgender,[2] being transgender is natural and is not a choice. Being transgender is also not a psychiatric condition, and implies no impairment in judgment, stability, reliability, or general social or vocational capabilities." *Grimm,* 972 F.3d at 594 (citations omitted; internal quotation marks omitted). "For many of us, gender identity is established between the ages of three and four years old. . . . Thus, some transgender students enter the K-12 school system as their gender; others . . . begin to live their gender when they are older." *Id.* at 596. "[T]ransgender people constitute a discrete group with immutable characteristics: . . . [G]ender identity is formulated for most people at a very early age, and . . . being transgender is not a choice. Rather, it is as natural and immutable as being cisgender." *Id.* at 612-613. Being transgender, without more, does not constitute a mental health condition. Plaintiffs' conclusory and implausible allegations to the contrary should be disregarded.

A.      Counts I-III Should Be Dismissed Based on the Doctrine of Qualified Immunity.

Counts I through III of the Amended Complaint, which are brought on behalf of all plaintiffs against all defendants, should be dismissed as against the individual defendants based on the doctrine of qualified immunity. There are two prongs to the qualified immunity analysis. See *Fernandez-Salicrup v. Figueroa-Sancha*, 790 F.3d 312, 325 (1st Cir. 2015). "A court must decide: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged

---

[2] Merriam-Webster defines "cisgender" as "of, relating to, or being a person whose gender identity corresponds with the sex the person had or was identified as having at birth." https://www.merriam-webster.com/dictionary/cisgender (last visited July 25, 2022). See also, *Grimm*, 972 F.3d at 594.

violation." *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009) (citation omitted).  The

Court, in the exercise of its discretion, may address the prongs in either order.  See *Hunt v. Massi*,

773 F.3d 361, 367 (1st Cir. 2014).

          1.      <u>The Facts Alleged in the Amended Complaint Do Not Make Out a Violation of Plaintiffs' Substantive Due Process Rights</u>.

Counts I-III do not allege conduct that shocks the conscience or that deprives plaintiffs of

a protected parental interest.  "As distinguished from its procedural cousin . . . a substantive due

process inquiry focuses on 'what' the government has done, as opposed to 'how and when' the

government did it." *Mongeau v. City of Marlborough*, 492 F.3d 14, 18 (1st Cir. 2007), *quoting,*

*Amsden v. Moran*, 904 F.2d 748, 754 (1st Cir. 1990) (internal quotation marks omitted).  It is

beyond dispute that "[w]here, as here, a plaintiff's substantive due process claims challenge the

constitutionality of certain executive acts, 'the plaintiff must show <u>both</u> that the acts were so

egregious as to shock the conscience <u>and</u> that they deprived him of a protected interest in life,

liberty, or property.'" *Harron v. Town of Franklin*, 660 F.3d 531, 536 (1st Cir. 2011) (emphasis

in original), quoting *Pagàn v. Calderón*, 448 F.3d 16, 32 (1st Cir. 2006).  "Only after 'show[ing]

a constitutionally significant level of culpability' may a plaintiff 'turn to establishing that a

protected right was offended.'" *Abdisamad v. City of Lewiston*, 960 F.3d 56, 60 (1st Cir. 2020),

quoting *Martínez v. Cui*, 608 F.3d 54, 65 (1st Cir. 2010).  See also, *Mongeau v. City of*

*Marlborough*, 492 F.3d 14, 19 (1st Cir. 2007); *DePoutot v. Raffaelly*, 424 F.3d 112, 118 (1st Cir.

2005) ("the question of whether the challenged conduct shocks the contemporary conscience is a

threshold matter that must be resolved before a constitutional right to be free from such conduct

can be recognized").

a.    <u>Defendants' Alleged Conduct Did Not Shock the Conscience</u>.

It is settled that government action "shocks the conscience" only if it is "arbitrary and capricious, runs counter to the concept of ordered liberty, or violates universal standards of decency."  See *Cruz-Erazo v. Rivera-Montanez,* 212 F.3d 617, 622 (1st Cir. 2000).  It is further settled law that "mere violations of a state regulatory scheme are not the stuff of which substantive due process claims are constituted."  See *Barrington Cove, Ltd. Partnership v. Rhode Island Housing & Mortgage Finance Corp.,* 246 F.3d 1, 7 (1st Cir. 2001), *citing, Coyne v. City of Somerville,* 972 F.2d 440, 444 (1st Cir. 1992).  As stated in *Coyne*, "it is bedrock law in this Circuit . . . that violations of state law - even where arbitrary, capricious, or undertaken in bad faith - do not, without more, give rise to a denial of substantive due process under the U.S. Constitution." *Id.*   Further, "'negligence, without more, is simply insufficient to meet the conscience-shocking standard.'"  *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 881 (1st Cir. 2010), quoting *J.R.* v. *Gloria*, 593 F.3d 73, 80 (1st Cir. 2010).

> A hallmark of successful challenges is an extreme lack of proportionality, as the test is primarily concerned with "violations of personal rights . . . so severe . . . so disproportionate to the need presented, and . . . so <u>inspired by malice or sadism</u> rather than a merely careless or unwise excess of zeal that it amounted to a <u>brutal and inhumane</u> abuse of official power literally shocking to the conscience." *Moran v. Clarke*, 296 F.3d 638, 647 (8th Cir. 2002) (en banc) (ellipses in original)).

*Gonzalez-Fuentes*, 607 F.3d at 881 (emphasis added).

Cases in which appellate courts have found substantive due process violations have involved "serious physical intrusions or sustained abuse" or the intentional "framing" of innocent citizens.  See *Cummings v. McIntire*, 271 F.3d 341, 346 (1st Cir. 2001), and cases cited; *DePoutot*, 424 F.3d at 119, and cases cited.  See also, e.g., *Hootstein v. Amherst-Pelham Reg'l Sch. Comm*., 361 F. Supp. 3d 94, 112 (D. Mass. 2019) (defendant provided lead-contaminated water and falsely certified that it was safe to drink); *Heinrich ex rel. Heinrich v. Sweet*, 62 F. Supp. 2d 282, 314 (D.

Mass. 1999) (medical experiments conducted under false pretenses); *Doe ex rel. B.G. v. Bos. Pub. Sch.*, 2019 U.S. Dist. LEXIS 32705, *16 (D. Mass 2019) (school officials' failure to report known sexual assaults despite the fact that elementary school-aged children had been repeatedly assaulted); *Doe v. D'Agostino*, 367 F. Supp. 2d 157, 172 (D. Mass. 2005) (teacher exposed and touched Plaintiff's lower abdomen during unwanted ringworm examination, coerced the plaintiff into kissing, hugging, and sitting on her lap, and rolled a lint brush over plaintiff's chest).

Here, in contrast to the foregoing, plaintiffs allege that defendants implemented a "Protocol" whereby "parents are not to be informed of their child's transgender status and gender-affirming social transition . . . unless the child, of any age, consents." Amended Complaint at ¶ 36.

Plaintiffs have waived any challenge the constitutionality of M.G.L. c. 76, § 5, which bars discrimination on the basis of gender identity in public schools. See Dkt. No. 17. M.G.L. c. 76, § 5 provides, in part:

> No person shall be excluded from or discriminated against in admission to a public school of any town, or in obtaining the advantages, privileges and courses of study of such public school on account of race, color, sex, gender identity, religion, national origin or sexual orientation.

M.G.L. c. 76, § 5 (emphasis added). It is impossible to comply with the statue without recognizing and respecting a student's stated gender identity, at least where a school district recognizes the gender identities of cisgender students. The statue does not create an exception where a parent demands discriminatory treatment for their children. Complying with M.G.L. c. 76, § 5 does not shock the conscience and, therefore, Counts I-III should be dismissed. Cf. *Irish v. Fowler*, 979 F.3d 65, 74 (1st Cir. 2020), cert. denied, 142 S. Ct. 74 (2021) ("In evaluating whether the defendant's actions shocked the conscience, we also consider whether the defendants violated state law or proper police procedures and training").

Defendants' alleged conduct is also consistent with state law and proper pedagogical procedures and training as established by 603 CMR 26.00.

> 603 CMR 26.00 is promulgated to insure that the public schools of the Commonwealth do not discriminate against students on the basis of race, color, sex, gender identity, religion, national origin or sexual orientation and that all students have equal rights of access and equal enjoyment of the opportunities, advantages, privileges and courses of study at such schools. 603 CMR 26.00 shall be liberally construed for these purposes.

603 CMR 26.01. 603 CMR 26.03 prohibits discrimination on the basis of gender identity "in accessing the courses of study and other opportunities available through the school system of the city or town in which [a student] resides." 603 CMR 26.03.

> 603 CMR 26.07 requires schools to undertake "Active Efforts" to prevent discrimination.
>
> (1) The school committee of each school district shall establish policies and procedures, and implement monitoring and evaluation practices that insure that all obstacles to equal access to school programs for all students regardless of . . . gender identity . . . are removed. Such policies shall include a requirement for an annual evaluation of all aspects of the K through 12 school program to insure that all students regardless of race, color, sex, gender identity, religion, national origin or sexual orientation are given an opportunity to participate in all programs offered by the school including athletics and other extra-curricular activities.
>
> (2) All public schools shall strive to prevent harassment or discrimination based upon students' race, color, sex, gender identity, religion, national origin or sexual orientation, and all public schools shall respond promptly to such discrimination or harassment when they have knowledge of its occurrence.

603 CMR 26.07 (1), (2). Like M.G.L. c. 76, § 5, 603 CMR 26.00 does not provide for parental notice and the opportunity to opt out of its mandate. In light of 603 CMR 26.00, defendants' conduct does not shock the conscience.

Further, contrary Amended Complaint's inaccurate characterization of the Massachusetts Department of Elementary and Secondary Education's ("DESE") Guidance for Massachusetts Public Schools Creating a Safe and Supportive School Environment ("DESE's Guidance" or the

"Guidance"), attached hereto as Exhibit 1,[3] defendants' alleged conduct complied with the Guidance. See Amended Complaint at ¶¶ 27-28 (quoting the Guidance). Under the heading "Understanding Gender Identity," the Guidance states:

> The responsibility for determining a student's gender identity rests with the student or, in the case of <u>young students not yet able to advocate for themselves</u>, with the parent. One's gender identity is an innate, largely inflexible characteristic of each individual's personality that is generally established by age four, although the age at which individuals come to understand and express their gender identity may vary based on each person's social and familial social development. As a result, <u>the person best situated to determine a student's gender identity is that student himself or herself</u>. . . .

> Consistent with the statutory standard, <u>a school should accept a student's assertion of his or her gender identity when there is "consistent and uniform assertion of the gender-related identity, or any other evidence that the gender-related identity is sincerely held as part of a person's core identity</u>." If a student's gender-related identity, appearance, or behavior meets this standard, <u>the only circumstance in which a school may question a student's asserted gender identity is where school personnel have a credible basis for believing that the student's gender-related identity is being asserted for some improper purpose</u>.

> In most situations, determining a student's gender identity is simple. A student who says she is a girl and wishes to be regarded that way throughout the school day and throughout every, or almost every, other area of her life, should be respected and treated like a girl. So too with a student who says he is a boy and wishes to be regarded that way throughout the school day and throughout every, or almost every, other area of his life. Such a student should be respected and treated like a boy.

Exhibit 1 (footnote omitted). As set forth above, the Guidance defines "young children" as those "not yet able to advocate for themselves." See *Id*. When a child is able to advocate for themselves, "the person best situated to determine a student's gender identity is that student himself or herself." See *Id*. Here, as alleged, Foote and Silvestri's children were able to advocate for themselves and did so. DESE's Guidance states nothing more is required for a school to recognize and respect their gender identity. See *Id*.

---

[3] Also available at: https://www.doe.mass.edu/sfs/lgbtq/genderidentity.html (last visited July 29, 2022).

The Guidance suggests that:

> Some transgender and gender nonconforming students are not openly so at home for reasons such as safety concerns or lack of acceptance. School personnel should speak with the student first before discussing a student's gender nonconformity or transgender status with the student's parent or guardian. For the same reasons, school personnel should discuss with the student how the school should refer to the student, e.g., appropriate pronoun use, in written communication to the student's parent or guardian.

Exhibit 1. Clearly, as set forth in the Guidance, the reason for speaking with a student before discussing their gender identity with parents is that they may not be openly transgender or gender nonconforming at home. See *Id.* The Guidance does not contemplate that a school will confer with a student and then notify their parents of their gender identity against their wishes, as the Amended Complaint asserts. See *Id.* The Guidance also plainly suggests that a student may be referred to by one set of pronouns in school and another set when communicating with parents. See *Id.* Cf. *Arroyo Gonzalez v. Rossello Nevares*, 305 F. Supp. 3d 327, 333 (D.P.R. 2018) ("The Commonwealth's forced disclosure of plaintiffs' transgender status violates their constitutional right to decisional privacy").

Following the DESE Guidance does not shock the conscience. Cf. *Irish*, 979 F.3d at 74. Nor does recognizing and respecting a student's gender identity despite their parents' contrary preferences. There are no allegations that any defendant engaged in any conduct whatsoever concerning Feliciano and Salmeron or their children. The Amended Complaint does not allege conduct that shocks the conscience and, therefore Counts I-III fail to state a claim for plaintiffs' substantive due process rights upon which relief can be granted.

b.      Plaintiffs Have Not Been Deprived of a Protected Interest.

Counts I-III should be dismissed because the Fourteenth Amendment does not provide the parental right(s) asserted by plaintiffs. The Due Process Clause of the Fourteenth Amendment

"specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition." *Washington v. Glucksberg*, 521 U.S. 702, 703 (1997). "Substantive due process analysis must begin with a careful description of the asserted right, for the doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field." *Reno v. Flores*, 507 U.S. 292, 302 (1993) (citations, alterations, and internal quotation marks omitted).  See also, *Glucksberg, supra*.  Here, the parental right(s) asserted by plaintiffs are the rights to notice of their children's gender identity so that a parent may insist that a public school, in violation of state and federal law, discriminate against their children by rejecting and/or ignoring their children's assertion of their gender identity.  Such rights have never been recognized and should not be recognized for the first time here.  One cannot "opt out" from having a transgender child.

        i.        <u>The Asserted Right(s) Cannot Co-Exist with M.G.L. c. 76, § 5.</u>

The right(s) asserted by plaintiffs are completely at odds with the anti-discrimination mandate of M.G.L. c. 76, § 5 and its implementing regulations.  See M.G.L. c. 76, § 5 (emphasis added); 603 CMR 26.00.  M.G.L. c. 76, § 5 does not provide any exceptions for parental preference and cannot be complied with where a student's asserted gender identity is denied or ignored.  See *Id.*; M.G.L. c. 4, § 7(59).  Plaintiffs have waived any challenge to the constitutionality of M.G.L. c. 76, § 5.  See Dkt. No. 17.  Since M.G.L. c. 76, § 5 bars the assertion of the right(s) claimed by plaintiffs, their substantive due process claims should fail.  Further, given that the statute is constitutional, all of defendants' alleged conduct that is required by it is barred as a basis for liability in this action.

655995

ii.   <u>Substantive Due Process Does Not Protect the Interest(s)
Asserted Here</u>.

The Due Process Clause has never been interpreted to grant the parental right(s) asserted

by plaintiffs in this case.  See *Parker v. Hurley*, 514 F.3d 87, 101-103 (1st Cir. 2008), *cert. denied*,

555 U.S. 815.  There is no case that stands for the proposition that a parent is entitled to notice of

their child's gender so that they can control it (or attempt to do so).

The holdings of the cases cited in the Amended Complaint make it clear that the Fourteenth

Amendment's protection of "the fundamental right of parents to make decisions concerning the

care, custody, and control of their children," as currently recognized, is much more limited than

plaintiffs would have it.  See *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality opinion).  The

right has its genesis in *Meyer v. Nebraska,* 262 U.S. 390 (1923), and *Pierce v. Society of

Sisters,* 268 U.S. 510, 535, (1925).  See *Brown v. Hot, Sexy & Safer Prods., Inc.*, 68 F.3d 525, 533

(1st Cir. 1995); *Parents for Priv. v. Barr*, 949 F.3d 1210, 1229 n.14 (9th Cir.), *cert. denied*, 141 S.

Ct. 894 (2020).

In *Meyer*, the Supreme Court struck down a Nebraska law that forbade instruction in

German and other foreign languages "in part because it arbitrarily interfered with the 'right of

parents' to procure such instruction for their children."  *Brown*, 68 F.3d at 533, citing *Meyer,* 262

U.S. at 400.  In *Pierce*, the Court held that a statute that made public school attendance compulsory,

barring secular and parochial private education, "unreasonably interfere[d] with the liberty of

parents and guardians to direct the upbringing and education of children under their control."

*Pierce*, 268 U.S. 510, 534–535.  According to the First Circuit:

> The *Meyer* and *Pierce* cases, we think, evince the principle that the state cannot
> prevent parents from choosing a specific educational program—whether it be
> religious instruction at a private school or instruction in a foreign language. That is,
> the state does not have the power to "standardize its children" or "foster a
> homogenous people" by completely foreclosing the opportunity of individuals and

groups to choose a different path of education. *Meyer,* 262 U.S. at 402, 43 S.Ct. at 627–28, *discussed in,* Tribe, *supra,* § 15–6 at 1319.

*Brown*, 68 F.3d at 533.

In *Prince v. Massachusetts*, 321 U.S. 158 (1944), the Supreme Court rejected a challenge to a Massachusetts statute that barred children from proselytizing in public through the sale of religious literature.

> [T]he family itself is not beyond regulation in the public interest, as against a claim of religious liberty. *Reynolds v. United States*, 98 U.S. 145, 25 L.Ed. 244; *Davis v. Beason*, 133 U.S. 333, 10 S.Ct. 299, 33 L.Ed. 637. And neither rights of religion nor rights of parenthood are beyond limitation. Acting to guard the general interest in youth's well being, the state as parens patriae may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor, and in many other ways.

*Id*. at 166 (1944) (footnotes omitted).

In *Moore v. City of E. Cleveland, Ohio*, 431 U.S. 494 (1977), the Supreme Court struck down an ordinance that made it a criminal offense for the appellant to share her home with her son and two grandsons. See *Id.* at 495-496. The Court held that the Fourteenth Amendment's substantive due process clause "prevents East Cleveland from standardizing its children and its adults by forcing all to live in certain narrowly defined family patterns." *Id*. at 506.

In *Troxel v. Granville*, 530 U.S. 57, 72–73 (2000), the Supreme Court held that, as applied, a Washington nonparental visitation statute violated the Fourteenth Amendment. "*Troxel* concerned a state government's interference with a mother's decision about the amount of visitation with her daughters' paternal grandparents that was in her daughters' best interests; it did not address the extent of parents' rights to direct the policies of the public schools that their children attend." *Parents for Priv.*, 949 F.3d at 1230. See also, *Parker*, 514 F.3d at 101. *Troxel* does not provide plaintiffs with the right(s) asserted here.

655995

The cases cited by the Amended Complaint for the proposition that parents have a Fourteenth Amendment right to control their children's health care, to the extent relevant, stand for the proposition that parents do not have absolute rights when it comes to their children and that children, as well as adults, enjoy constitutional protections. They do not establish the existence of the rights asserted by plaintiffs. *J.R. v. Parham*, 442 U.S. 584 (1979), dealt with the voluntary commitment of children by their parents.

> In defining the respective rights and prerogatives of the child and parent in the voluntary commitment setting, we conclude that our precedents permit the parents to retain a substantial, if not the dominant, role in the decision, absent a finding of neglect or abuse, and that the traditional presumption that the parents act in the best interests of their child should apply. We also conclude, however, that the child's rights and the nature of the commitment decision are such that parents cannot always have absolute and unreviewable discretion to decide whether to have a child institutionalized. They, of course, retain plenary authority to seek such care for their children, subject to a physician's independent examination and medical judgment.

*Id.* at 604.

Similarly, in *Custody of a Minor*, 375 Mass. 733, 737 (1978), the Supreme Judicial Court held that:

> [T]he question before the Superior Court was whether the State may intervene when parents decline to administer the only type of medical treatment which evidence before the court indicates could save their child's life. We affirm the judge's resolution of this issue. While recognizing that there exists a "private realm of family life which the state cannot enter," *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944), we think that family autonomy is not absolute, and may be limited where, as here, "it appears that parental decisions will jeopardize the health or safety of (their) child." *Wisconsin v. Yoder*, 406 U.S. 205, 234, 92 S.Ct. 1526, 1542, 32 L.Ed.2d 15 (1972).

*Custody of a Minor*, 375 Mass. 733, 737 (1978).

None of the foregoing decisions, which are cited within plaintiffs' Amended Complaint, establishes the right(s) asserted by plaintiffs. The First Circuit has repeatedly rejected attempts to transform the holdings of these cases into sweeping grants of parental rights. See *Parker,* 514 F.3d

at 101-103 & n.15 ("*Troxel* is not so broad as plaintiffs assert") (rejecting asserted right to prior notice and the opportunity for exemption from young children's exposure to books containing positive portrayals of gay marriage); *Brown*, 68 F.3d at 534 ("the rights of parents as described by *Meyer* and *Pierce* do not encompass a broad-based right to restrict the flow of information in the public schools. See also, *Parents for Priv.*, 949 F.3d at 1231 (rejecting claim that policy allowing transgender students to use bathrooms, locker rooms and showers corresponding to their gender identity violated the rights of parents of cisgender children). The facts alleged in the Amended Complaint do not plausibly suggest that plaintiffs have been deprived of an interest protected by the Fourteenth Amendment.

   iii.   The Parental Right(s) Asserted by Plaintiffs are Incompatible with the Constitutional Rights of Students in Public Schools.

The Amended Complaint asserts only parental rights. However, students also have constitutional rights and plaintiffs cannot point to a single case where a parent's rights have been held to supplant a child's rights under the circumstances as alleged. Cf. *Tinker v. Des Moines Indep. Comm. Sch. Dist.,* 393 U.S. 503, 506 (1969) (children do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate").

Specifically in this context, the Equal Protection Clause of the Fourteenth Amendment and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), protect transgender students from discrimination by public schools. *See Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1039, 1049, 1054 (7th Cir. 2017); *Grimm v. Gloucester County School Board,* 972 F.3d 586, 606-615, 616-619 (4th Cir. 2020), *cert. denied* 141 S. Ct. 2878 (school board's refusal to allow a transgender male high school student to use boys' bathrooms violated his equal protection rights and his rights pursuant to Title IX). Contrast, *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 521 (3d Cir. 2018), cert. denied, 139 S. Ct. 2636;

*Parents for Priv. v. Barr*, 949 F.3d 1210, 1230 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 894 (2020). Cf. *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1737 (2020) (Title VII of the Civil Rights Act of 1964 prohibits employers from firing individuals for being homosexual or transgender). Plaintiffs cannot point to any authority that stands for the proposition that parents have the right to notice and the opportunity to waive their transgender children's constitutional and statutory rights or that children's rights are violated by a school district's failure to honor such a parental right.

While parents have the right to choose which schools their children attend, they do not have the right to dictate whether or not a public school will recognize and respect their children's gender identity. Cf. *Parker,* 514 F.3d at 102. Therefore, the adult plaintiffs' claims fail. "B.F." and "G.F.s" claims fail because in the absence of a parental right to notice and the opportunity to demand rejection of a child's gender identity by a public school there can be no corresponding right on the part of a child, even assuming, without conceding, such corresponding rights exist. The facts alleged by the plaintiffs do not make out a violation of a constitutional right and, therefore, Counts I-III should be dismissed.

2.      Qualified Immunity Bars the Imposition of Liability Because the Rights Asserted by Plaintiffs Were Not Clearly Established.

It is beyond dispute that "[a] government official sued under § 1983 is entitled to qualified immunity unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Carroll v. Carman*, 574 U.S. 13, 16 (2014) (per curiam). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015), quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (emphasis added). "[Q]ualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.* at 12 (citations omitted; internal quotation marks omitted).

655995

The First Circuit has taught that "[t]he second prong (whether the law was clearly established at the time of the incident) is itself divisible into two inquiries. First, <u>the plaintiff must identify</u> either controlling authority or a consensus of persuasive authority sufficient to put [an official] on notice that his conduct fell short of the constitutional norm. Second, the plaintiff must show that an objectively reasonable [official] would have known that his conduct violated the law." *Conlogue v. Hamilton*, 906 F.3d 150, 155 (1st Cir. 2018) (citations omitted) (emphasis added).

As set forth above, the Amended Complaint does not, and plaintiffs cannot, identify either controlling precedent or a consensus of persuasive authority that would put defendants on notice that their alleged conduct violated plaintiffs' rights. The Supreme Court has strongly emphasized "the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'" *White v. Pauly*, 137 S. Ct. 548, 552 (2017), quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). See also, *Kisela v. Hughes*, 138 S. Ct. 1148, 1152-1153 (2018); *Mullenix*, 577 U.S. at 12. "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Mullenix*, 577 U.S. at 12, quoting *al-Kidd*, 563 U.S. at 742 (emphasis in original). "This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id*. (citations omitted; internal quotation marks omitted). See also, *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7–8 (2021) ("Although this Court's case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate") (citation and internal quotation marks omitted).

It is notable that, as of this writing, there are multiple cases pending around the country that raise issues that are similar to the issues here. See, e.g., *Perez v. Broski*, Case No. 3:22-cv-

0083-TJC-JBT (M.D. Fla.) (motion to dismiss pending); *Littlejohn v. Sch. Bd. Of Leon County*, Case No. 4:21-cv-00415 (N.D. Fla.) (same);[4] *Ricard v. USD 475 Geary Cnty., KS Sc. Bd.*, Case No. 5:22-cv-04015-HLT-GEB (D. Ks.) (same); *Doe 1 v. Madison Metropolitan Sch. Dist.*, 976 N.W.2d 584 (2022). See also, https://www.washingtonpost.com/education/2022/07/18/gender-transition-school-parent-notification/ (last visited July 26, 2022). This is an emerging area of law, not one where the rights asserted by the plaintiffs are clearly established.

Second, plaintiffs cannot show that every reasonable official would have known that defendants' alleged conduct violated the constitution. A reasonable defendant would not understand that complying with state and federal law would violate plaintiffs' rights. As set forth above, defendants' conduct was consistent with the Equal Protection Clause, Title IX, M.G.L. c. 76, § 5, and 603 CMR 26.00. A reasonable official could believe that a parent had no right to request or require that a school not recognize a child's gender identity and that a parent had no right to prior notice of non-discrimination. Similarly, as to the minor plaintiffs, a reasonable official could conclude that respecting both a student's assertion of gender identity and request for confidentiality would not violate that student's rights.

While the age of a child may have some bearing on the relevant analysis, no court has established a rule that establishes a parent's asserted right trumps the rights of an eleven-year-old or twelve-year-old who asserts their gender identity. Particularly given that gender identity has been found to be immutable and that it is usually established at an early age, a reasonable official could understand themselves bound to accept a pre-teen's assertion of their gender identity. See *Grimm,* 972 F.3d at 612-613.

---

[4] Attorneys Broyles and McAlister, plaintiffs' counsel here, also represent plaintiffs in the *Perez* and *Littlejohn* matters.

655995

Additionally, DESE is the licensing body for all of the individual defendants. See M.G.L. c. 61, § 1B; M.G.L. c. 71, § 38G. A reasonable administrator, guidance counsellor, or school librarian would not understand DESE's Guidance to suggest conduct that would violate plaintiffs' Fourteenth Amendment rights. Cf. *Irish*, 979 F.3d at 77 (when an officer violates police procedure it supports an argument that a reasonable officer would have known that the conduct violated the Constitution).

In light of the foregoing, a reasonable school official could conclude that accepting a student's assertion of gender identity and complying a request to keep that gender identity confidential from parents would not violate plaintiffs' rights. Therefore, Counts I-III should be dismissed as against the individual defendants.

B.     The Doctrine of Qualified Immunity Precludes the Imposition of Liability as to Count IV.

Without waiving Feliciano and Salmeron's lack of standing, Count IV, which asserts a free exercise of religion claim brought by Feliciano and Salmeron, fails to state a claim upon which relief can be granted as against the individual defendants. The Amended Complaint alleges:

> 255. Defendants' actions in excluding Plaintiffs Feliciano and Salmeron from decision making regarding their children's sexual and gender identity target the Plaintiffs' beliefs regarding the created order, human nature, sexuality, gender, parental authority, and morality which constitute central components of their sincerely held religious beliefs.

> 256. Defendants' actions have caused a direct and immediate conflict with Plaintiffs' religious beliefs by prohibiting them from being informed of mental health issues their children are or might be experiencing and by denying them the opportunity to seek counseling and guidance for their children in a manner that is consistent with the beliefs sincerely held by their family instead of the government.[5]

> 257. Defendants' actions are coercive in that they deliberately supplant Plaintiffs' role as advisors of the moral and religious development of their children so that

---

[5] It is not clear what this refers to. As discussed above, gender conversion therapy is not available in Massachusetts for patients less than 18 years of age. See M.G.L. c. 112, § 275.

they are not able to direct their children's mental health care, counseling, and beliefs regarding sex and gender identity in accordance with their values because Defendants have substituted and supplanted the state's perspective on the issues of sex and gender identity for the perspective of Plaintiffs in violation of Plaintiffs' free exercise rights.

Amended Complaint at 255-257 (emphasis added).

1.  <u>The Facts Alleged in the Amended Complaint Do Not Make Out a Violation of Plaintiffs' First Amendment Rights</u>.

Pursuant to the Free Exercise Clause of the First Amendment the government may not: "(1) compel affirmation of religious beliefs; (2) punish the expression of religious doctrines it believes to be false; (3) impose special disabilities on the basis of religious views or religious status; or (4) lend its power to one side or the other in controversies over religious authorities or dogma." *Parker v. Hurley*, 514 F.3d 87, 103 (1st Cir. 2008). See also, *Perrier-Bilbo v. United States*, 954 F.3d 413, 428 (1st Cir. 2020), *cert. denied*, 141 S. Ct. 818 (2020); *Freedom From Religion Found. v. Hanover Sch. Dist.*, 626 F.3d 1, 14 (1st Cir. 2010). "The Free Exercise Clause, importantly, is not a general protection of religion or religious belief. It has a more limited reach of protecting the *free exercise* of religion." *Parker*, 514 F.3d at 103 (emphasis in original). "The First Amendment does not "'require the Government *itself* to behave in ways that the individual believes will further his or her spiritual development or that of his or her family.'" *Id., quoting Bowen v. Roy,* 476 U.S. 693, 699 (1986) (emphasis in original). Rather, "[a] plaintiff alleging a Free Exercise violation must show that a government action has a coercive effect on her religious practice." *Perrier-Bilbo,* 954 F.3d at 429.

First, as with plaintiffs' other claims Count IV should be dismissed to the extent that it is inconsistent with plaintiffs' waiver of any claim that M.G.L. c. 76, § 5 is unconstitutional. For example, Feliciano and Salmeron's claim to notice and exemption from their children's possible

(but unpled) gender identities are incompatible with the statute and should be dismissed. See M.G.L. c. 76, § 5.

Substantively, Feliciano and Salmeron's free exercise claim fails because the Amended Complaint does not allege facts from which it can be inferred that either the so-called "Protocol" or defendants' alleged conduct has had a coercive effect on their religious practice. See *Perrier-Bilbo,* 954 F.3d at 429. As discussed above, there are almost no facts pled in the amended complaint regarding the Feliciano/Salmeron children. The Amended Complaint does not allege that any defendant had any contact or communication with either Feliciano or Salmeron, or their children. There are no facts from which it can be inferred that any defendant has supplanted Feliciano and Salmeron's "role as advisors of the moral and religious development of their children." The Amended Complaint should be dismissed because it will not support a claim "that as a condition of attendance at the public schools, the defendants have forced plaintiffs—either the parents or the children—to violate their religious beliefs." *Parker*, 514 F.3d at 105. There are also no facts from which it can be inferred that the Feliciano and Salmeron children have suffered coercion in the form of "extreme indoctrination" even assuming, without conceding that such a claim would be cognizable. See *Parker*, 514 F.3d at 105. Count IV fails to state a claim upon which relief can be granted and should be dismissed.

    2.    Qualified Immunity Bars the Imposition of Liability Because the Rights Asserted by Plaintiffs Were Not Clearly Established.

Plaintiffs cannot point to "either controlling authority or a consensus of persuasive authority" that would have provided defendants with notice that their (unpled) conduct violated Feliciano and Salmeron's rights. See *Conlogue,* 906 F.3d at 155. There is no authority for the proposition that a parent's First Amendment rights are violated by the adoption of a policy that is

655995

inconsistent with the parent's religious beliefs. To the contrary, the most closely analogous authority provides that:

> [T]he mere fact that a child is exposed on occasion in public school to a concept offensive to a parent's religious belief does not inhibit the parent from instructing the child differently. A parent whose 'child is exposed to sensitive topics or information [at school] remains free to discuss these matters and to place them in the family's moral or religious context, or to supplement the information with more appropriate materials.'"

*Parker*, 514 F.3d at 105, quoting *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 185 (3d Cir. 2005). See also, *Freedom From Religion Found.*, 626 F.3d at 14.

Here, a reasonable school official, guidance counselor, or librarian could conclude that defendants' conduct was consistent with the law because it did not: compel affirmation of a particular religious belief; punish plaintiffs for the expression of their religious beliefs; impose a special disability on plaintiffs because of their religious beliefs; or take a position in a religious controversy. See *Parker*, 514 F.3d at 103. Count IV should be dismissed as against the individual defendants because they are protected by qualified immunity.

C.   Plaintiffs' Claims Should Be Dismissed as Against the Town of Ludlow and the Ludlow School Committee.

In an action pursuant to 42 U.S.C. § 1983, a municipality cannot be liable on a theory of *respondeat superior*, but, rather, may only be liable upon allegations and proof of impermissible policy, custom or practice. *Monell v. Dept. of Social Services,* 436 U.S. 658, 690-695 (1978). The *Monell* Court held that municipal liability under § 1983 can be imposed only where the municipality itself "causes" the alleged constitutional violation. *Monell, supra,* 436 U.S. at 658, 692. See also, *DiRico v. City of Quincy*, 404 F.3d 464, 469, n.12 (1st Cir. 2005). A plaintiff bears the burden of demonstrating the existence of a policy or custom and a "direct causal link" between that policy or custom and the alleged constitutional violation. *City of Canton v. Harris*, 489 U.S.

378, 385 (1989); *Monell*, 436 U.S. at 694; *Santiago v. Fenton*, 891 F.2d 373, 381-382 (1st Cir. 1989). "Official municipal policy includes, among other things, the acts of the municipality's policymaking officials." *Saldivar v. Racine*, 818 F.3d 14, 20 (1st Cir. 2016), quoting, *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (internal quotation marks omitted; alterations omitted).

Plaintiffs' claims as against the Town of Ludlow should be dismissed because there is no underlying constitutional violation committed by the individual defendants, as set forth above. See *Kennedy v. Town of Billerica*, 617 F.3d 520, 531-32 (1st Cir. 2010). As alleged, the so-called Protocol did not cause a violation of plaintiffs' rights. Therefore, plaintiffs' claims against the Town of Ludlow should be dismissed.

The Ludlow School Committee is not a body "politic and corporate" and cannot sue or be sued. Cf. *Doe v. Town of Blandford*, 402 Mass. 831, 834-835 (1988). See also, M.G.L. c. 258, § 1; *Martins v. Town of Rockland*, 66 Mass. App. Ct. 1118, 2006 WL 204268 at *1 n.2 (July 21, 2006) (Rule 1:28 decision) (claim against municipal school committee "dismissed, as it is not subject to suit as separate entity under G.L. c. 258, §§ 1 & 2"); *Murphy v. Town of Natick*, 516 F. Supp. 2d 153 (D. Mass. 2007); *Curran v. City of Boston*, 777 F. Supp. 116, 120 (D. Mass. 1991) (holding that the Boston Police Department was a "non-person" and, as such, "not a suitable entity"); *Henschel v. Worcester Police Dept.*, 445 F.2d 624 (1st Cir. 1971). The Town of Ludlow is the real party in interest here and plaintiffs' separate claims against the Ludlow School Committee should be dismissed.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss should be allowed.

655995

## CERTIFICATE OF CONSULTATION PURSUANT TO LOCAL RULE 7.1

Counsel for defendants and counsel for plaintiffs have conferred and have attempted in good faith to resolve or narrow the issues that form the subject matter of the instant motion.

Respectfully submitted,
THE DEFENDANTS,
LUDLOW SCHOOL COMMITTEE,
LISA NEMETH, TODD GAZDA,
STACY MONETTE, MARIE-CLAIRE FOLEY
AND JORDAN FUNKE

By: */s/ Nancy Frankel Pelletier, Esq.*
Nancy Frankel Pelletier, Esq., BBO #544402
npelletier@robinsondonovan.com

By: */s/ David S. Lawless, Esq*
David S. Lawless, Esq., BBO #664754
dlawless@robinsondonovan.com

Both of:
Robinson Donovan, P.C.
1500 Main Street, Suite 1600
Springfield, MA 01115
Tel. (413) 732-2301

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on this 29th day of July, 2022.

*/s/ David S. Lawless*
David S. Lawless, Esq.