IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| STEPHEN FOOTE, *et. al.* | ) | |
| Plaintiffs, | ) | CASE NO. 3:22-cv-30041-MGM |
| v. | ) | |
| | ) | |
| TOWN OF LUDLOW, LUDLOW | ) | |
| SCHOOL COMMITTEE, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

Plaintiffs, by and through their attorneys of record, submit the following Memorandum of

Law in Opposition to Defendants' Motion to Dismiss the First Amended Complaint.

**PRELIMINARY STATEMENT**

As a preliminary matter, Plaintiffs Jonathan Feliciano and Sandra Salmeron have

withdrawn their children from Ludlow Public Schools this school year. For that reason and without

waiving their rights to re-assert their claims should new information arise or circumstances change,

Plaintiffs Feliciano and Salmeron request that their claims be dismissed without prejudice.

Plaintiffs' response to the Motion to Dismiss will address the remaining claims by Plaintiffs

Stephen Foote and Marissa Silvestri.

**INTRODUCTION**

"It is difficult to envision why a school would even claim—much less how a school could

establish—a generalized interest in withholding or concealing from the parents of minor children,

information fundamental to a child's identity, personhood, and mental and emotional well-being

such as their preferred name and pronouns." *Ricard v. USD 475 Geary Cnty., KS Sc. Bd.*[1] Yet, that is precisely what Defendants have done and are now asking this Court to condone based upon misrepresentation of the factual allegations of the First Amended Complaint ("FAC") and relevant precedent.

Operating from an over-inflated concept of their authority as educators, Defendants have declared themselves the arbiters of whether Plaintiffs and other Ludlow Public School parents are deserving of receiving information fundamental to their child's identity, personhood, and mental and emotional well-being. Defendants eschew Supreme Court and First Circuit precedent which establish that parents retain a substantial, if not the dominant, role in mental health decision-making for their minor children, absent a judicial finding of neglect or abuse, and that the state should apply the traditional presumption that the parents act in the best interests of their minor children. *Parham v. J. R.*, 442 U.S. 584, 604 (1979); *Colon v. Collazo*, 729 F.2d 32, 34 (1st Cir. 1984). Defendants instead operate from the premise that, when gender identity issues are involved, parents are not entitled to even receive information, let alone make decisions concerning their child's upbringing and mental health, unless their minor children consent. Defendants use Massachusetts' non-discrimination statute to attempt to justify their upside-down perspective. (MTD, p. 16). They argue not merely that the statute does not **require** that they inform parents about their children's gender identity, but that providing such information would violate the statute. (*Id.*). Defendants further argue that 11- and 12-year old children who cannot enter into legal contracts[2], consent to medical treatment[3] or even change their educational records[4] have the

---

[1]     Case No. 5:22-cv-04015 (D. Ks.), Ruling on Motion for Preliminary Injunction [Dkt. 21] (May 9, 2022), p. 12 ("Ricard ruling").

[2]     M.G.L. ch. 231, §85P.

[3]     *Id.*

[4]     603 CMR 23.00 provides that students 14 years of age or older or in 9th grade can access their records.

unilateral right to make decisions regarding their mental health and gender identity without their parents even being informed. (MTD, p. 14). Defendants ask this Court to adopt these assumptions and find that Plaintiffs cannot state a claim for violation of their fundamental constitutional rights. Defendants also ask this Court to grant them qualified immunity.

This Court should reject Defendants' arguments. The allegations of the FAC when viewed without the ideological taint applied by Defendants and in light of Supreme Court and First Circuit precedent more than sufficiently state claims for violations of Plaintiffs' fundamental parental rights to direct the upbringing of their children, *Troxel v. Granville*, 530 U.S. 57, 66 (2000) and make mental health care decisions for their children, *Parham,* and *Colon,* and their right to familial privacy, *Prince v. Massachusetts*, 321 U.S. 158 (1944). These are rights that have been clearly established for decades, which militates against qualified immunity. Furthermore, Defendants have acted in direct contravention of established state law and regulations, vitiating any claim to qualified immunity. This Court should deny the Motion to Dismiss. Alternatively, if the Court finds legal insufficiencies, Plaintiffs request leave to amend.

## FACTUAL BACKGROUND

Plaintiffs are the parents of a daughter, B.F., age 11 at the time of the actions alleged in the First Amended Complaint ("FAC"), and a son, G.F., who was age 12 during the relevant period. (FAC, ¶¶ 11, 12, 58, 93). Both children are enrolled in Ludlow Public Schools and were attending Baird Middle School in the 2020-2021 school year. (FAC ¶¶ 58, 78). On December 15, 2020, B.F. met with her teacher, Ms. Manchester, at B.F.'s request. (FAC ¶¶ 58,59). During the meeting, B.F. said that she was experiencing insecurity, low self-esteem, poor self-image, and a perceived lack of popularity. (FAC ¶ 59). Also, after looking at unsolicited LGBT-themed videos on her school computer, B.F. began questioning whether she might be attracted to girls and whether she might

have "gender identity" issues. (FAC ¶ 61). B.F. told Ms. Manchester she was depressed and did

not know how to talk to her parents. (FAC ¶ 62). Ms. Manchester offered to speak to B.F.'s parents.

(FAC ¶ 63). B.F. agreed. (*Id.*). Ms. Manchester contacted Mrs. Silvestri and told her about

concerns about B.F. feeling depressed, and that B.F. had said that she might be attracted to the

same sex and was having issues with self-image. (FAC ¶ 66). Mrs. Silvestri was grateful that Ms.

Manchester had contacted her so that she and the children's father, not the school, could address

B.F.'s mental health issues. (FAC ¶ 68). Plaintiffs retained a private therapist to work with B.F.

and on December 20, 2020 sent an email to B.F.'s teachers, Defendant Monette, Defendant Gazda,

and the members of Defendant School Committee stating:

> It has been brought to the attention of both Stephen and myself that some of B's
> teachers are concerned with her mental health. I appreciate your concern and would
> like to let you know that her father and I will be getting her the professional help
> she needs at this time. With that being said, **we request that you do not have any
> private conversations with B. in regards to this matter**. Please allow us to
> address this as a family and with the proper professionals. (FAC ¶¶ 69-70)
> (emphasis added).

Meanwhile, unbeknownst to Plaintiffs, Defendants had put in place a Protocol that re-

interpreted the Department of Elementary and Secondary Education's ("DESE") "Guidance for

Massachusetts Public Schools Creating a Safe and Supportive School Environment," ("Guidance")

created in response the Legislature's recent revision of Mass. G.L. c. 76, §5. (FAC ¶¶ 22-24, 34-

36). The Guidance suggests that district staff discuss children's assertion of an alternate gender

identity with the student first before speaking with parents. (FAC ¶ 28). The Guidance also

references 603 CMR 23.01 and advises that students who are age 14 or in ninth grade can decide

to whom personal information can be disclosed, but that if students are under age 14 or not in ninth

grade, then parents alone have the right to decide. (FAC ¶ 30). Defendants re-interpreted the DESE

Guidance as providing that parents cannot be informed about their children's assertion of an

alternate gender identity and request to "socially transition" unless the child consents. (FAC ¶ 34).

Defendants also reinterpreted the Guidance to give children of any age the authority to determine whether their parents will be notified about decisions related to social transitioning. (FAC ¶ 35). Defendants parlayed their re-interpretation into a districtwide Protocol which provides that parents are not to be informed of their child's transgender status and social transition to a discordant gender identity unless the child, of any age, consents. (FAC ¶ 36).

"Social transitioning," which includes dressing and grooming as the opposite sex and adopting an alternate name and pronouns, is recognized as a mental health intervention for children with gender dysphoria. (FAC ¶ 42). Under Massachusetts law, parents must consent to medical treatment, including mental health treatment, of their children under age 18 unless the child is emancipated, married, in the armed forces, pregnant or contracted a sexually transmitted disease, none of which applies to Plaintiffs' children. Mass. G.L. c. 231, §85P, Mass. G.L. c. 112 §12F. (FAC ¶ 44). Defendants' Protocol operates contrary to the law by deliberately concealing from Plaintiffs that their minor children are receiving mental health care, *i.e.*, socially transitioning to a discordant gender identity, at school without the parents' knowledge or consent. (FAC ¶ 45). Defendants have also implemented customs, practices and procedures that introduce and promote the concept of gender-affirming social transitioning, i.e., mental health treatment, and experimentation with discordant gender identities to children without the knowledge or consent of their parents. (FAC ¶¶ 46-56).

On February 28, 2021, B.F. sent an email to Defendant Foley, Defendant Gazda, and teachers at Baird Middle School, including Ms. Manchester, announcing that she was "genderqueer" and had changed her name and pronouns. (FAC ¶ 81). The next day Defendant Foley sent an email after meeting privately with B.F., in direct contradiction to Plaintiffs' explicit instructions, and wrote that B.F. was still in the process of telling her parents and that she requested

that staff use her name and female pronouns when communicating with Plaintiffs but alternate name and pronouns at school. (FAC ¶ 83). In a later email, Defendant Foley explicitly told staff that Plaintiffs were not to be told about B.F.'s social transitioning. (FAC ¶ 88). Ms. Foley told teachers during a meeting that "the law" says that school staff do not have to tell parents about their children's requests to change their name or otherwise be socially affirmed in an asserted transgender identity, even, in Plaintiffs' case, when their children are 11 and 12 years old. (FAC ¶¶ 91, 93).

Plaintiffs only learned about B.F.'s February 28, 2021 email after a conversation with Ms. Manchester. (FAC ¶ 87). Plaintiffs later learned that teachers and staff at Baird Middle School were also facilitating their son G.F.'s social transitioning without Plaintiffs' knowledge or consent. (FAC ¶ 89). Importantly, G.F. had been diagnosed with ADHD and had in place an Accommodation Plan under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et. seq.* ("504 Plan"). (FAC ¶ 76). Defendants knew or should have known of G.F.'s status as a 504 Plan recipient and that such status meant that G.F. had underlying mental health issues which required parental notice and input. (FAC ¶ 77).

Meanwhile, Defendant Foley referred B.F. to Defendant Funke for private meetings and conversations to promote and facilitate B.F.'s gender-affirming social transitioning (mental health treatment) without notifying Plaintiffs. (FAC ¶ 86). Ms. Foley also began weekly private meetings with B.F. without the knowledge and consent of her parents in which she applauded B.F.'s decision, discussed B.F.'s gender identity issues, and facilitated B.F.'s social transition. (FAC ¶¶ 95, 98, 118). Despite repeated requests from Plaintiffs that school staff not engage with their children regarding gender identity issues which Plaintiffs were addressing through private mental health professionals, Ms. Foley continued to have at least weekly private meetings with B.F.

throughout the spring semester 2021. (FAC ¶¶ 118-127). Ms. Foley's inquiries became increasingly intrusive and critical of B.F.'s parents. (*Id.*). Ms. Foley repeatedly told B.F. that she (Ms. Foley) was concerned for B.F.'s safety when Ms. Foley was not available, questioned whether B.F.'s therapist (chosen by her parents) was providing appropriate care and whether B.F.'s parents were providing proper support. (*Id.*). During this time, Defendant Funke, the middle school librarian, was actively promoting gender experimentation and sex education with 11-year-old B.F. without the knowledge or consent of her parents. ( FAC ¶¶ 116-117).

Plaintiffs attempted to discuss the violations of their explicit instructions regarding their children's mental health care and the active concealment and deception by district staff with Defendants. (FAC ¶¶ 99-114). However, Plaintiffs' concerns were rebuffed with assertions that Defendants acted appropriately and in accordance with DESE guidance. (*Id.*). Defendant Gazda and Committee Chairman Kelliher went further by publicly disparaging Plaintiffs and other parents raising concerns about the District's conduct related to students' gender identity. (FAC ¶¶ 136-149). Mr. Gazda said that parents' concerns about the concealment of information amounted to "intolerance of LGBTQ people thinly veiled" behind a "camouflage of parental rights," and that schools were the only" safe space" for children. (FAC ¶¶ 141-142).  Mr. Kelliher said publicly that parents who were making their concerns known to the Committee were "under the spell" of "outside groups." (FAC ¶ 147).

## LEGAL ARGUMENT

## I.     Plaintiffs Have Stated Claims For Violations Of Their Constitutional Rights.

Reviewing the actual allegations of the FAC without the smog of Defendants' misrepresentations of the facts and relevant constitutionally protected rights yields the conclusion that Plaintiffs have pled "factual matter that, if taken as true, states a claim that [Defendants] deprived [them] of [their] clearly established constitutional rights" *Ashcroft v. Iqbal*, 556 U.S. 662,

666 (2009). Viewing the allegations of the FAC in the context of longstanding Supreme Court and First Circuit parental right precedents "allows the court to draw the reasonable inference that the Defendant[s] [are] liable for the misconduct alleged." *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

Defendants attempt to escape that conclusion by painting the factual allegations with a taint of bias, misstating the relevant constitutional rights, and then opining that the tainted facts and misstated constitutional rights cannot support a plausible claim. (MTD, pp. 8, 16-21). Defendants attempt to bolster their tenuous argument by expansively reinterpreting Massachusetts' non-discrimination law and misinterpreting regulations and administrative guidance to claim that Plaintiffs are seeking to violate those laws and/or have Defendants violate them. (MTD, pp. 12-15). For good measure, Defendants throw in a reference to Massachusetts' law prohibiting mental health professionals from undertaking "sexual orientation and gender identity change efforts," and conclude that the law somehow forecloses Defendants from providing information to parents about their children's gender identity. (MTD, p. 8).

Notably, the cases cited by Defendants to support children's rights to maintain secrecy about their gender identity actually support parental involvement in that in every instance parents were intimately involved in the decision-making for their children and brought claims on their children's behalf. *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017); *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020); *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 521 (3d Cir. 2018) (MTD, p. 20). None of Defendants' tactics can change the conclusion that Plaintiffs have pled sufficient facts to show that by prohibiting parents from receiving information related to their children's gender identity the Defendants have violated Plaintiffs' fundamental parental rights.

### A. Longstanding Precedent Supports Plaintiffs' Parental Rights Claims When The Rights Are Properly Described.

Defendants rightly state that "The Amended Complaint asserts only parental rights" (MTD p. 20), since those are rights belonging to the Plaintiff parents that Defendants have violated. Defendants go on to assert, "However, students also have constitutional rights and plaintiffs cannot point to a single case where a parent's rights have been held to supplant a child's rights under the circumstances as alleged." (*Id.*). To the contrary, when the constitutional rights asserted by Plaintiffs are properly identified, there is a plethora of precedent upholding parental rights against asserted rights or over the apparent objection of their children.

Students do have constitutional rights vis-à-vis the government while attending public schools. *See e.g., Tinker v. Des Moines Indep. Comm. Sch. Dist.,* 393 U.S. 503, 506 (1969) (finding students' free speech rights were violated **by the public school**'s prohibition on anti-war protests) (emphasis added). As *Tinker* and similar precedents establish, those rights exist in relation to state action by public school officials, not as against disclosing information to the child's parents. Furthermore, Defendants do not have standing to assert rights on behalf of Plaintiffs' children. In fact, Defendants' attempt to assert such rights is further evidence of the underlying violations alleged in the FAC, *i.e.,* that by concealing information directly affecting a child's mental health and well-being Defendants are usurping Plaintiffs' rights as parents to direct their children's upbringing, care and control, and mental health decision making.

Defendants attempt to recast the fundamental parental rights which Plaintiffs alleged have been violated into nonsensical propositions with no basis in the allegations of the FAC or in constitutional jurisprudence. Unsurprisingly, Defendants then claim that there are "no cases" supporting their fictional propositions. Defendants go on to contend, "There is no case that stands for the proposition that a parent is entitled to notice of their child's gender so that they can control

it (or attempt to do so)." (MTD, p. 17). Undoubtedly, that is true, but that is not a right for which Plaintiffs are seeking relief. Neither are Plaintiffs asserting a right to notice of their children's gender identity so that they "may insist that a public school, in violation of state and federal law, discriminate against their children by rejecting and/or ignoring their children's assertion of their gender identity." (MTD, p. 16). Finally, Plaintiffs are not seeking to "'opt out' from having a transgender child." (*Id.*). What Plaintiffs are asking is that their parental rights be respected so that they are not deprived of critical information related to their children's mental health.

Substantive due process analysis requires a "careful description" of the asserted fundamental liberty interest, not a self-serving redefinition of the relevant interests to serve the Defendants' agenda. *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997). The allegations of the FAC offer that careful description. Namely, Plaintiffs allege violation of their right to direct the upbringing of their children, *Pierce v. Society of Sisters*, 268 U.S. 510, 534-35 (1925); *Troxel v. Granville*, 530 U.S. 57, 68 (2000) (FAC, ¶¶ 163-188); their right to direct the medical and mental health decision-making for their children, *Parham* 442 U.S. 584, *Colon*, 729 F.2d 32 (FAC ¶¶ 189-217); and the right to familial privacy, *Moore v. East Cleveland*, 431 U.S. 494 (1977); *Prince v. Massachusetts*, 321 U.S. 158 (1944) (FAC ¶¶ 218-248). Properly described, Plaintiffs are alleging violations of "fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition." *Glucksberg*, 521 U.S. at 720-21.

### 1. *Plaintiffs State Claims for Violation of Their Right to Make Mental Health Decisions.*

When Plaintiffs' claims are properly defined, it is pellucid that, contrary to Defendants' assertion, Plaintiffs can cite to Supreme Court and First Circuit precedent where parents' rights have been held to supplant a child's rights in mental health decision making. *Parham* 442 U.S. 584; *Colon*, 729 F.2d 32. Mental health decision making is at the heart of Plaintiffs' claims not

because, as Defendants assert, Plaintiffs allege that "being transgender is a mental health condition" (MTD, pp. 8-9), but because the conduct of Defendants in socially transitioning Plaintiffs' children is recognized as mental health intervention and the mental health of Plaintiff's children was a major concern in the events that unfolded in this case. (FAC, ¶¶ 42-43, 62, 64-65, 69-70).

The very cases cited by Defendants for the proposition that children's rights predominate in the gender identity context confirm that the social transitioning engaged in by Defendants, *i.e.,* changing children's names and pronouns, is part of a treatment protocol for children with gender dysphoria. The WPATH guidelines outline "appropriate treatments for persons with gender dysphoria, including [c]hanges in gender expression and role (which may involve living part time or full time in another gender role, consistent with one's gender identity)." *Grimm*, 972 F.3d at 596. "Treatment for children and adolescents who experience gender dysphoria includes social gender transition." *Doe v. Boyertown,* 897 F.3d at 522. *See also,* Paragraph 42 of the FAC. As part of a treatment for gender dysphoria, social transitioning inevitably involves decisions related to children's mental health, something within the purview of the parents, not educators.

Mental health decisions are also clearly part of addressing a child's assertion of an alternate gender identity because "[transgender people] are up to three times more likely to report or be diagnosed with a mental health disorder as the general population." *Grimm*, 972 F.3d at 594.  Also, transgender people are "nearly nine times more likely to attempt suicide than the general population." *Id.* Children such as B.F. and G.F., therefore, face these mental health challenges, not because Plaintiffs believe that "being transgender is a mental health condition," but because of demonstrated correlations between transgenderism and mental health issues. B.F.'s and G.F.'s increased risks of mental health issues associated with an assertion of an alternate gender identity

must be addressed by their parents. *Parham* 442 U.S. 584; *Colon*, 729 F.2d 32. The transgender student cases cited by Defendants, *Grimm* and *Whitaker v. Kenosha U.S.D. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017) and others including *Adams v. School Board of St. Johns County*, 318 F.Supp.3d 1293 (M.D. Fla. 2018) *rehearing en banc granted*, 9 F. 4th 1369 (11th Cir. 2021), further confirm that parental participation is critical when children assert a transgender identity.[5,6] Defendants' Protocol prohibiting the disclosure of information to parents interferes with Plaintiffs' exercise of their right, and necessary authority, to make mental health decisions for their children.

In upholding the primacy of parental decision-making *Parham* and *Colon* rejected children's claims that permitting their parents to make decisions regarding their mental health care (to which they demonstrably disagreed) violated the children's constitutional rights. In *Parham*, the Supreme Court rejected the children plaintiffs' claim that "that the constitutional rights of the child are of such magnitude and the likelihood of parental abuse is so great that the parents' traditional interests in and responsibility for the upbringing of their child must be subordinated." 442 U.S. at 602.

> Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children. Our cases have consistently followed that course; our constitutional system long ago rejected any notion that a child is "the mere creature of the State" and, on the contrary, asserted that parents generally "have the right, coupled with the high duty, to recognize and prepare [their children] for additional obligations.... Surely, this includes a "high duty" to recognize symptoms of illness and to seek and follow medical advice. The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's

---

[5]    In each of these cases parents were involved in the decisions related to the children's assertion of an alternate gender identity, and it was the parents who challenged school district actions on behalf of their children. None of the cases support Defendants' proposition that minor children have rights that supersede their parents' rights when gender identity is involved.

[6]    Defendants' citations of dicta statements from these cases suggesting that gender identity is innate and unchangeable is another example of Defendants trying to paint the facts of this case with a particular bias. The statements are not only dicta but are also inaccurate, as testimony from detransitioning young adults attests. *See e.g.*, *Brief of Amici Curiae Detransitioners, D.H. v. Snyder*, (9th Cir. 2021, Case # 21-15668)); *Brief of Amici Curiae Detransitioners, Brandt v. Rutledge*, (8th Cir. 2021, Case # 21-2875); *Brief of Amici Curiae Detransitioners, Eknes-Tucker v. Ivey*, (11th Cir. 2022, Case #2211707).

> difficult decisions. More important, historically it has recognized that natural bonds
> of affection lead parents to act in the best interests of their children.

*Id.* Notably for this case, the Supreme Court stated, "Simply because the decision of a parent is not agreeable to a child or because it involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state," *e.g.,* Defendants here. *Id.* "Most children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment. Parents can and must make those judgments." *Id.* That is precisely what Plaintiffs are alleging here, *i.e.,* that their 11- and 12-year-old children are not able to make sound judgments concerning treatment, in the form of social transitioning, for their claimed gender dysphoria and other manifest mental health concerns. Plaintiffs, as their parents, must make those decisions. Defendants' protocol and resulting actions in this case to conceal information from parents regarding their children's claimed gender identity interferes with that right to the detriment of Plaintiffs' children.

Citing *Parham*, the First Circuit similarly held that parents' rights supplanted the rights of children in mental health decision-making. *Colon*, 729 F. 2d at 34. The *Colon* court rejected the plaintiff children's argument that Puerto Rico's law permitting parents to request temporary institutional care for "non-delinquent" children with behavioral problems violated the children's constitutional rights. *Id.* The First Circuit affirmed the district court's determination, in keeping with *Parham,* that the parents are best able to make a determination as to their children's mental health needs. *Id.* The same is true here with regard to making decisions regarding Plaintiffs' 11- and 12-year-old children's expression of discordant gender identities and overall mental health needs. It is the Plaintiffs, not the children or the Defendants, who have the authority (along with the maturity, affection, and sound judgment) to direct the children's mental health care. To find differently is to effectively make Plaintiffs' children the "mere creatures of the state" as decried

by the Supreme Court in *Pierce*, 268 U.S. at 535. Denying Plaintiffs the information necessary to make such decisions violates their rights under *Colon* and *Parham.*

### 2. *Plaintiffs' Claims Fall Outside of the Pedagogical Purview of Defendants.*

The nature of the information concealed by Defendants' Protocol, *i.e.,* information regarding children's gender identities, makes this case unlike the cases which limited parental rights in educational decision making. *Brown v. Hot, Sexy & Safer Prods., Inc*., 68 F.3d 525 (1st Cir. 1995); *Parker v. Hurley*, 514 F.3d 87 (1st Cir. 2008). (MTD pp. 18-20). In *Brown* and *Parker*, parents challenged the content of a safe sex presentation and the reading of a book on same-sex marriage, respectively. The First Circuit rejected the parents' claims that school activities violated their right to direct the education of their children. *Brown*, 68 F.3d at 534; *Parker*, 514 F.3d at 101-103. In *Brown,* the court said that parents' rights to direct their children's education does not encompass "a fundamental constitutional right to dictate the curriculum at the public school to which they have chosen to send their children." 68 F.3d at 533. Similarly, in *Parker,* the First Circuit concluded that parents do not have a constitutional right to "direct how a public school teaches their child." 514 F.3d at 102 (citation omitted). No such right is at issue here.

Instead, what Plaintiffs have alleged has happened in this case is that Defendants have forgotten that "'in loco parentis' does not mean to 'displace parents.'" *Gruenke v. Seip*, 225 F.3d 290, 307 (3d Cir. 2000). When, as here, school officials move from pedagogical considerations such as curriculum or educational environment to private family matters, "they overstep the boundaries of school authority and impermissibly usurp the fundamental rights of parents to bring up their children, as they are guaranteed by the Constitution*." Id.* "It is not educators, but parents who have primary rights in the upbringing of children. School officials have only a secondary responsibility and must respect these rights." *Id. Gruenke* is particularly instructive in that the parents alleged that the school's failure to notify them of their daughter's pregnancy and continued

intrusion into that family decision obstructed their parental right to choose the proper resolution of the issue.

Also instructive is the Eleventh Circuit's decision in *Arnold v. Board of Education*, 880 F.2d 305 (11th Cir. 1989). *Arnold* involved similar interference with parental notification and authority as was alleged in *Gruenke* and is alleged here. In *Arnold*, school staff convinced the students not to tell their parents about a pregnancy and abortion. *Id.* at 312-13. That directive "unduly interferes with parental authority in the household and with the parental responsibility to direct the rearing of their child." *Id.* (holding that parents sufficiently stated a claim for violation of their right to familial privacy). Similarly here, Plaintiffs allege that Defendants' failure to notify them of their children's assertion of discordant gender identities and social transitioning, and the continued intrusion by Defendants even after receiving the clear instructions of the parents to the contrary has obstructed their parental right to make consequential decisions for their children.

### 3. Plaintiffs Allege Interference with Their Fundamental Parental and Privacy Rights.

As well as alleging interference with their fundamental right to make mental health care decisions for their children, Plaintiffs have also sufficiently alleged interference with their fundamental right to direct their children's upbringing, *Troxel,* 530 U.S. at 68-69, and right to familial privacy, *Prince*, 321 U.S. at 166; *Moore,* 431 U.S. at 503. Again, reviewing the actual allegations of the FAC, instead of Defendants' mischaracterizations, reveals that Defendants have interfered with these parents' decisions regarding the best interests of their children, as was true in *Troxel.* In overturning a state court's decision granting grandparent visitation over the objection of the children's mother, the *Troxel* Court said, "[t]he Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge [here, school employees] believes a 'better' decision could be made." 530 U.S. at 72-73. "So

long as a parent adequately cares for his or her children (*i.e.,* is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Id.* at 68-69.

Implicit in Defendants' arguments in the MTD and in their interactions with B.F. is an accusation that Plaintiffs are somehow unfit because Defendants believe they will not immediately and sufficiently "affirm" their children's assertion of an alternate gender identity. (MTD, pp. 12, 16, 17; FAC, ¶¶ 119-125; 142-144; 147-148). In addressing similar accusations by a school district trying to justify a similar parental non-disclosure policy, the *Ricard* court said:

> Presumably, the District may be concerned that some parents are unsupportive of their child's desire to be referred to by a name other than their legal name. Or the District may be concerned that some parents will be unsupportive, if not contest, the use of pronouns for their child that the parent views as discordant with a child's biological sex. But this merely proves the point that the District's claimed interest is an impermissible one because it is intended to interfere with the parents' exercise of a constitutional right to raise their children as they see fit. **And whether the District likes it or not, that constitutional right includes the right of a parent to have an opinion and to have a say in what a minor child is called and by what pronouns they are referred.**
>
> The Court can envision that a school would have a compelling interest in refusing to disclose information about preferred names or pronouns where there is a particularized and substantiated concern that disclosure to a parent could lead to child abuse, neglect, or some other illegal conduct. Indeed, at least in Kansas, were such a case to arise, a school would likely have to report the matter to the Department for Children and Families.

*Ricard* Ruling, p. 14 (emphasis added). Similarly here, if Defendants have a particularized and substantiated concern that disclosure of information regarding children's gender identity and related mental health concerns could lead to abuse or neglect by Plaintiffs, then, as mandated reporters under Mass. G.L. c. 119, § 51A, Defendants would be required to report the matter to the Department of Children and Families. Lacking such particularized and substantiated concern about

abuse or neglect in this case, then, under *Troxell,* Defendants do not have any justification for interfering with Plaintiffs' parental rights by withholding this information.

Likewise, Defendants cannot supply any justification for interfering with the private realm of Plaintiffs' family by withholding such information because Defendants do not approve of how Plaintiffs might react to the information. "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder. And it is in recognition of this that these decisions have respected the private realm of family life which the state cannot enter." *Prince*, 321 U.S. at 166 (citations omitted). While, as was true in *Prince*, the state can act when parents' decisions endanger the children's welfare, absent evidence of such endangerment, the state cannot interfere with the private realm of the family. *Id.*

That was the conclusion in *Moore*, where the Supreme Court struck down a city ordinance that unreasonably interfered with the plaintiff's right to determine which family members could reside with her. 431 U.S. at 503. "Our decisions establish that the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition. It is through the family that we inculcate and pass down many of our most cherished values, moral and cultural." *Id.* Defendants' Protocol directly and intentionally interferes with that right vis-a-vis Plaintiffs based on Defendants' assumption that Plaintiffs will not affirm their children's assertion of an alternate gender identity to the Defendants' satisfaction. (MTD, pp. 12, 16, 17; FAC, ¶¶ 119-125; 142-144; 147-148).

When the actual factual allegations of the FAC are viewed through the lens of the carefully defined constitutional rights asserted in the FAC, it is clear that Plaintiffs have pled sufficient facts to state viable claims that Defendants deprived them of their fundamental parental rights.

Furthermore, when the facts of the FAC are viewed in light of the actual language of Massachusetts' non-discrimination statute, DESE guidance and Massachusetts laws regarding the rights of minors and of parents, it is clear that Plaintiffs have alleged conduct on the part of Defendants that "shocks the conscience."

### B. Plaintiffs Have Alleged Acts That Shock The Conscience.

The Court need look no further than Mr. Kelliher and Mr. Gazda publicly calling Plaintiffs and other concerned parents intolerant, transphobic, prejudiced, bigoted and "under the spell of outside groups" to determine that Defendants have engaged in conduct that shocks the conscience. (FAC ¶¶ 141-142, 147, 148). For the superintendent of Ludlow Public Schools to call parental rights a thinly veiled camouflage for intolerance of LGBTQ people and explicitly state that the district will continue to disregard parental requests regarding their children's well-being because the school is the only "safe space" for children is shocking to the taxpaying parents who are the targets of his accusations. (FAC ¶¶ 141-143). Beyond those inflammatory comments, themselves exhibiting an intolerance and prejudice toward Plaintiffs and other parents, Defendants' actions in re-interpreting DESE Guidance and state regulations in a manner that violates state law and the U.S. Constitution evinces reckless indifference and intentional disregard that constitute conscience-shocking behavior under the circumstances of this case. *Rivera v. Rhode Island*, 402 F.3d 27, 36 (1st Cir. 2005); *Hootstein v. Amherst-Pelham Reg'l Sch. Comm*., 361 F. Supp. 3d 94, 112 (D. Mass. 2019). Perhaps most shocking of all, Defendants adopted and implemented a Protocol explicitly designed to deceive Plaintiffs and other parents on matters fundamental to their children's identity, personhood, and mental and emotional well-being.

Although the cases in which courts have found governmental conduct to shock the conscience have often involved state action that was physically intrusive, violent or abusive, courts have found that conduct of a government official with a child that "strikes at the basic fabric of all

parent-child relationships: love, trust, and faith" to shock the conscience. *See, e.g.*, *Grendell v. Gillway*, 974 F. Supp. 46, 51 (D.Me. 1997). Each determination of whether state conduct "shocks the conscience" is necessarily fact-specific and unique to the particular circumstances in which the conduct occurred. *Cruz-Erazo v. Rivera-Montanez*, 212 F.3d 617, 623 (1st Cir. 2000).

In situations "where government officials must act in haste, under pressure, and without an opportunity for reflection, even applications of deadly force by those officials cannot be conscience-shocking unless undertaken maliciously and sadistically for the very purpose of causing harm." *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 881 (1st Cir. 2010). *See also, Cummings v. McIntire,* 271 F.3d 341, 346 (1st Cir. 2001) (police officer's striking of a person seeking directions not conscience-shocking); *DePoutot v. Raffaelly*, 424 F.3d 112, 118 (1st Cir. 2005) (police handling of DUI suspect not conscience-shocking). However, "in situations where actors have an opportunity to reflect and make reasoned and rational decisions, deliberately indifferent behavior may suffice to 'shock the conscience.'" *Hootstein,* 361 F. Supp. 3d at 112, quoting *Rivera*, 402 F.3d at 36 (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 851-52 (1998)). In such situations, verbal or other less physical harassment may rise to a conscience-shocking level. *Cruz-Erazo*, 212 F.3d at 622.

This is particularly true when the conduct strikes at the basic fabric of any protected relationship, such as the parent-child relationship. *Id.* (citing *Grendell v. Gilway*, 974 F. Supp. 46, 51 (D.Me. 1997). In *Cruz-Erazo,* the Court found that the verbal threats by police officers did not strike at the fabric of a protected relationship, so, while a close call, the conduct did not shock the conscience. *Id.* Here, by contrast, Defendants actions in concealing information from Plaintiffs regarding their children's gender identity issues and social transitioning, conspiring with children to deliberately deceive their parents by using different names and pronouns in their presence, and

secret conversations with B.F. questioning her parents' support and choice of a mental health professional does strike at the heart of the parent-child relationship. Defendants' active deception sets this case apart from others in which state actors have simply failed to disclose information. Since the circumstances here involved time to reason and reflect instead of urgent high-pressure decision-making, such intentional interference with Plaintiffs' parental rights and the parent-child relationships in this case constitute conscience-shocking behavior under the context-specific analysis described in *Cruz-Erazo,* 212 F.3d at 623, and *Hootstein,* 361 F. Supp. 3d at 112. Even if this case were a "close call" factually, the Court should still permit the substantive-due-process claim to go forward so that the factual context can be further developed, as it did in *Pimentel v. City of Methuen*, 323 F. Supp. 3d 255, 269 (D. Mass. 2018).

Defendants' arguments do not require a different result. Again misrepresenting the factual allegations and legal theories of the FAC, Defendants spin a fanciful tale that they are complying with state law and Plaintiffs are asking them to violate the law by informing and abiding by the instructions of parents concerning their child's assertion of a discordant gender identity. (MTD pp. 11-15). While accusing Plaintiffs of misinterpreting the DESE Guidance, Defendants go on to misinterpret and misrepresent its provisions. Defendants claim that the DESE Guidance defines "younger children" as ones "who cannot advocate for themselves," whatever that means. (MTD p. 14). In fact, the DESE Guidance does not define "young children." The Guidance does indicate, in keeping with 603 CMR 23.01, that children who are age 14 or in the ninth grade are "eligible students" who can decide to whom their personal information can be disclosed. (FAC ¶ 30). Defendants fail to cite that provision in the Guidance, which is convenient since they are not complying with it by granting children of any age the ability to decide whether their own parents receive such information. Defendants also misrepresent the contents of the Guidance when they

claim that the suggestion that staff should speak to a student first before speaking to parents really means that staff should not speak to parents at all if the student does not consent. (MTD p. 15). Nothing in the Guidance precludes school staff from notifying parents about their child's gender identity and abiding by their instructions. That is particularly true here where the parents have indicated that they have retained professional assistance for one child and in light of the other child's known mental health diagnosis and 504 Plan.

Defendants turn the Guidance and regulations on their head and say that they do not require that parents be notified so that failing to notify parents does not shock the conscience. (MTD p. 13). That conclusion is flawed in at least three ways. First, since the Guidance is just that, guidance, and not a statute or regulation, compliance with it does not determine whether school staff are complying with the law. (FAC ¶ 26). Second, since social transitioning is recognized as a mental health treatment, failure to notify and gain consent from parents of minor children does violate the law requiring parental consent for medical/mental health care. Mass. G.L. c. 231, §85P, Mass. G.L. c. 112 §12F. Also, in this case Plaintiffs specifically stated that they were addressing the children's mental health issues, including the gender issues, through a private counselor and requested that Defendants not interfere with that decision. (FAC ¶¶ 69-70). Engaging in social transitioning and deliberately undermining Plaintiffs' ability to address these issues as a family strikes at the basic fabric of the parent-child relationships here and shocks the conscience. *Cruz-Erazo,* 212 F.3d at 623.

Defendants further argue that their actions do not shock the conscience because if they were to do what they claim Plaintiffs are asking for, then it would somehow cause Defendants to violate Mass. G.L. c. 76 §5. (MTD, p. 12). Defendants can only make this argument by fundamentally misrepresenting the clearly stated allegations of the FAC. Plaintiffs allege that

Defendants violated Plaintiffs' constitutional rights by concealing information from them regarding their children's gender identity and social transitioning and superseding their exercise of decision-making authority. (FAC ¶ 161). Defendants claim that Plaintiffs are asking Defendants to discriminate against their children by not affirming the children's gender identities as they claim is required under Mass. G.L. c. 76 § 5. (MTD p. 12). Defendants cannot point to any provision in Mass. G.L. c. 76 § 5 or the cited regulations which would be violated by notifying parents of their children asserting alternate gender identities and being socially transitioned. By contrast, failing to notify parents does violate Mass. G.L. c. 231, § 85P and Mass. G.L. c. 112 § 12F. Defendants might not like how Plaintiffs might respond to such notice, as evidenced by their public disparagement of Plaintiffs. (FAC ¶¶ 136-149). However, that disagreement with how Plaintiffs exercise their fundamental right to direct their children's upbringing and mental health care does not justify withholding information or authorize them to override the parents' decisions.

Reviewed in the context of the actual facts and legal theories in the FAC, Defendants' actions in deliberately disregarding Plaintiffs' fundamental parental rights, secretly socially transitioning Plaintiffs' children, privately meeting with Plaintiffs' children to convey the message that their parents are not safe and supportive, undermining the mental health care decisions for one child who was exhibiting signs of mental health distress and another with known mental health diagnosis and a 504 Plan in place, and publicly maligning the parents for asserting their parental rights are sufficient to allege conscience shocking conduct. Those allegations coupled with Plaintiffs' allegations of violations of protected constitutional interests are more than sufficient to state claims for violation of Plaintiffs' substantive due process rights.

## II.   Individual Defendants Are Not Entitled To Qualified Immunity.

Defendants' assertion of qualified immunity, like their arguments regarding Plaintiffs' substantive due process claims, must be viewed in the context of the actual factual allegations and

actual enumerated constitutional rights of the FAC, not Defendants' misleading ideologically driven concoctions. In *Maldonado v. Fontanes*, the First Circuit rejected the defendant's similar attempt to restate the relevant facts, confirming that the court must accept the allegations of the Complaint, not the inconsistent statements by defendants, as true for purposes of evaluating a qualified immunity defense. 568 F.3d 263, 269 (1st Cir. 2009). Precision in describing the relevant facts and defining the relevant constitutional rights is critical because the qualified immunity inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015).

Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."" *Feliciano-Angulo v. Rivera-Cruz*, 858 F.2d 40, 45 (1st Cir. 1988) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Courts employ a two-step analysis to determine whether defendants can claim qualified immunity: 1) Whether the facts as alleged in the Complaint (accepted as true at the Motion to Dismiss stage) make out a constitutional violation and 2) whether the violated right or rights were "clearly established" at the time that the offending conduct occurred. *Hunt v. Massi*, 773 F.3d 361, 367 (1st Cir. 2014). Determining whether the rights were "clearly established," in turn, encompasses two questions: 1) whether the contours of the right, in general, were sufficiently clear, and 2) whether, under the specific facts of the case, a reasonable defendant would have understood that he was violating the right. *Id.* In this case, the actual facts alleged in the FAC make out constitutional violations, as discussed *supra,* which answers the first factor in Plaintiffs' favor. Likewise, the longstanding statutory and constitutional rights actually alleged in the FAC have been clearly established and known by educators such as Defendants for many years, answering

the second factor in Plaintiffs' favor. Therefore, Defendants have not shown they are entitled to qualified immunity.

The fundamental parental rights that are the subject of Plaintiffs' claims have been established by Supreme Court and First Circuit precedent for decades. The Supreme Court has recognized that parents have the fundamental right to direct the upbringing of their children for nearly 100 years. *Meyer v. Nebraska*, 262 U.S. 390 (1923); *Pierce* 268 U.S. at 534-35. Since 2000 it has been clearly established that the Due Process Clause does not permit a state to infringe on the fundamental right of parents to make child rearing decisions simply because state actors believe a "better" decision could be made. *Troxel,* 530 U.S. at 72-73. For 22 years, Supreme Court precedent has provided that "[s]o long as a parent adequately cares for his or her children (*i.e.,* is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Id.* at 68-69.

Furthermore, that the fundamental right of parents to direct the upbringing of their children includes the right to make medical and mental health decisions has been established by the Supreme Court since 1979, *Parham,* 442 U.S. at 604 and the First Circuit since 1984, *Colon,* 729 F.2d at 34. Importantly, these courts have established that parents' rights (and mature judgment) trump the asserted rights of minor children regarding mental health decisions. *Parham,* 442 U.S. at 604, *Colon,* 729 F.2d at 34. Contrary to Defendants' assertions, since affirming a child's gender identity and facilitating social transitioning is recognized as a mental health treatment for gender dysphoria, *Grimm*, 972 F.3d at 596, *Doe v. Boyertown,* 897 F.3d at 522-23, *Parham* and *Colon* have "established a rule that establishes a parent's asserted right trumps the rights of an eleven-year-old or twelve-year-old who asserts a discordant gender identity," (MTD, p. 23). That being

the case, a reasonable school official would not believe himself or herself bound to endorse a pre-teen's assertion of a discordant gender identity contrary to the parents' judgment and mental health decision-making.

A reasonable school official would not believe that *Brown* and *Parker* somehow permit him or her to ignore parental rights in favor of children's desires in the context of this case. It is important to recognize that by contrast to this case, the *Brown* decision held that the freedom to direct upbringing of children does not encompass "a fundamental constitutional right to **dictate the curriculum** at the public school to which they have chosen to send their children." *Brown,* 68 F.3d at 533 (emphasis added). Similarly, in *Parker* the court found "no federal case under the Due Process Clause which has permitted parents to demand an exemption for their children from **exposure to certain books** used in public schools." *Parker*, 514 F.3d at 102 (emphasis added). Plaintiffs here are not seeking to dictate curriculum or to exempt their children from certain books or other pedagogical concerns, but rather are challenging Defendants' assertion of rights to exclude Plaintiffs from decisions related to their children's discordant gender identity and mental health decision-making that is squarely within their parental authority and <u>not</u> within the purview of educators. A reasonable educator would recognize that "withholding or concealing from the parents of minor children, information fundamental to a child's identity, personhood, and mental and emotional well-being such as their preferred name and pronouns" *Ricard Ruling,* p. 12, is not on par with choosing curriculum and so could not believe that he or she is carrying out legitimate pedagogical duties.  Consequently, under the specific facts of this case, a reasonable defendant would have understood that he or she was violating the parents' fundamental right to direct the upbringing and mental health decision making of their children, a right clearly established in the First Circuit for almost 40 years.

A reasonable educator would also know that under Massachusetts law children under age 18 cannot make medical/mental health decisions without the consent of their parents. Therefore, the reasonable educator would understand that facilitating social transitioning, a recognized mental health treatment, for a child under age 18 without notifying or obtaining the consent of parents would violate Massachusetts law. Similarly, a reasonable educator would know that DESE regulations (603 CMR 23.01) provide that parents have sole authority to determine whether and to whom a child's personal information is disclosed until the child is 14 or in grade nine. That educator would understand that letting an 11- or 12-year-old child decide whether his or her parents can receive information regarding a child's gender identity would violate the parents' rights.

Defendants disingenuously argue that "[a] reasonable defendant would not understand that complying with state and federal law would violate plaintiffs' rights." (MTD, p. 23) and "[a] reasonable administrator, guidance counsellor, or school librarian would not understand DESE's Guidance to suggest conduct that would violate plaintiffs' Fourteenth Amendment rights" (MTD, p. 24). These statements again reflect Defendants' fundamental misrepresentation of the facts and legal theories of the FAC. Plaintiffs nowhere assert that the statutes, regulations and DESE Guidance are unconstitutional. What Plaintiffs do assert is that Defendants have improperly re-interpreted the statutes and Guidance to create a Protocol requiring that information regarding a child's gender identity and social transitioning be withheld from parents unless the child of any age consents. (FAC ¶ 36). If Defendants were to comply with the text of the statutes and Guidance absent their reinterpretation and embellishment, then they would not deny Plaintiffs their right to make decisions regarding their children's upbringing and mental health care. That is not the case here, however. Instead, Defendants are complying with their embellished, self-serving redefinitions of statutes and Guidance that correspond with their ideological agenda and in so

doing are violating Plaintiffs' rights. They cannot misuse the doctrine of qualified immunity to legitimize their subterfuge.

III.     **Plaintiffs Have Stated Claims Against The Institutional Defendants.**

Defendants rely on their flawed analysis of Plaintiffs' constitutional claims to assert that Plaintiffs cannot state claims against the Town of Ludlow (MTD pp. 27-28). They further allege that the School Committee, which is the final policymaking authority for the Town of Ludlow with regard to Ludlow Public Schools, is not a proper Defendant. (MTD p. 28). Neither argument has merit.

Plaintiffs can state a claim against the Town of Ludlow if they can show that a policy or custom of the Town led to the constitutional deprivations alleged in the FAC. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694 (1978). Plaintiffs must demonstrate both the existence of a policy or custom and a causal link between that policy and the constitutional harm. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). Official municipal policy includes the acts of the municipality's policymaking officials," in this case, the School Committee. Mass. G.L. c. 71 § 37. *Santiago v. Fenton*, 891 F.2d 373, 382 (1st Cir. 1989). The Town is liable under *Monell* for the acts of the School Committee if the acts constitute deliberate indifference. *Saldivar v. Racine*, 818 F.3d 14, 20 (1st Cir. 2016).

Defendants assert that the Town cannot be liable because Plaintiffs did not state facts sufficient to state a constitutional deprivation. (MTD, p. 28). That conclusion is based upon Defendants' misrepresentation of the constitutional violations alleged by Plaintiffs, as discussed *supra*. Since Plaintiffs do state claims for constitutional deprivations, the Town can be liable for deliberately indifferent actions by the School Committee as its final policymaker which caused the constitutional violations. *Saldivar,* 818 F.3d at 20. Plaintiffs allege that the School Committee sanctioned and oversaw implementation of a Protocol based on misinterpretation and misstatement

of statutes and DESE Guidance that prohibits the disclosure of information to parents regarding children's discordant gender identity and social transitioning unless the child of any age consents. (FAC ¶¶ 36, 134-149, 168, 182-187, 197, 211-216, 228, 242-247). Plaintiffs allege that the Protocol was employed with their children to conceal from Plaintiffs information related to their children's gender identity and social transitioning, and that concealment of such information violated Plaintiffs' fundamental parental rights by interfering with their ability to make important decisions related to the upbringing, well-being, and mental health of their children. (*Id.*). Plaintiffs further allege that School Committee members and Mr. Gazda, an employee of the Committee, publicly defended the Protocol to the point of saying that they would continue to be implemented regardless of objections by parents, who were labeled bigots, transphobes and "under the spell" of outside groups. (FAC ¶¶ 134-149). These allegations show reckless disregard for the fundamental rights of parents which caused the deprivation of Plaintiffs' constitutional rights. Plaintiffs' allegations are more than sufficient to establish liability against the Town under *Monell.*

Defendants argue that the School Committee, the final policymaker for the Town regarding Ludlow Public Schools, is somehow not a proper Defendant because it is not independent of the Town of Ludlow. (MTD, p. 28). However, none of the cases cited by Defendants support that proposition. *Martins v. Town of Rockland*, 66 Mass. App. Ct. 1118 (2006) stated only, "The order denying the defendant's motion to dismiss is reversed, and judgment is to enter dismissing the action." *Murphy v. Town of Natick,* 516 F. Supp. 2d 153 (D. Mass. 2007), *Curran v. City of Boston*, 777 F. Supp. 116, 120 (D. Mass. 1991), and *Henschel v. Worcester Police Dept*., 445 F.2d 624 (1st Cir. 1971) dealt with municipal police departments, not school committees. In *Thomas v. Town of Chelmsford,* 267 F. Supp. 3d 279, 306 (D. Mass. 2017), the court analyzed whether the Chelmsford School Committee or the Town, not just the Town, engaged in any policymaking that

violated the plaintiff's constitutional rights. In *Doe v. Bradshaw,* No. CIV.A. 11-11593-DPW, 2013 WL 5236110, at *7–8 (D. Mass. Sept. 16, 2013), the Court noted that "discrete actions by municipal officials with final policymaking authority," including the school committee, may subject the Town to liability. In neither case did the court state that the school committee must be dismissed as an improper party. Indeed, if the actions of the school committee could impart liability to the Town, it would be reasonable that the committee would also be a party. Defendants point to no definitive ruling requiring dismissal of a school committee.

**CONCLUSION**

Plaintiffs have pled sufficient facts to show that Defendants have violated Plaintiffs' fundamental rights. Defendants' deliberate misinterpretation of state law and DESE Guidance to attempt to justify their disregard for Plaintiffs' parental rights belies any claim for qualified immunity. For these reasons, this Court should deny the motion to dismiss. If the Court should find legal insufficiencies in the pleading, then Plaintiffs request leave to amend.

Dated:   August 12, 2022.

/s/ Mary E. McAlister
Mary E. McAlister, Esq.*

Andrew Beckwith (MA Bar No. 657747)
Massachusetts Family Institute
401 Edgewater Place, Suite 580
Wakefield, MA 01880
781.569.0400
andrew@mafamily.org

Vernadette R. Broyles (GA Bar No. 593026)*
Mary E. McAlister (VA Bar No. 76057)*
CHILD & PARENTAL RIGHTS CAMPAIGN, INC.
5805 State Bridge Rd., Suite G310
Johns Creek, GA 30097
770.448.4525
vbroyles@childparentrights.org
mmcalister@childparentrights.org
* admitted pro hac vice
Attorneys for Plaintiffs

29

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on this 12th day of August, 2022.

/s/ Mary E. McAlister
Mary E. McAlister, Esq.