IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
SPRINGFIELD DIVISION

STEPHEN FOOTE, *et al.*,                )
                              Plaintiffs )         CASE NO. 3:22-cv-30041-MGM
v.                                       )
                                         )
TOWN OF LUDLOW, LUDLOW                   )
SCHOOL COMMITTEE, *et al.,*              )
                                         )
                              Defendants. )
_____)

**MEMORANDUM OF LAW OF *AMICI CURIAE* GLBTQ LEGAL ADVOCATES &
DEFENDERS AND THE MASSACHUSETTS ASSOCIATION OF SCHOOL
SUPERINTENDENTS, IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

<u>INTEREST OF AMICI CURIAE</u>

        Amici curiae GLBTQ Legal Advocates & Defenders and the Massachusetts Association

of School Superintendents submit this memorandum of law to provide this Court with additional

information on two points that will assist this Court in its consideration of the sweeping charges

in Plaintiffs' Amended Complaint (hereinafter, the "Complaint"), Dkt. No. 22. First, even if the

conclusory allegations pervading the Complaint stated a legal claim for some manner of parental

due process violation under the United States Constitution, Plaintiffs must also demonstrate that

Defendants' conduct "shocks the conscience," a high bar that also requires consideration of the

various interests involved here—those of the school, the students, and the parents. Second, amici

provide information about the legal obligations of schools to address safety, bullying, and

ensuring an opportunity for all students to succeed, as well as information about the benefits of

positive school environments toward those ends, both of which militate against finding

Defendants' conduct conscience-shocking.

*Amicus curiae* GLBTQ Legal Advocates & Defenders (GLAD) is New England's leading public interest legal organization dedicated to creating a just society free of discrimination based on gender identity and expression, HIV status, and sexual orientation. GLAD has successfully litigated many cases in the federal courts, including before the U.S. Supreme Court, the Court of Appeals for the First Circuit, and this Court to advance the rights of LGBT people and people living with HIV, including *Obergefell v. Hodges*, 135 S. Ct. 2071 (2015); *Bragdon v. Abbott*, 524 U.S. 624 (1998); *Gill v. Office of Pers. Mgmt.*, 682 F. 3d 1 (1st Cir. 2012); and *Rosa v. Park West Bank*, 214 F.3d 213 (1st Cir. 2000). Where schools are vital for all students to learn, grow, and take their places in the adult community, and because they are foundational community institutions, GLAD's work has long involved school issues, spanning from *Fricke v. Lynch*, 491 F.Supp. 381 (D.R.I. 1980) to *Doe v. Hopkinton Public Schools*, 19 F.4th 493 (1st Cir. 2021) (representing amici curiae).

*Amicus curiae* the Massachusetts Association of School Superintendents (M.A.S.S.) is a Massachusetts non-profit corporation organized for the purposes of improving all phases of public education in the Commonwealth and representing the interests of four hundred (400) superintendents and assistant superintendents of Massachusetts' public schools. M.A.S.S. represents approximately ninety-nine percent (99%) of all public school superintendents in the Commonwealth.

## ARGUMENT

### I. NOTHING IN DEFENDANTS' CONDUCT WAS SHOCKING TO THE CONSCIENCE.

In order to make out a substantive due process claim for a state actor's asserted violation of a constitutionally protected interest, it is undisputed that a plaintiff must show that the complained of executive actions "were so egregious as to shock the conscience . . . ." *Harron v.*

*Town of Franklin*, 660 F.3d 531, 536 (1st Cir. 2011) (quoting *Pagán v. Calderón*, 448 F.3d 16, 32 (1st Cir. 2006)). *See* Dkt. No. 29 at 18-22. Plaintiffs submit, however, that the allegations of the Complaint are sufficient to state a claim of conscience-shocking behavior.

For the reasons stated by Defendants, and the additional reasons offered for this Court's consideration, the amici agree that no properly-supported factual allegations in the Complaint conceivably state a claim of conscience-shocking behavior.

### A.      Legal Standard

As the First Circuit has noted,

> certain principles have emerged from the case law [as to sufficiently shocking conduct]. Executive acts that shock the conscience must be "truly outrageous, uncivilized, and intolerable," *Hasenfus v. LeJeunesse*, 175 F.3d 68, 72 (1st Cir. 1999), and "the requisite arbitrariness and caprice must be stunning, evidencing more than humdrum legal error." *Amsden v. Moran*, 904 F.2d 748, 754 n.5 (1st Cir. 1990). Indeed, "[a] hallmark of successful challenges is an extreme lack of proportionality, as the test is primarily concerned with violations of personal rights so severe[,] so disproportionate to the need presented, and so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." *González-Fuentes v. Molina*, 607 F.3d 864, 881 (1st Cir. 2010).

*Harron*, 660 F.3d at 536; *Rivera v. Rhode Island*, 402 F.3d 27, 36 (1st Cir. 2005) (state action must be "egregious" and "outrageous" to shock the conscience); *Meléndez-García v. Sánchez*, 629 F.3d 25, 37 (1st Cir. 2010) (burden to show "state conduct that 'shocks the conscience' is extremely high," requiring evidence beyond "[m]ere violations of state law, even violations resulting from bad faith . . . ." [quoting *J.R. v. Gloria*, 593 F.3d 73, 80 (1st Cir. 2010)]).

As to the level of culpability necessary to make out a claim of conscience-shocking behavior, Plaintiffs appear to argue that this case involves alleged conduct where the state actors

had the chance to reflect and make reasoned decisions such that "deliberately indifferent behavior" could suffice to shock the conscience. Dkt. No. 29 at 18-20.[1]

Assuming for the sake of argument that is the proper standard to be applied in this case, it is settled that "deliberately indifferent behavior does not per se shock the conscience," *J.R. v. Gloria*, 593 F.3d at 80, and the burden to show conscience-shocking behavior remains "extremely high." *Id.*

In addition, the determination of what is conscience-shocking is very context- and fact-specific, *see Hootstein*, 361 F. Supp. 3d at 112; and "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another." *Ramos-Pinero v. Puerto Rico,* 453 F.3d 48, 53 (1st Cir. 2006) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998)). Also, the analysis "may be informed in some cases by the nature of the right violated." *Hootstein*, 361 F. Supp. 3d at 112 (quoting *Martinez v. Cui*, 608 F.3d 54, 66 (1st Cir. 2010)).

In this particular case, the context involves school control over their education and environment; student privacy; and parental rights as necessarily understood in the school context.

1.      A <u>school</u> has an *in loco parentis* role where children are in its care during the school day; has control over the curriculum and the content of any other information provided to its students; and has a duty to protect all of its students and provide them with a safe and equal learning environment. *See* G.L. c. 76, §5; Defendants' Memorandum of Law in Support of

---

[1]      Both the First Circuit and this court have acknowledged the availability of this standard in that context. *See, e.g., J.R. v. Gloria*, 593 F.3d at 80; *Hootstein v. Amherst-Pelham Reg'l Sch. Comm.*, 361 F. Supp. 3d 94, 112 (D. Mass. 2019). At the same time, it is worth noting that as of the *J.R. v. Gloria* decision in 2010, the court stated that it had "never found on the facts of a case that deliberately indifferent behavior was sufficiently conscience-shocking to violate a plaintiff's substantive due process rights." *J.R. v. Gloria*, 593 F.3d at 80 n.4. More recently, in the context of the state-created danger doctrine, the First Circuit has recognized that deliberate indifference may shock the conscience. *Irish v. Fowler*, 979 F.3d 65, 74-75 (1st Cir. 2020).

Defendants' Motion to Dismiss, Dkt. No. 28 at 12-14. *See generally Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1204-07 (9th Cir. 2005) (detailing the broad scope of a school's control of the education provided and the lack of a parental right to prevent the school "providing its students with whatever information it wishes to provide, sexual or otherwise, when and as the school determines that it is appropriate to do so"); *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 185 (3rd Cir. 2005) (school's discretion to introduce sensitive topics to students does not unconstitutionally intrude on parental authority). *Cf. Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2046 (2021) ("The doctrine of *in loco parentis* treats school administrators as standing in the place of students' parents under circumstances where the children's actual parents cannot protect, guide, and discipline them.").

2. <u>Students</u>, who, when they come to their teachers and counselors to share personal information about themselves in confidence, have certain rights to have their private information held confidentially and not shared. *See, e.g.*, *C.N.*, 430 F.3d at 179-80 (minor students can assert a disclosure-based privacy claim); *Gruenke v. Seip*, 225 F.3d 290, 302-03 (3rd Cir. 2000) (same); *Aid for Women v. Foulston*, 441 F.3d 1101, 1119-20 (10th Cir. 2006) (addressing a minor's privacy rights in confidential information albeit as not as strong as an adult's rights); *Planned Parenthood of S. Ariz. v. Lawall*, 307 F.3d 783, 789-90 (9th Cir. 2002) (deciding minor's rights in "avoiding disclosure of sensitive personal information"); *Arnold v. Board of Educ. of Excambia Cnty., Ala.*, 880 F.2d 305, 314 (11th Cir. 1989) ("The decision whether to seek parental guidance . . . should rest within the discretion of the minor" in matter of pregnancy counseling).

3. <u>Parents</u>, who have certain rights to direct the upbringing of their children and to protect familial privacy, albeit rights that are not absolute and that must be balanced against the

state's interests. *See, e.g., Brown v. Hot, Sexy & Safer Products, Inc.*, 68 F.3d 525, 534 (1st Cir. 1995) (there is no "broad-based [parental] right to restrict the flow of information in the public schools"); *Parker v. Hurley*, 514 F.3d 87, 102 (1st Cir. 2008) (the "proposition is well recognized" that parents do not have a constitutional right to "direct *how* a public school teaches their child" [emphasis in text] [quoting *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 395 (6th Cir. 2005)]); *id.* at 102-03 (the right of parental control or familial privacy "does not give plaintiffs the degree of control over their children's education that their requested relief seeks").

With specific regard to parental familial rights, it is also worth noting that the First Circuit has made it clear that the alleged conduct "must be directly aimed at the parent-child relationship." *Pittsley v. Warish*, 927 F.2d 3, 8 (1st Cir. 1991). The parental right is

> Implicated whenever the state directly seeks to change or affect the parent-child relationship. State action that affects the parental relationship only incidentally, however, even though the deprivation may be permanent, as in the case of unlawful killing by the police, is not sufficient to establish a violation of a[n] identified liberty interest.

*Id.* (no viable claim by young children for comments, threats and conduct by the police toward them concerning their parents); *C.N.*, 430 F.3d at 184-85 (citing cases, including *Pittsley*, that require "actions that strike at the heart of parental decision-making authority"; "directly aim[] at the parent-child relationship"; implicate the family's right "to remain together without the coercive interference of the . . . state"; or drive "a wedge into a family and threaten[] its very foundation"); *Castro v. Windham*, 1-16-cv-08148, 2017 U.S. Dist. LEXIS 153376, at *13 (S.D.N.Y. Sept. 19, 2017) (foster family took foster child on a short vacation to Florida against the father's wishes as expressed to the agency; no basis to conclude that the grant of permission for the trip "was directed specifically towards the disruption of the family relationship").

Given this complex context of schools' obligations, students' rights and parents' rights, Plaintiffs make only one simplistic substantive argument to support their claim of conscience-shocking behavior. In essence, they argue that Defendants' conduct—in "concealing information" from them; "conspiring with [their] children to deliberately deceive" them with different names and pronouns; and having "secret conversations with B.F. questioning [their] support and choice of a mental health professional"—"strike[s] at the heart of the parent-child relationship." Dkt. No. 29 at 19-20 (citing *Grendell v. Gillway*, 974 F. Supp. 46 (D. Me. 1997)).[2,3]

However, *Grendell* is too slender a reed to support the Plaintiffs' claim on the facts in this wholly different context. In *Grendell*, the story starts with a school counselor taking an eleven-year-old student out of class for a conversation as to "whether her parents abused drugs." *Id.* at 49. The student told the counselor that her parents smoked marijuana. *Id.* This ultimately led, at the urging of the counselor, to a conversation between the student and the police at school in the counselor's presence. *Id.* The police officer told the student that, if she did not cooperate,

---

[2]      A complaint should be dismissed "if the factual allegations . . . stripped of conclusory legal allegations, raise no more than a sheer possibility that a defendant has acted unlawfully." *Frith v. Whole Foods Mkt. Inc.*, 38 F.4th 263, 270 (1st Cir. 2022) (internal quotation marks and citation omitted). The "allegations must be enough to raise a right to relief above the speculative level," and "beyond the realm of pure conjecture, that is, across the line from conceivable to plausible." *Id.* at 270 & 274 (internal quotation marks and citation omitted). In addition, when the facts alleged "support an obvious alternative explanation," they "do not take [Plaintiffs'] claims across the plausibility threshold"; and the complaint should be dismissed. *Id.* at 274-75. None of the allegations in the Complaint are adequately supported with pertinent facts.

[3]      The Plaintiffs make two other rhetorical flourishes suggesting conscience-shocking behavior: (1) the alleged "inflammatory" public comments of Mr. Kelliher and Mr. Gazda; and (2) the asserted "re-interpreting DESE Guidance and state regulations" in violation of law. Dkt. No. 29 at 18. As to the former, the public comments have simply nothing to do with the gist of the complaint, i.e., the school's interactions with the Plaintiffs' children at school. As to the latter, as noted above, even a bad faith violation of state law cannot rise to the level of shocking the conscience.

her parents would be arrested and she would be "in a lot of trouble." *Id.* The officer also warned

her not to tell her parents as she would likely be beaten by them if she did. *Id.* The parents were

arrested later that day, and the child was kept from seeing her mother. *Id.* at 49-50.

Based on these facts, the district court addressed claims that the *child's*—not the

parents'—substantive due process rights had been violated. At the time when a plaintiff could

make out a substantive due process claim in either of two ways—by showing state conduct that

shocked the conscience <u>or</u> by demonstrating a violation of a protected liberty interest—the court

found that the police officer's conduct shocked the conscience while the school counselor's

conduct—not seeking parental consent for the police interrogation—did not. *Id.* at 51-53.

In addition, the court found that neither the police officer nor the school counselor had

violated the child's right to familial privacy because neither's actions was "directly aimed at the

parent-child relationship." *Id.* at 53, relying on *Pittsley*, *supra*.

In short, *Grendell* stands, at best, for the proposition that a police officer's coercive

extraction of information from a minor could shock the conscience while not violating any

protected familial privacy rights.[4]

By contrast, accepting all of the properly alleged—and not conclusory—facts in the

Complaint, there is nothing in any way comparable to *Grendell*. Here, there was no allegation of

coercive extraction of information from Plaintiffs' children. Rather, the children sought out

school employees; imparted personal and private information to them; and requested that the

information not be immediately disclosed to their parents. Specifically, one student's Feb. 28,

---

[4]     Of course, under current law, the district court in *Grendell* would have been required to
find against the police officer as well because the plaintiff would have been required to prove
*both* conscience-shocking conduct *and* the deprivation of a constitutionally protected liberty
interest. *Harron*, 660 F.3d at 536.

2021 written "announcement" to trusted teachers and guidance counselor that they are "genderqueer" and would be using different names and pronouns, was followed the next day by the guidance counselor's memo to staff asking them not to disclose this information to the parents because the student "is still in the process of telling [the student's] parents." Dkt. No. 22 at ¶¶ 81, 83. *Contrast Arnold*, 880 F.2d at 314 ("We hold merely that the counselors must not coerce minors to refrain from communicating with their parents. . . . As a matter of common sense, not constitutional duty, school counselors should encourage communication with parents regarding difficult decisions [such as pregnancy counseling].").

> **B.** **Research-Based Best Practices and the Legal Obligations of Schools and Provide Additional Context as to Why Its Actions are Not Conscience-Shocking.**

1. No one contests that these parents, like all parents, are uniquely important in their children's lives and have the opportunity to know and guide them, and to share and teach their values to them. As the District of New Hampshire observed about a policy similar to the DESE Guidance cited by Plaintiffs, students are not "prevent[ed] . . . from sharing information with their parents" and nor are the parents barred from "observing their children's behavior, moods, and activities," from "talking" with them, from "obtaining medical care and counseling," "providing religious or other education to their children," from enrolling them in a different school, or from monitoring their social media, choosing with whom their children socialize or what the children may do in their free time. *Doe v. Manchester Sch. Dist.*, 216-2022-CV-00117, Order, at *7 (N.H. Super. Sept. 6, 2022). Still, a parent's rights to bring up their child is "necessarily qualified in a school setting where the state's power is custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults," *C.N.*,

430 F.3d at 182 (internal citations and quotation marks omitted). *See Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 655 (1995).

2.    The school's supportive response to B.F. is consistent with student privacy interests and the students' interest in their relationship with their family, and well-established research that a positive climate in which all people are welcomed, supported and feel safe— socially, emotionally, intellectually, and physically is critical for student learning.

Schools must consider the privacy rights of students as well as the risks of inserting themselves into the students' family relationships. As to privacy, failure to respect student confidences has the perverse effect of incentivizing secrecy for those students who, for any number of reasons, are not ready to share something with their parents but would benefit from casual interactions with school staff as well as guidance or guidance and adjustment counseling. Moreover, forcing disclosure despite the contrary wishes of the student means inserting the school directly into the family-student relationship rather than allowing the student to manage their parental relationships by sharing information when they are ready to do so. In this matter, Plaintiffs' child B.F. made a written announcement to trusted teachers and their guidance counselor, and the counselor followed up with staff to ask for nondisclosure since the student "is still in the process of telling his [sic] parents." Complaint, paras. 81, 83. To be sure, we do not know the consequences of the disclosure here, if any. However, failure to respect a young person's informational privacy, in some instances, has catastrophic effects for the young person. *E.g. Sterling v. Borough of Minersville*, 232 F.3d 190, 196-97 (3d Cir. 2000) (police officer's threat to disclose a young person's sexual orientation to a family member—"an intimate aspect of his personality entitled to protection"—violates the young person's privacy rights, and resulted in suicide). Here, Plaintiffs claims are so expansive, even claiming that speaking about

how a child is doing at home violates the United States Constitution, that teachers and staff will be strongly incentivized to refrain from those and other questions and casual conversations with students for fear of triggering liability claims. It barely needs to be said that this threat would undermine the very kind of positive school environments that support students.

A positive school climate in which all people are welcomed, supported, and feel safe—socially, emotionally, intellectually, and physically—is critical for student learning. Jonathan Cohen, *School Climate and Culture Improvement: A Prosocial Strategy that Recognizes, Educates, and Supports the Whole Child and the Whole School Community*, from Handbook of Prosocial Education Vol. 1 (Rowman & Littlefield Publishers, Inc. 2012). School policies that welcome all students and support them in their expression of identity help to create a positive school climate for those students. The Centers for Disease Control and Prevention (the "CDC") identified key elements of a positive school climate, explaining:

> Children and adolescents who feel supported by important adults in their lives are likely to be more engaged in school and learning. In the school setting, students feel supported and cared for when they see school staff dedicating their time, interest, attention, and emotional support to them. Students need to feel that adults care about them as individuals as well as about their academic achievement.

CDC, U.S. Dep't of Health & Hum. Servs., *School Connectedness: Strategies for Increasing Protective Factors Among Youth* 6 (2009) (footnotes omitted), *available at* https://stacks.cdc.gov/view/cdc/5767.

A positive school climate, fostering a sense of safety, belonging, and respect for every student in a school community, has deep and long-lasting effects for every child who experiences it, and is an essential foundation for learning. A review of 78 studies looking to associations of economic background, inequality, school climate, and academic achievement found that positive school climate can raise grades, affect student attendance and achievement and also mitigate the

negative effects of poverty on academic performance. *See* Kia Daring Hammond & Linda Darling Hammond, *Supportive and Inclusive Schools*, in The Civil Rights Road to Deeper Learning, at 40 (Teachers College Press 2022).

Although the Complaint does not allege that the students here are transgender, *amici* bring to this Court's attention that these concepts are as true for them as they are for all students. Whether as a consequence of a non-discrimination law, a positive school environment focus, or other practices, affirming children who are exploring their gender, are transgender, or are gender nonconforming at school is essential for providing these students with equal educational opportunities. Nat'l Acads. of Sci., Eng'g, & Med., *Understanding the Well-Being of LGBTQI+ Populations*, at 2-7 (2020) (hereinafter "National Academies"), *available at* http:nap.edu/25877 ("Gender affirmation is a key determinant of health and well-being for transgender people."). *See also, e.g.*, Stephen T. Russell et al., *Chosen Name Use is Linked to Reduced Depressive Symptoms, Suicidal Ideation and Behavior Among Transgender Youth*, 63 J. Adolescent Health 503, 504 (2018) ("Transgender youth who were able to use their chosen name in multiple contexts reported fewer depressive symptoms and less suicidal ideation and behavior.").

Consistent with this research, experts on the administration of schools recommend that "[a]ll school staff should use the student's preferred name and pronoun, which is a sign of respect to the student and affirms his or her gender identity." Nat'l Ass'n of Secondary Sch. Principals, *Position Statement: Transgender Students*, at 5 (2016), https://goo.gl/kcfImn. According to the National Academies, there is "clear evidence that state and local K-12 education policies that are inclusive of SGD [sexual and gender diverse] students" support a positive school climate and student well-being and success." *National Academies*, at 9-5.

3.      Massachusetts law and educational policy seeks to implement this critical and well-accepted paradigm on positive school learning environments for students. Numerous laws make demands of schools for the benefit of student learning, safety, and well-being at school. In this context, it is common sense and far from shocking that schools retain great authority over their educational methods, practices and procedures, and that schools would endeavor to know and support every student.

State law instructs educators to "engage [students] fully in learning" but "without threats to their sense of security or self-esteem" so that they have "the opportunity to reach their full potential" and participate in the "political," "social," and "economic" life of the community, G.L. c. 69, §1(1).

The non-discrimination law makes more specific the equal opportunity commitment to all children regardless of their status, identities or circumstances: "no person" may be "excluded from or discriminated against" with respect to admission, advantages, privileges, or courses of study "on account of race, color, sex, gender identity, religion, national origin, or sexual orientation as areas of particular concern." G.L. c.76, § 5. *See also* 603 CMR 26.01(1), 26.07(1)-(2) (requiring schools to take "active efforts to "prevent harassment of discrimination" based on personal characteristics).[5]

---

[5]      Federal law also imposes obligations on schools, such as the equal protection guarantee and Title IX, 20 U.S.C. § 1681(a), and both have been applied to require schools to ensure the integration of students exploring or asserting their identities. In *Grimm v. Gloucester Cnty. Sch. Bd.*, for example, a school's refusal to allow a student to use a bathroom consistent with their gender identity constituted discrimination because of sex and because of transgender people constitute a quasi-suspect class. 972 F.3d 586, 609-10 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2878 (June 28, 2021) (citing cases). The School Board also violated Title IX, both in denying him use of the boys' bathroom and refusing to update his sex on school records. *Id*. at 619. The U.S. Department has confirmed this approach multiple times, including in draft regulations covering "sexual orientation" and "gender identity" discrimination within Title IX's prohibition

The "Guidance for Massachusetts Public Schools Creating a Safe and Supportive School Environment," issued by the Department of Elementary and Secondary Education (hereinafter, the "DESE Guidance"), assists schools in implementing the gender identity amendment to G.L. c. 76, § 5. *See* Dkt. No. 28, Exh. 1. It includes "case studies" based on past experiences of schools and students to assist educators in developing a school environment that supports student development and learning for transgender and gender nonconforming students. *Id.*, "Nondiscrimination," "The Law." Adhering to first principles in education, it asserts that "[a]ll students need a safe and supportive school environment to progress academically and developmentally," it encourages schools to look to individual circumstances by "consider[ing] issues on a case-by-case basis," and providing "illustrative, not prescriptive" examples. *Id.*

Although not alleged here, schools are required to take numerous other steps to keep students safe and maintain a supportive environment. For example, state law requires schools to address bullying through education, prevention and remediation and must abide by a detailed statute, regulations and guides on policy and procedures. G.L. c. 71, § 37O; 603 CMR 49.00 et seq., Mass. Dep't of Elementary & Secondary Educ., *Model Bullying Prevention and Intervention Plan* (2014), *available at* https://www.doe.mass.edu/sfs/bullying/. Further, Massachusetts comprehensive anti-bullying law enumerates classes of students who are particularly vulnerable to the harmful short and long-term effects of bullying, requiring schools to be particularly sensitive to the needs and realities of historically marginalized groups, including LGBT students. In addition, since 2014, Massachusetts has been promoting safe and supportive school environments to achieve "high academic standards and other important

---

of discrimination "on the basis of sex." Dep't of Educ., Office for Civil Rights, 87 Fed. Reg. 41390 (July 12, 2022) (notice) (citing *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020)).

educational reform goals" and to "avoid[] acts of violence that have devastated too many school communities." DESE, *Safe and Supportive Schools Commission—Seventh Annual Report* (Feb. 2022), at 1-2 (discussing the Commission's work pursuant to the school-related portions of Chapter 284 of the Acts of 2014, *An Act Relative to Gun Violence*), *available at* https://www.doe.mass.edu/sfs/safety/commission.html#:~:text=The%20Safe%20and%20Supportive%20Schools,the%20Reduction%20of%20Gun%20Violence.

Each of the above-referenced policies supports students' safety and well-being at school, because those are predicates to being able to learn and grow at school, and therefore reach their full potential. *See also* Dkt. No. 28 at 12-15.

To the extent that the defendants provided a supportive and affirming environment for all students by adhering to a policy of listening to and supporting each student, including using the names and pronouns requested by students, such conduct are examples of nondiscrimination and best practices in actual practice, both of which are far from conscience-shocking behavior.

## Conclusion

As noted in a perceptive law review article, "[t]here is no way for schools to shield themselves from learning about students' personal and family lives." Emily Gold Waldman, *Show and Tell?: Students' Personal Lives, Schools, and Parents*, 47 Conn. L. Rev. 699, 739 (2015). Once the school has such information, "both possible routes—disclosure and nondisclosure—have the potential to alter the family dynamic as well. . . . When it comes to disclosure . . . *some* distortion of the parent-child relationship is inevitable." *Id.* at 737 (emphasis in text). Research suggests that "disclosures could potentially undermine the parent/child relationship by depriving students of the chance to share information on their own terms and by

making parents aware that their child is concealing information from them." *Id.* at 735-36

(footnotes omitted) and nn.198-201.

For these reasons, Professor Waldman offer this prescription:

We want schools to ask questions . . . when a student—or her parent—initiates the school's involvement. . . . [The school] should have a wide zone of discretion to decide whether to disclose students' personal information to their parents, as long as they remain within the corridor of neither pressuring students to keep secrets from their parents nor disclosing student's personal information without a legitimate reason for doing so.

*Id.* at 739-740.

For the above stated reasons, Amici Curiae urge this Court to grant Defendants' Motion to Dismiss.

Dated: October 7, 2022

/s/ Chris Erchull
Mary L. Bonauto (No. 549967)
mbonauto@glad.org
Gary D. Buseck (No. 067540)
gbuseck@glad.org
Bennett H. Klein (No. 550702)
bklein@glad.org
Chris Erchull (No. 690555)
cerchull@glad.org
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont Street, Suite 950
Boston, MA 02108
(617) 426-1350
*Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I certify that on this 7th day of October, 2022, I electronically filed the foregoing document with

the United States District Court for the District of Massachusetts using the Court's CM/ECF

system. All participants in this case are registered CM/ECF users and will be served by the

appellate CM/ECF system.

Dated: October 7, 2022                    By: /s/ Chris Erchull

## STATE OF NEW HAMPSHIRE

**HILLSBOROUGH, SS.**                                                **SUPERIOR COURT**
**NORTHERN DISTRICT**

Jane Doe

v.

Manchester School District
and
School Administrative Unit #37

Docket No. 216-2022-CV-00117

## <u>ORDER</u>

The plaintiff brought this action alleging that the transgender student policy of the Manchester School District violates the plaintiff's constitutional and statutory parental rights. The defendants now move to dismiss. The plaintiff objects. For the reasons set forth below, the defendants' motion to dismiss is GRANTED.

### Factual Background

The Amended Complaint alleges the following facts, which the Court assumes to be true for purposes of this motion.  On February 8, 2021, the Manchester School District adopted Policy 100.1, titled Transgender and Gender Non-Conforming Students (hereinafter "the Policy"). (<u>See</u> Am. Compl. ¶ 24; Ex 1.) The Policy provides:

> District policy requires that all programs, activities, and employment practices be free from discrimination based on sex, sexual orientation, or gender identity. This policy is designed in keeping with these mandates to create a safe learning environment for all students and to ensure that every student has equal access to all school programs and activities. . . . In all cases, the goal is to ensure the safety, comfort, and healthy development of the transgender or gender nonconforming

This is a Service Document For Case: 216-2022-CV-00117
Hillsborough Superior Court Northern District
9/6/2022 9:07 AM

student while maximizing the student's social integration and minimizing stigmatization of the student.

(Am. Compl., Ex. 1, Section I.) Of particular relevance to the plaintiff's claims, the Policy further provides that:

> The Board recognizes a student's right to keep private one's transgender status or gender nonconforming presentation at school. Information about a student's transgender status, legal name, or gender assigned at birth also may constitute confidential information. School personnel should not disclose information that may reveal a student's transgender status or gender nonconforming presentation to others, including parents and other school personnel, unless legally required to do so or unless the student has authorized such disclosure. Transgender and gender nonconforming students have the right to discuss and express their gender identity and expression openly and to decide when, with whom, and how much to share private information.
>
> When contacting the parent or guardian of a transgender or gender nonconforming student, school personnel should use the student's legal name and the pronoun corresponding to the student's gender assigned at birth unless the student, parent, or guardian has specified otherwise. Any student who has a need or desire for increased privacy, regardless of the underlying reason, should be provided with a reasonable alternative to meet the need for that individual's privacy, regardless of gender identity.

(Id., Section III.A.) The Policy was derived from a model policy that was drafted, circulated, and recommended by the New Hampshire School Boards Association, an organization to which the defendants pay dues with funds provided by taxpayers. (Am. Compl. 25.) On March 14, 2022, the District amended the Policy, making the following changes (deletions in ~~strikethrough~~ format; additions in **[bold and in brackets]**):

> The Board recognizes a student's right to keep private one's transgender status or gender nonconforming presentation at school. Information about a student's transgender status, legal name, or gender assigned at birth also may constitute confidential information. School personnel should not disclose information that may reveal a student's transgender status or gender nonconforming presentation to others~~, including parents and other school personnel,~~ unless legally required to do so or unless the student has authorized such disclosure.

> Transgender and gender nonconforming students have the right to discuss and express their gender identity and expression openly and to decide when, with whom, and how much to share private information. **[Nothing herein shall be construed to change the obligation of the school to take action when student safety is concerned.]**

> When ~~contacting the parent or guardian of~~ **[referring to]** a transgender or gender nonconforming student, school personnel should use the student's legal name and the pronoun corresponding to the student's gender assigned at birth unless the student, parent, or guardian has specified otherwise. Any student who has a need or desire for increased privacy, regardless of the underlying reason, should be provided with a reasonable alternative to meet the need for that individual's privacy, regardless of gender identity.

(Am. Compl., Ex. 2, Section III.A.)

The plaintiff's minor child (M.C.) attends a school in the Manchester School District. (Am. Compl. ¶ 48.) In the fall of 2021, the plaintiff learned that M.C. had asked teachers and fellow students to refer to M.C. by a name traditionally associated with a gender different from their gender as assigned at birth. (Id. ¶ 49.) The plaintiff reached out to M.C.'s guidance counselor and informed her that she would like the school to continue to treat M.C. according to M.C.'s birth gender, address M.C. by their given name, and address M.C. using the pronouns traditionally associated with their biological sex. (Id. ¶ 50.)

While some of M.C.'s teachers communicated their willingness to comply with the plaintiff's wishes, (id. ¶¶ 51–52), the school's principal sent the plaintiff an email in which he stated:

> While I respect and understand your concern, we are held by the District policy as a staff. I have quoted our district policy below, which outlines the fact that we cannot disclose a student's choice to parents if asked not to. If [M.C.] insists on being called [M.C.'s desired name] as a staff we have to respect that according to the policy or unfortunately we can be held accountable despite parents' wishes.

(Id. ¶ 53.) Following this exchange, M.C. informed the plaintiff that they had asked school personnel to use their birth name and pronouns. (Id. ¶ 54.) School personnel made similar representations to the plaintiff. (Id. ¶ 55.) Nevertheless, the plaintiff has brought this action claiming that the continued existence of the policy "means that [she] cannot know whether representations by District personnel are factually true, or whether the District personnel are simply following the Policy by misleading and/or lying to [her] about M.C.'s in-school gender expression and the District's response thereto." (Id. ¶ 56.) Count I alleges that by promulgating and enforcing the Policy, the defendants are violating her parental rights under Part I, Article 2 of the New Hampshire Constitution. Count II alleges that the Policy is *ultra vires*. Count III alleges that the Policy violates the Family Educational Rights and Privacy Act (FERPA). Finally, Count IV alleges that the Policy violates the Protection of Pupil Rights Act (PPRA). The plaintiff seeks a declaratory judgment, permanent injunction, nominal damages, and attorneys' fees. (Id. ¶ 1; Prayer for Relief.)

**Analysis**

In ruling on a motion to dismiss, the Court determines "whether the allegations contained in the pleadings are reasonably susceptible of a construction that would permit recovery." Pesaturo v. Kinne, 161 N.H. 550, 552 (2011). The Court rigorously scrutinizes the facts contained on the face of the complaint to determine whether a cause of action has been asserted. In re Guardianship of Madelyn B., 166 N.H. 453, 457 (2014). The Court "assume[s] the truth of the facts alleged by the plaintiff and construe[s] all reasonable inferences in the light most favorable to the plaintiff." Lamb v. Shaker Reg'l Sch. Dist., 168 N.H. 47, 49 (2015). The Court "may also consider documents attached to the plaintiff's pleadings, or documents the authenticity of which are not disputed by the

parties[,] official public records[,] or documents sufficiently referred to in the complaint." Beane v. Dana S. Beane & Co., P.C., 160 N.H. 708, 711 (2010). "If the facts do not constitute a basis for legal relief, [the Court will grant] the motion to dismiss." Graves v. Estabrook, 149 N.H. 202, 203 (2003).

The defendants first argue that Count I of the Amended Complaint should be dismissed because the Policy does not infringe the plaintiff's right to parent under Part I, Art. 2 of the New Hampshire Constitution. Specifically, while the defendants concede that the plaintiff has a fundamental right to raise her child as she wishes, they assert that the plaintiff's right to parent does not include the ability to direct how the school teaches her child. In response, the plaintiff argues that by preventing the free flow of information between parents and the school concerning a child's preferred name, gender identity, or social transitioning status, the Policy infringes on the fundamental right to parent. She thus asserts that the policy is subject to strict scrutiny, which it cannot survive.

The Plaintiff invokes both the State and Federal Constitutions. (See Am. Compl. ¶ 2.) Accordingly, the Court will address the State Constitutional claim first, citing to federal law to aid in its analysis. See In re Nelson, 149 N.H. 545, 547 (2003) (citing State v. Ball, 124 N.H. 226, 231–33 (1983)).

"The right of parents to raise and care for their children is a fundamental liberty interest protected by Part I, Article 2 of the New Hampshire Constitution." In re R.A., 153 N.H. 82, 90 (2005). "Similarly, the United States Supreme Court has recognized that the 'Due Process Clause of the Fourteenth Amendment protects the fundamental rights of parents to make decisions concerning the care, custody, and control of their children.'" Id. (quoting Troxel v. Granville, 530 U.S. 57, 66 (2000)). "Parental rights have been found

to operate against the State, against third parties, and against the child." Id. (quotation omitted). However, the right to make decisions about the care, custody, and control of one's children is not absolute. Reardon v. Midland Community Schools, 814 F. Supp. 2d 754, 768 (E.D. Mich. 2011) (citing Prince v. Massachusetts, 321 U.S. 158, 165–66 (1944)); see also Arnold v. Bd. of Education, 880 F.2d 305, 313 (11th Cir. 1989) ("We recognize that parental autonomy to direct the education of one's children is not beyond limitation. When parents enroll their children in public schools they cannot demand that the educational program be tailored to their individual preferences."). For example, "[w]hile parents may have a fundamental right to decide whether to send their child to a public school, they do not have a fundamental right generally to direct how a public school teaches their child." Blau v. Fort Thomas Pub. Sch. Dist., 401 F.3d 381, 395 (6th Cir. 2005). "Whether it is the school curriculum, the hours of the school day, school discipline, the timing and content of examinations, the individuals hired to teach at the school, the extracurricular activities offered at the school or . . . a dress code, these issues of public education are generally committed to the control of state and local authorities." Id. at 395–96.

By its plain terms, the Policy encourages respect for student wishes when it comes to when and with whom to share information regarding the student's preferred name and gender identity. Nevertheless, it is not stated in absolute terms. Indeed, the policy specifically contemplates that it shall not prevent school officials from taking action when student safety is concerned. Even crediting the plaintiff's assertion that the policy would allow school officials to affirmatively conceal her child's gender identity preferences from her, the Court rejects the plaintiff's argument that the Policy violates her fundamental right

to parent. See Parents for Privacy v. Barr, 949 F.3d 1210, 1231 (9th Cir. 2020) (affirming district court's conclusion that "Plaintiffs lack a fundamental right to direct Dallas High School's bathroom and locker room policy"); Thomas v. Evansville-Vanderburgh School Corp., 258 Fed.Appx. 50, 52–54 (7th Cir. 2007) (finding no violation of parent's right to direct upbringing of child where the school did not inform mother of school counselor's private conversations with student regarding her problems at school); Doe v. Irwin, 615 F.2d 1162, 1168 (6th Cir. 1980) (finding no deprivation of the liberty interest of parents in the practice of not notifying them of their children's voluntary decisions to participate in the school's voluntary birth control clinic). Indeed, the policy does not encourage or prevent students from sharing information with their parents. Moreover, the Policy does not prevent parents from observing their children's behavior, moods, and activities; talking to their children; providing religious or other education to their children; choosing where their children live and go to school; obtaining medical care and counseling for their children; monitoring their children's communications on social media; choosing with whom their children may socialize; and deciding what their children may do in their free time. In short, the Policy places no limits on the plaintiff's ability to parent her child as she sees fit.

The Court therefore finds that because no fundamental right is infringed, plaintiff's claims do not warrant the application of strict scrutiny. Instead, where a challenged law or regulation does not impinge upon a fundamental right, the Court employs a rational basis review. See Lloyd v. Sch. Bd. of Palm Beach Cty., No. 9:21-cv-81715-KMM, 2021 U.S. Dist. LECIS 210628, at *21–29 (S.D. Fla. Oct. 29, 2021) (finding that because a school mask mandate did not implicate fundamental rights, rational basis review was

appropriate). The rational basis test requires that the Policy only be rationally related to a legitimate governmental interest. State v. Hollenbeck, 164 N.H. 154, 163 (2012). The party challenging the legislation has the burden of proof. Id. This level of review contains no inquiry into whether the Policy unduly restricts individual rights, nor does the Court independently examine the factual basis. Id. Rather, the Court will inquire only as to whether the defendants could reasonably conceive to be true the facts upon which the Policy is based. Id.

Here, the defendants have a legitimate interest in ensuring that "all school district programs, activities, and employment practices be free from discrimination," to "create a safe learning environment for all students," and to "ensure that every student has equal access to all school programs and activities." See (Am. Compl., Ex. 2, Section I); see also RSA 193:38 (prohibiting discrimination in public schools on the basis of gender identity); RSA 193:39 (requiring school districts to develop and implement anti-discrimination plans). The defendants enacted the Policy in furtherance of those interests. As it pertains to student privacy, the Policy notes that a student's transgender status may constitute confidential information and provides that "[s]chool personnel should not disclose information that may reveal a student's transgender status or gender nonconforming presentation to others unless legally required to do so or unless the student has authorized such disclosure." (Am. Compl., Ex. 2, Section III.) The Policy is flexible and acknowledges that the "needs of each transgender or gender nonconforming student must be assessed on a case-by-case basis." (Id. at Section I.) The parties disagree as to whether the Policy properly balances and respects competing rights and adequately protects the interests of transgender students. While competing values and policy

interests may be at stake, "[i]t is not for the court to inquire into the wisdom or unwisdom of such [rulemaking]. Whether the act be wise, reasonable, or expedient, is a legislative and not a judicial question." Cram v. School Bd., 82 N.H. 495, 496 (1927). Here, the School Board considered the various interests involved and specifically acknowledged that differing circumstances may exist for each student. It adopted a policy derived from a model policy recommended by the New Hampshire School Boards Association. (Am. Compl. ¶ 25.) They considered changes and subsequently amended the Policy. (Id. ¶ 43.) The Policy itself sets forth its purpose and is drafted in flexible terms. While the plaintiff may disagree with the Policy, it is rationally related to a legitimate governmental interest and the Court finds, therefore, that it does not offend the constitution.

Accordingly, the defendants' motion to dismiss is GRANTED as to Count I of the Amended Complaint.

The defendants next argue that the school board was authorized to enact the Policy and therefore it is not *ultra vires*. "Administrative rules may not add to, detract from or modify the statute they are intended to implement." Appeal of Mader 2000 Trust, 174 N.H. 520, 525 (2021) (brackets and quotation omitted). "Thus, the determination of whether an administrative rule is *ultra vires* involves statutory interpretation." Id. When interpreting statutes, we ascribe the plain and ordinary meanings to the words used. Id. The interpretation of a statute is a question of law for this Court.

The relevant statutory authority is contained within RSA 193:38–:39, reproduced below:

> **193:38 Discrimination in Public Schools. –** No person shall be excluded
> from participation in, denied the benefits of, or be subjected to discrimination
> in public schools because of their age, sex, gender identity, sexual
> orientation, race, color, marital status, familial status, disability, religion, or

> national origin, all as defined in RSA 354-A. Any person claiming to be aggrieved by a discriminatory practice prohibited under this section, including the attorney general, may initiate a civil action against a school or school district in superior court for legal or equitable relief, or with the New Hampshire commission for human rights, as provided in RSA 354-A:27-28.
>
> **193:39 Discrimination Prevention Policy Required. –** Each school district and chartered public school shall develop a policy that guides the development and implementation of a coordinated plan to prevent, assess the presence of, intervene in, and respond to incidents of discrimination on the basis of age, sex, gender identity, sexual orientation, race, color, marital status, familial status, disability, religion, national origin, or any other classes protected under RSA 354-A.

RSA 193:38 makes discrimination based on sex or gender identity unlawful in public schools. RSA 193:39 requires that each school district develop a discrimination prevention and response plan targeted at, *inter alia*, discrimination based on sex or gender identity. The Policy by its own terms "is designed . . . to create a safe learning environment for all students and to ensure that every student has equal access to all school programs and activities." (Am. Compl., Ex. 2, Section I.) Given the relevant statutory framework, the language of the Policy, and the record before it, the Court finds the plaintiff has failed to set forth a legal or factual basis to support its contention that the policy is *ultra vires*.

As a result, the defendants' motion to dismiss Count II of the Amended Complaint is GRANTED.

Finally, the defendants contend that the plaintiff lacks standing to assert the federal statutes referenced in Counts III and IV of the Amended Complaint, and that even if she did, she has failed to state a claim for relief. In her Amended Complaint, the plaintiff asserts taxpayer standing under Part I, Article 8 of the State Constitution. However, in her objection, the plaintiff fails to address the defendants' arguments as to Counts III and IV.

Part I, Article 8 provides that:

> [A]ny individual taxpayer eligible to vote in the State, shall have standing to petition the Superior Court to declare whether the State or political subdivision in which the taxpayer resides has spent, or has approved spending, public funds in violation of a law, ordinance, or constitutional provision. In such a case, the taxpayer shall not have to demonstrate that his or her personal rights were impaired or prejudiced beyond his or her status as a taxpayer.

Part I, Article 8 confers standing upon a plaintiff who challenges a particular governmental spending action, that is to say, "a plaintiff with standing under Part I, Article 8 can call on the courts to determine whether a specific act or approval of spending conforms with the law." Carrigan v. N.H. Dep't of Health and Human Servs., 174 N.H. 362, 370 (2021). The phrase "has spent, or has approved spending" does not mean "a governmental body's overall management of its operations and functions, including its allocation of appropriations, as opposed to one or more discrete acts or decisions approving certain spending." Id.

The plaintiff first claims that by withholding information regarding a student's preferred name or gender identity, the defendants are violating FERPA, 20 U.S.C. ¶ 1232g(a)(1)(A), by unlawfully withholding "education records." As a threshold matter, it is well settled law that FERPA cannot be enforced through a private cause of action. See Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 69 (1st Cir. 2002) (finding no private cause of action under FERPA and collecting cases holding the same). Nor can FERPA be enforced through an action under 42 U.S.C. § 1983. See Gonzaga Univ. v. Doe, 536 U.S. 273, 290 (2002). The Court therefore has doubts about whether a plaintiff could use Article 8 taxpayer standing to assert an otherwise unavailable FERPA claim.

In any event, the relevant provision of FERPA requires educational institutions and agencies to make education record available to parents in order to be eligible for federal funding. "Education records" are defined as "those records that are: (1) Directly related to a student; and (2) Maintained by an educational agency or institution or by a party acting for the agency or institution." 34 CFR § 99.3. Here, contrary to the defendant's assertions, the language of the Policy suggests that some records may be generated about students as a result of the policy. (See Am. Compl., Ex. 2, Section III.B (noting that the permanent pupil record will contain the student's legal name and gender, but that the district is not required to use a student's legal name or gender on other school records or documents).) Nevertheless, as noted above, the Policy does not create an absolute bar to the release of information. Specifically, it states that "[s]chool personnel should not disclose information that may reveal a student's transgender status or gender nonconforming presentation to others unless legally required to do so or unless the student has authorized such disclosure." (Id., Section III.A.) Thus, to the extent any "education records" are actually generated under the Policy, by the Policy's very terms, the defendants are required to treat and handle them in accordance with FERPA. As a result, the Court finds that the Policy does not violate FERPA.

As a result, the defendants' motion to dismiss Count III of the Amended Complaint is GRANTED.

Finally, the plaintiff claims that the Policy violates the PPRA because it requires students to submit to surveys or evaluations concerning their sex behaviors or attitudes without parental consent. The relevant portion of the PPRA provides that:

> No student shall be required, as part of any applicable program, to submit to a survey, analysis, or evaluation that reveals information

concerning . . . sex behavior or attitudes . . . without the prior consent of the student (if the student is an adult or emancipated minor), or in the case of an unemancipated minor, without the prior written consent of the parent.

20 U.S.C. § 1232h(b)(3). Likewise, the associated regulations require that

(a) No student shall be required . . . to submit without prior consent to psychiatric examination, testing, or treatment, or psychological examination, testing, or treatment, in which the primary purpose is to reveal information concerning . . . (3) Sex behavior and attitudes.

(b) As used in paragraph (a) of this section, prior consent means . . . (2) Prior written consent of the parent or guardian, if the student is an unemancipated minor.

34 CFR § 98.4

Nothing in the Policy mandates or suggests that school personnel should survey or question students regarding their preferred names or gender identities. Nor does the Policy mandate or suggest students submit to psychiatric examination, testing or treatment without the consent of a parent. Rather, the Policy establishes that should a student discuss with or express to the school a preference for a name or gender identity other than that assigned at birth, then the school would honor that choice and, to the extent allowable by law, protect the confidentiality of that information. As a result, the Court finds that the Policy does not violate the PPRA.

Accordingly, the defendants' motion to dismiss COUNT IV of the Amended Complaint is GRANTED.

## Conclusion

Consistent with the foregoing, the defendants' motion to dismiss the Amended Complaint is GRANTED.

**SO ORDERED.**

September 5, 2022
Date

Amy B. Messer
Presiding Justice


Clerk's Notice of Decision
Document Sent to Parties
on  09/06/2022