UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

| | | |
|---|---|---|
| STEPHEN FOOTE, *et. al.* | ) | |
| Plaintiffs, | ) | CASE NO. 3:22-cv-30041-MGM |
| v. | ) | |
| | ) | |
| TOWN OF LUDLOW, LUDLOW | ) | |
| SCHOOL COMMITTEE, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OF LAW OF *AMICUS CURIAE* FAMILY INSTITUTE OF CONNECTICUT IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

*Amicus Curiae* Family Institute of Connecticut, by and through its attorney of record, submits the following Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Plaintiffs' First Amended Complaint.

## INTEREST OF AMICUS CURIAE

Family Institute of Connecticut ("FIC") is a 501 (c)(3) non-profit educational organization founded in 1989. FIC's mission is to encourage and strengthen the family as the foundation of society and to promote sound ethical and moral values in our culture and government. To that end, FIC strongly advocates for parental rights, especially in schools. FIC is all-too familiar with the ongoing erosion of parental rights in public schools across our nation. Increasingly, educators have supplanted parents as the arbiters of children's best interests. This is having a profound detrimental effect on families and children. FIC has a particular interest in the specific issue in this case, the secret social transitioning of children by schools without parental consent, because Connecticut schools have implemented similar protocols. The decision in this case will have significant consequences for the rights of families in Connecticut and throughout the country. FIC is

positioned to draw on decades of experience advocating for parental rights to offer this Court a unique perspective that may help it in resolving this case.

## ARGUMENT

As alleged in Plaintiffs' First Amended Complaint, Defendants have violated the rights of Plaintiffs Stephen Foote and Marisa Silvestri to the care, custody, and control of their children. In part, Defendants have done so by providing unauthorized mental health treatment to Plaintiffs' children. This conduct, along with Defendants' other actions, shocks the conscience and therefore states a claim for the violation of Plaintiffs' substantive due process rights.

## I. DEFENDANTS' DECISION TO SOCIALLY TRANSITION PLAINTIFFS' CHILDREN CONSTITUTED THE UNAUTHORIZED PROVISION OF MENTAL HEALTH TREATMENT.

As Plaintiffs make clear in their Memorandum in Opposition to Defendants' Motion to Dismiss, decades of precedent clearly establish that fit parents have a fundamental right to direct the mental healthcare decisions of their children. *See* Pl's Mem. in Opposition to Def's Mot. to Dismiss at 10-13 (citing *Parham v. J. R.*, 442 U.S. 584, 604 (1979); *Colon v. Collazo*, 729 F.2d 32, 34 (1st Cir. 1984)). Social transitioning, which includes the use of preferred names and pronouns, has been recognized by both courts and transgender health experts as a mental health treatment. Even if Plaintiffs' children had no mental health issues, socially transitioning them still constituted the unauthorized provision of mental health services. And by concealing the children's gender identity issues from their parents, Defendants deprived Plaintiffs of the ability to seek mental health treatment on their own terms, should such treatment have been needed. Defendants therefore violated Plaintiffs' fundamental parental rights and their Motion to Dismiss should be denied.

### A. Both Transgender Healthcare Experts and Courts Have Recognized Social Transitioning as a Mental Health Treatment.

While Defendants attempt to denigrate Plaintiffs' claims regarding mental health treatment as "bizarre," Def's Reply Mem. in Support of Mot. to Dismiss at 2, transgender healthcare experts and multiple federal courts disagree with that sentiment. Social transition is "a process by which a child is acknowledged by others and has the opportunity to live publicly, either in all situations or in certain situations, in the gender identity they affirm" and includes name changes and pronoun changes.[1] Although not all healthcare professionals agree, leading proponents of gender-affirming care state that social transitioning can be critical to the mental health of transgender youth. For example, the World Professional Association for Transgender Health (WPATH) states in its Standards of Care that "the social transition process may serve a protective function for some prepubescent children and serve to foster positive mental health and well-being."[2] Indeed, Defendants' *own amici* state in their Memorandum of Law that "[g]ender affirmation is a key determinant of health and well-being for transgender people" and that "[t]ransgender youth who were able to use their chosen name in multiple contexts reported fewer depressive symptoms and less suicidal ideation and behavior." Mem. of *Amici Curiae* GLAD and MASS in Support of Def's Mot. to Dismiss at 12.[3]

Perhaps most strikingly, the WPATH Standards of Care clearly regard social transitioning as a mental health treatment when they recommend that health care professionals **"discuss the potential benefits *and risks* of a social transition with families who are**

---

[1] E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8,* 23 Int'l J. of Transgender Health S1, S75 (2022) (hereinafter "WPATH Standards of Care"), *available at* https://www.tandfonline.com/doi/pdf/10.1080/26895269. 2022.2100644.

[2] WPATH Standards of Care at S76.

[3] Quoting Nat'l Acads. of Sci., Eng'g, & Med., *Understanding the Well-Being of LGBTQI+ Populations*, at 2-7 (2020), *available at* http:nap.edu/25877 and Stephen T. Russell et al., *Chosen Name Use is Linked to Reduced Depressive Symptoms, Suicidal Ideation and Behavior Among Transgender Youth*, 63 J. Adolescent Health 503, 504 (2018).

**considering it."[4]** (Emphasis added). The WPATH standards acknowledge that social

transitioning is a mental health treatment that can have adverse effects, stating that

> One concern often expressed relates to fear that a child will preclude considering the possible evolution of their gender identity as they mature … a child may suffer negative sequelae if they revert to the former gender identity that matches their sex designated at birth."[5]

In other words, if a child's mental and emotional state is not thoroughly assessed before

beginning treatment, providers run the risk of causing psychological damage by socially

transitioning a child who later decides that he or she is not transgender. For this reason,

"parents/caregivers should be aware of the potential developmental effect of a social transition

on a child" and healthcare providers must work "collaboratively with family members … to

facilitate a social transition in a way that is optimal for the child's unfolding gender development,

overall well-being, and physical and emotional safety."[6] WPATH acknowledges that the decision

to socially transition a child is a significant mental health decision, not to be taken lightly. That

decision lies with the child's family, and in order to make such a decision, parents must be

accurately informed of the potential benefits and risks.[7]

Courts in various jurisdictions have also acknowledged that social transitioning is a

mental health treatment. *See, e.g., Grimm v. Gloucester County School Board*, 972 F.3d 586, 596

(4th Cir. 2020) (stating that the WPATH guidelines outline "appropriate treatments for persons

with gender dysphoria, including [c]hanges in gender expression and role, which may involve

living part time or full time in another gender role, consistent with one's gender identity"); *Doe v.

Boyertown Area Sch. Dist.*, 897 F.3d 518, 522 (3d Cir. 2018) ("Treatment for children and

adolescents who experience gender dysphoria includes social gender transition."). In *Grimm* and

---

[4] WPATH Standards of Care at S77.
[5] *Id.* at S78.
[6] WPATH Standards of Care at S78.
[7] *Id.*

*Doe,* however, the parents were informed of their children's discordant gender identity and *supported* their social transitions; it was the schools that opposed them. *Grimm,* 972 F.3d 586; *Doe,* 897 F.3d 518. Here, of course, the school has recklessly begun this mental health treatment in direct *contravention of* the parents' explicit directions, violating their parental rights.

If for no other reason, this Court should allow Plaintiffs' claims to proceed beyond the motion to dismiss stage to allow Plaintiffs to further develop through mental health experts the potential detrimental effects of social transitioning minor children. As explained further below, administering such a treatment to an 11- or 12-year-old child without parental consent or medical oversight is truly conscience-shocking.

**B. Even if Plaintiffs' Children Have No Mental Health Issues, Defendants Still Had No Right to Provide Them with Mental Healthcare.**

Defendants also contend that because Plaintiffs have not alleged that their children have been diagnosed with gender dysphoria, the school's decision to socially transition them cannot be seen as unauthorized mental health treatment. *See* Def's Reply Mem. at 1-2. But this is simply incorrect. A medical treatment is a medical treatment regardless of whether the patient has the condition for which she is being treated. And it is a cardinal rule of medicine that, absent extraordinary circumstances, a physician must receive informed consent from parents before beginning any treatment on a child. *See, e.g. Felder v. The Children's Hospital Corporation,* 97 Mass. App. Ct. 620, 627-628 (2020) ("[T]he duty to obtain informed consent necessarily means that the medical provider must discuss significant treatment decisions with the custodial adult."). Therefore, a doctor must obtain informed consent from parents before beginning chemotherapy on their child, whether or not the child actually has cancer. And by the same token, a school must obtain informed consent from parents before socially transitioning a child, whether or not the child suffers from gender dysphoria.

The Defendants go to great lengths to emphasize that not every child who is transgender suffers from gender dysphoria. *See* Def's Reply Mem. at 1-2. Even accepting that assertion as true, it must be equally true that not every child who asserts a discordant gender identity is actually transgender. A growing body of research suggests that the marked increase in minor children asserting a discordant gender identity (especially among young girls) may be the result of social contagion.[8] In other words, children are identifying as a different gender not because they are transgender, but because it provides them with a sense of belonging among their peers.[9] It is therefore imperative that the social transitioning process not be undertaken lightly in order to avoid the negative consequences attendant to transitioning a child who is not transgender.[10] Informed parental consent to social transitioning and medical oversight is absolutely critical when children assert a discordant gender identity.

In this case, the Defendants did not obtain such informed consent, and in fact actively conspired to *prevent* Plaintiffs from becoming informed about their children's gender identity issues. First Amended Complaint (hereinafter "FAC") at ¶¶ 41; 74; 83-85. While B.F. and G.F. have not yet been diagnosed with gender dysphoria, Defendants treated them as if they had, ignoring the clear risks of doing so. FAC at ¶¶ 42-43; 71-75. They did so without receiving an individualized assessment from a healthcare professional and even without informing their parents. *Id.* The fact that the children had no diagnosis makes Defendants' conduct *more* egregious, not less, since socially transitioning a child who is not gender dysphoric or even transgender can have serious negative consequences.[11] If any other type of healthcare treatment

---

[8] L. Littman, *Rapid-onset gender dysphoria in adolescents and young adults: A study of parental reports*, PLOS One (August 2018), *available at* https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0202330.
[9] *Id.*
[10] *See* notes 4 and 5, *supra*.
[11] *See* notes 4 and 5, *supra*.

were at issue, Defendants could not with a straight face claim the right to do what they have done to the children in this case. But because this case is set in the context of gender identity issues, Defendants feel comfortable asserting that they had the right, and indeed the obligation, to administer a potentially damaging mental healthcare treatment to B.F. and G.F. without parental consent or even parental knowledge.[12]

Finally, it is important to note that Plaintiffs have alleged that B.F. appeared to be suffering from depression at the time that she began to question her gender identity. FAC at ¶¶ 62; 64-65. And while B.F. has not yet been diagnosed with gender dysphoria, she has exhibited symptoms of dysphoria, such as depression and discomfort with her given name and certain pronouns. *See* FAC at ¶¶ 62; 64-65; 81. These facts show that Defendants knew exactly what they were doing when they decided to socially transition B.F. – they were treating her perceived mental health issues. The essential purpose of social transitioning according to its proponents is to alleviate depression, reduce risk of suicidality, and remediate any gender dysphoria, whether diagnosed or undiagnosed. *See* Mem. of *Amici Curiae* GLAD and MASS at 12.[13] Defendants responded to B.F.'s apparent symptoms by administering a treatment without parental knowledge or consent, thereby violating Plaintiffs' parental rights.

### C. By Deliberately Deceiving Plaintiffs Regarding Their Children's Gender Identity Issues, Defendants Interfered with Plaintiffs' Right to Direct the Mental Healthcare Decisions of their Children.

---

[12] Defendants claim that Plaintiffs are asserting a right to force schools to "out" their transgender children. This is a clever way to reframe the real issues in this case. Highlighting concerns about a student to her parents when she may suffer from gender dysphoria and has exhibited symptoms of depression is fundamentally different from "outing" a gay or lesbian student. In the latter case, respecting student privacy regarding their sexual orientation is not likely to have negative mental health consequences; in the former case, keeping such information from parents could ultimately be devastating to the student's wellbeing. That Defendants cannot see the difference is alarming.

[13] Quoting Stephen T. Russell et al., *Chosen Name Use is Linked to Reduced Depressive Symptoms, Suicidal Ideation and Behavior Among Transgender Youth*, 63 J. Adolescent Health 503, 504 (2018).

Even if B.F. and G.F. do not have gender dysphoria, and even if the Defendants' decision to socially transition the children did not constitute mental health treatment, Plaintiffs still state a claim in Count II of the FAC for violations of their right to direct the mental health treatment of their children. By deliberately deceiving the Plaintiff parents regarding their children's discordant gender identities and attendant depression and discomfort, Defendants deprived Plaintiffs of the ability to address these mental healthcare concerns in whatever way they believed was in their children's best interests. Had one of B.F.'s teachers not broken protocol and told Plaintiff parents what the Defendants were doing to their child (an offense for which she was subsequently terminated), Plaintiff parents would likely still not know about their children's gender identity issues *to this day.* FAC ¶¶ 87; 135. Defendants' protocol of deception ensured that Plaintiffs did not have the opportunity to seek counseling or other support for their children at the onset of their gender identity issues. The people best positioned to make healthcare decisions for B.F. and G.F. at that critical time were their parents. By cutting the Plaintiff parents out of the equation, the Defendants may have done untold and irreparable psychological damage to B.F. and G.F.[14] This was a clear violation of Plaintiffs' parental right to direct their children's mental health treatment. *See Parham*, 442 U.S. at 602. And by continuing to secretly meet with B.F., counsel her regarding her gender identity, and socially transition her, the Defendants further violated Plaintiffs' rights.

## II. DEFENDANTS' ATTACK ON PLAINTIFFS' PARENT-CHILD RELATIONSHIP SHOCKS THE CONSCIENCE

As the parties have acknowledged, Plaintiffs must also show that Defendants' violations of their rights shock the conscience. However, in situations where state action undermines family relationships, courts have held that the shock-the-conscience standard presents a lower bar for

---

[14] *See* notes 4 and 5, *supra.*

plaintiffs. Here, Defendants' attack on Plaintiffs' parent-child relationship does shock the conscience. Therefore, Defendants' Motion to Dismiss should be denied.

### A. Plaintiffs' Allegations Must Meet a Lower Standard than Other Conscience-Shocking Conduct.

In most cases involving a claim that a state actor violated a plaintiff's substantive due process rights, the shock-the-conscience standard requires a plaintiff to show that the defendant's actions amounted to "a brutal and inhumane abuse of official power literally shocking to the conscience." *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 881 (1st Cir. 2010). Ordinarily, this means that the defendant must have engaged in physical or psychological abuse. *McConkie v. Nichols*, 446 F.3d 258, 261 (1st Cir. 2006). Courts set this high bar for substantive due process claims to avoid downgrading the Constitution to a "font of tort law." *See id.* at 260. While this rationale makes sense in situations where a plaintiff can bring common-law tort actions for redress against state officials (e.g. battery, intentional infliction of emotional distress), it does not fit as well in situations where state actors have violated fundamental rights that cannot be redressed by these other means. Therefore, the First Circuit has made clear that conduct which interferes with a protected relationship, such as the parent-child relationship, can also shock the conscience. *Id.* at 261. Actions that undermine the "basic fabric of all parent-child relationships: love, trust, and faith" have been held to shock the conscience. *Grendell v. Gillway*, 974 F. Supp. 46, 51 (D. Me. 1997). As further explained below, Plaintiffs' allegations more than meet this standard.

### B. Defendants' Attack on Plaintiffs' Parent-Child Relationship Shocks the Conscience.

Plaintiffs have alleged instances of conduct that constituted not only deliberate indifference toward Plaintiffs' parent-child relationship, but in multiple cases, a direct attack on that relationship. These actions clear the bar for conscience-shocking conduct. Defendants and

their *amici* claim that Plaintiffs have not stated a claim because they have not alleged conduct that is "directly aimed" at the parent-child relationship. *See* Mem. of *Amici Curiae* GLAD and MASS at 6 (citing *Pittsley v. Warish*, 927 F.2d 3, 8 (1st Cir. 1991)). But a closer look at *Pittsely* reveals that it provides strong *support* for Plaintiffs' case. *Pittsely* stated that in cases where police have only incidentally affected a familial relationship, such as by threatening a mother in front of her children during the course of an investigation, there is no violation of the right to familial association. *Pittsley*, 927 F.2d at 8-9. This is because the police actions were directed toward furthering an investigation (even if they were unlawful), rather than at affecting the family relationship. *Id.; see also Grendell,* 974 F. Supp. at 53. However, *Pittsley* contrasted these facts with conduct that is directly aimed at the parent-child relationship, such as the termination of parental rights or the determination of paternity. *Pittsley*, 927 F.2d at 8. The right to familial association is implicated, *Pittsely* stated, "whenever the state directly seeks *to change or affect the parent-child relationship*." *Id.* (emphasis added).

In this case, the Defendants did seek to directly affect the parent-child relationship between Plaintiffs and their children, for the worse. They did so by "actively and intentionally nurturing distrust for parents through secret meetings in which parents' decisions and ability to provide for their children are questioned," including questioning whether their parents were "safe," FAC at ¶¶ 213; 120-123; by conspiring to deceive Plaintiffs about their children's gender identities based on the assumption that Plaintiffs would not properly support their children, FAC at ¶¶83-84; and by usurping Plaintiffs' role as the ultimate decisionmakers regarding the physical and mental health of their children, FAC at ¶¶193; 85-86; 89; 105, among other things. These actions without question undermined the "basic fabric of the parent-child relationship: love, trust, and faith" between B.F., G.F., and their parents. *See Grendell,* 974 F. Supp. at 51. Their effect on

Plaintiffs' parent-child relationship was not "incidental;" it was the essential purpose of the conduct at issue. Defendants acted to create distance and distrust between B.F., G.F., and their parents because they believed that they knew better than the parents how to care for their own children. In effect, Defendants unilaterally decided to terminate Plaintiffs' parental rights to direct the mental healthcare decisions of their children, to be informed about matters essential to their children's inner wellbeing, and to direct their children's upbringing. This is exactly the type of conscience-shocking conduct that *Pittsley* stated is "directly aimed at the parent-child relationship." *Pittsley*, 927 F.2d at 8.

Finally, one need not look only at Defendants' conduct to infer their purposes in this case; Defendants have also made statements making the intent behind that conduct clear. At the school committee meeting on June 8, 2021, superintendent Gazda stated, "Right now we have a situation where intolerance, prejudice and bigotry against LGBTQ individuals by members of our community is being thinly veiled behind a camouflage of what is being asserted as 'parental rights.'" Def's Reply Mem. at Ex. 1. This Court could not ask for a better exposition of Defendants' state of mind. Defendants saw Plaintiffs not as the primary caregivers of their 11- and 12-year-old minor children, but as the *enemies* of those children. This is made even more clear by Gazda's next statement:

> At its core this current controversy isn't about sex, it's about identity. It is about ensuring a safe environment with caring adults that students can rely on to discuss problems, issues or questions they might have. For many of our students school IS their only safe place and that safety evaporates when they leave the confines of our buildings.

Def's Reply Mem. at Ex. 1. Without any allegations that Plaintiffs abused or neglected their children, Defendant Gazda assumed that their children were not safe at home. These statements reflect conduct that directly interferes with the parent-child relationship and display the kind of thinking that motivated that conscience-shocking conduct. They make clear that Defendants'

actions – socially transitioning children without parental consent, deceiving parents about that conduct, telling an 11-year-old child that her parents are not safe to be around – were directly aimed at creating distance between Plaintiffs and their children. Without any evidence, Defendants decided that Plaintiffs were a threat to their children's best interests and acted to usurp the parental role of protecting those interests. This conduct would shock anyone's conscience, not to mention the conscience of a parent of minor children, and provides Plaintiffs with a basis for relief in this case.

## CONCLUSION

Providing a mental health treatment with potentially far-reaching negative effects to a child without parental consent or medical supervision; deliberately deceiving parents regarding issues fundamental to their child's mental and emotional health and development; telling those children that because their parents might not support the child's ideas about their identity, the parents are not safe to be around; in any other context, no reasonable person could dispute that these actions shock the conscience. But because this case takes place against the backdrop of ideologically-driven mania over transgender issues, Defendants feel that they can frame their conduct as furthering the civil rights of transgender students, rather than as violating the fundamental rights of parents. This Court should not accept Defendants' sleight of hand. It should reject the assertion that public officials can conceal from the parents of 11- and 12-year-old minor children "information fundamental to a child's identity, personhood, and mental and emotional well-being" because those officials think that they know better than the parents. *Ricard v. USD 475 Geary Cty.*, 2022 U.S. Dist. LEXIS 83742 at *20 (D. Kan. 2022).

For the foregoing reasons, this Court should deny the motion to dismiss.

Dated: October 21, 2022.

Respectfully Submitted,

Family Institute of Connecticut
By its Attorney,


/s/ Carl F. Schmitt
Carl F. Schmitt, Esq.
MA BBO No. 564988
Schmitt & Dillon
233 Main Street
Lancaster, MA 01523
978-368-7500
cschmitt@sdslawyers.com


## CERTIFICATE OF SERVICE


I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on this 21st day of October, 2022.

/s/ Carl F. Schmitt
Carl F. Schmitt, Esq.