IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

SPRINGFIELD DIVISION


| | | |
|---|---|---|
| STEPHEN FOOTE, *et. al.* | ) | |
| | ) | |
| Plaintiffs, | ) | CASE NO. 3:22-cv-30041-MGM |
| | ) | |
| v. | ) | |
| | ) | |
| LUDLOW SCHOOL COMMITTEE, | ) | |
| *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## NOTICE OF SUPPLEMENTAL AUTHORITY

Plaintiffs, by and through their counsel of record, submit this notice to alert the Court of the following decision that bears on Defendants' Motion to Dismiss the First Amended Complaint, *Tatel v. Mt. Lebanon School District,* W.D. of Pennsylvania Case No. 2:22-cv-00837-JFC *Opinion on Motion to Dismiss,* Document 38, filed 10/27/22, attached hereto as Exhibit 1.

Dated: November 7, 2022.

  _/s/Mary E. McAlister_____
Mary E. McAlister

Andrew Beckwith
MA Bar No. 657747

Massachusetts Family Institute
401 Edgewater Place, Suite 580
Wakefield, MA 01880
781.569.0400
andrew@mafamily.org

Vernadette R. Broyles (GA Bar No. 593026)*
Mary E. McAlister (VA Bar No. 76057)*
CHILD & PARENTAL RIGHTS CAMPAIGN, INC.
5805 State Bridge Rd., Suite G310
Johns Creek, GA 30097
770.448.4525
vbroyles@childparentrights.org
mmcalister@childparentrights.org
* admitted pro hac vice
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on this 12th day of October, 2022.

*/s/ Mary E. McAlister*
Mary E. McAlister, Esq.

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CARMILLA TATEL, STACY DUNN and GRETCHEN MELTON,** individually and as parents and natural guardians of their children,<br><br>Plaintiffs,<br><br>v.<br><br>**MT. LEBANON SCHOOL DISTRICT, THE MT. LEBANON SCHOOL BOARD, MEGAN WILLIAMS, DR. TIMOTHY STEINHAUER, DR. MARYBETH D. IRVIN, BRETT BIELEWICZ, JACOB W. WYLAND, VALERIE M. FLEISHER, TODD W. ELLWEIN, ANDREW D. FREEMAN, ERIN C. GENTZEL, CLAIRE B. GUTH, DR. JUSTIN D. HACKETT, ANAMARIA A. JOHNSON, and SARAH L. OLBRICH,**<br><br>Defendants. | CIVIL ACTION NO.   22-837 |

**OPINION**

## I.    Introduction

This case involves the extent of parents' constitutional rights to control when and how information about transgender topics is presented by a public school to their first-grade children. The parents allege that their children's first-grade teacher, with the permission of the public school district, pursued her own agenda outside the curriculum, which included showing videos or reading books about transgender topics and telling the first-grade students in her class (ages six and seven years old) to keep her discussions with them about transgender topics secret from their parents. The teacher's alleged conduct went far beyond instructing a student that someone

who differs from that student must be treated with kindness, tolerance and respect. As pled in the complaint, the teacher, among other things, instructed the children in her first-grade class that their parents might be wrong about their children's gender and told one of her students that she (the teacher) would never lie (implying that the parents may lie about their child's identity) and the child could dress like a different gender and be like the teacher's transgender child. When the parents complained, the school district supported the teacher and allegedly adopted a policy (the "de facto policy") that the teacher's conduct could continue in the future without notice to the parents or the opportunity to opt out.

The parents assert constitutional claims against the public school district, the teacher, the administrators and the school board members arising from the exposure of their first-grade children to transgender topics over their objections. The defendants argue that the parents have no constitutional claims because parents do not have any right to control how or what a public school chooses to teach their children. As will be discussed below, the defendants' position does not comport with Supreme Court or Third Circuit precedent. The Third Circuit Court of Appeals has recognized that the fundamental right of parents to raise and nurture their children may sometimes conflict with a public school's policies, but explained: "when such collisions occur, the primacy of the parents' authority must be recognized and should yield only where the school's action is tied to a compelling interest." *Gruenke v. Seip*, 225 F.3d 290, 305 (3d Cir. 2000).

The Parents assert they do not seek to impose their religious or moral beliefs about transgender topics on other students. Instead, the parents seek to protect their own young children from a public school teacher's showing videos and reading books about transgender topics and her attempts to promote or inculcate in the young children in her class the teacher's ideas or beliefs about a child's gender identity and to initiate and engage in discussions with the

first-graders in her class about the children's own gender identity without the permission of their parents. No party in this case raised any issue about the existence in the school district of bullying or intolerance toward transgender children. Based upon the allegations of the complaint, the court need not resolve at the pleading stage whether there is a difference, for constitutional purposes, between teaching children about kindness toward other children and seeking to influence a young child's beliefs about the child's own gender identity or to advance a teacher's own beliefs about the inappropriateness of a parent's religious beliefs concerning gender identity.

Pending before this court are motions to dismiss the complaint filed on behalf of defendant Mt. Lebanon School District (the "District") (ECF No. 14) and the individual defendants (ECF No. 16), with briefs in support (ECF Nos. 15, 17). The individual defendants also filed a motion to strike certain allegations in the complaint (ECF No. 16). Plaintiffs Carmilla Tatel, Stacy Dunn and Gretchen Melton (collectively, "Plaintiffs" or the "Parents") filed an omnibus response in opposition to the motions (ECF No. 28) and the motions are ripe for disposition.

## II.   Factual[1] and Procedural Background

Each Parent had a first-grade child enrolled at the Jefferson Elementary School in the District during the 2021-2022 school year.[2] Defendant Megan Williams ("Williams") was their children's first-grade teacher. Williams is certified to teach kindergarten through fifth grade and has taught several different grade levels in the past. Complaint ¶ 52.

---

[1] The factual background is taken from the complaint (ECF No. 1) and the factual allegations in the complaint are regarded as true for the purpose of resolving a motion to dismiss. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

[2] The Parents have other children in the District.

The District is a public school district organized under Pennsylvania law and governed by a nine-member, elected board of school directors (the "Board"). Defendant Jacob Wyland ("Wyland") is the president of the Board. Defendants Valerie Fleisher ("Fleisher"), Todd Ellwein ("Ellwein"), Andrew Freeman ("Freeman"), Erin Gentzel ("Gentzel"), Claire Guth ("Guth"), Dr. Justin Hackett ("Hackett"), Anamaria Johnson ("Johnson") and Sarah Olbrich ("Olbrich") are members of the Board. Defendant Dr. Timothy Steinhauer ("Steinhauer") is the superintendent of the District. Defendant Dr. Marybeth D. Irvin ("Irvin") is the assistant superintendent of the District and is in charge of elementary education. Defendant Brett Bielewicz ("Bielewicz") is the principal at Jefferson Elementary School. Each individually-named defendant is sued in both the defendant's individual and official capacities.

In the complaint, the Parents assert § 1983 claims and seek declaratory judgment on those claims and on a pendant state law claim, as follows:

> Count 1: Substantive Due Process (14th Amendment)-fundamental right of parents to direct the education and upbringing of their children;
> Count 2: Procedural Due Process (14th Amendment) -fundamental right of parents to direct the education and upbringing of their children;
> Count 3: right to familial privacy (14th Amendment);
> Count 4: Free Exercise of Religion (1st Amendment) and Equal Protection (14th Amendment);
> Count 5: children's right to privacy (14th Amendment); and
> Count 6: declaratory judgment with respect to the § 1983 claims and that defendants violated 22 Pa. Code § 4.4(d).

Counts 1 through 5 are asserted against all named defendants. Count 6 is asserted only against the District.

District Policy I(J) provides that the responsibility to select instructional materials rests with the superintendent, subject to final approval by the Board. Complaint ¶ 36. Instructional materials shall be appropriate to the age and emotional development of the students. *Id.*

The Parents allege that the District had a policy and practice of providing parental

notification and "opt out" rights when sensitive, complex or controversial topics (such as the Holocaust, slavery, the 9/11 terrorist attacks, reproductive education, sex education, Black Lives Matter and Planned Parenthood) were to be taught in a given class.  *Id.* ¶ 3.  District Policy I(F) is entitled "Curriculum and Parental Rights" and provides for parental review of instructional materials and opt out rights related to instruction that conflicts with their First Amendment beliefs.  *Id.* ¶¶ 37-38.  The Parents allege that defendants failed to recognize their fundamental rights as parents or adhere to the District's notice and opt out policies in Williams' classroom. *Id.* ¶ 5.

Williams is the mother of a transgender child who, like the Plaintiffs' children, was in the first grade during the 2021-2022 school year.  *Id.* ¶ 54.  Williams told parents she "has an agenda" and intends to teach "right on the edge."  *Id.* ¶ 9.  Williams told one Plaintiff "as long as I am on this earth, I am going to teach children what **I feel** they need to learn."  *Id.* ¶ 56 (emphasis in original).[3]  For example, students in Williams' classroom, against the instruction of the District, were not given the opportunity to recite the Pledge of Allegiance for 52 straight days at the start of the school year.  *Id.* ¶¶ 57-61.  As another example, a Plaintiff's child informed Williams that she was not allowed to watch a certain cartoon (based on a parental choice that some of the content was not age-appropriate).  *Id.* ¶¶ 68-69.  Williams forged ahead, telling the child "I will tell your mom that I told you it was ok to watch it."  *Id.* ¶ 70.  Williams emailed the parent, informing her that she showed the cartoon to the student even though the child told her she was not allowed to watch it at home. *Id.* ¶ 72.

The published Grade 1 curriculum does not mention or discuss teaching about gender dysphoria and transgender transitioning.  *Id.* ¶ 41.  Teaching about diversity, equity and inclusion

---

[3] Williams made this statement in a phone call to a Plaintiff several weeks after that Plaintiff removed her child from Williams' class.  Complaint ¶ 106.

("DEI") is not included in the first-grade curriculum.  *Id.* ¶ 44.  No notice or information was provided to parents indicating that gender dysphoria and transgender transitioning would be taught to first graders.  *Id.* ¶ 47.  In October 2021, a group of concerned parents met with Bielewicz, who assured them there were no formal lessons about gender identity, especially in first grade.  *Id.* ¶ 88.

The Parents allege that defendants permitted Williams to teach and condoned her teaching about gender dysphoria and transgender transitioning to her first-grade students.  *Id.* ¶ 6. The Parents allege that this instruction was: (1) contrary to the District's published curriculum; and (2) "in direct disregard of one set of parents' express request that such topics **not** be taught to their seven-year-old child."  *Id.* (emphasis in original).  The Parents allege that Williams taught their children that "'sometimes parents make mistakes' about a child's gender."  *Id.*  The Parents allege that Williams encouraged their children "not to tell their parents about her instruction." *Id.*

The Parents allege that Williams brought the topics of gender dysphoria and transgender transitioning into her classroom teachings throughout the school year.  Early in the fall of 2021, Williams played a video of "Jacob's New Dress."  *Id.*  ¶ 76.  Williams explained to her students that her transgender child wore an Elsa dress for Halloween.  *Id.* ¶ 77.

The child of one Plaintiff reported that Williams told him that he could "wear a dress and have hair like my mom."  *Id.* ¶ 78.  At a parent-teacher conference, that Plaintiff expressed displeasure with Williams for telling her son that he could dress and wear his hair like his mother.  *Id.*  Williams had private conversations with this boy throughout the school year, in which she discussed the similarities between the boy and Williams' transgender child.  Williams suggested the boy might want to wear a dress; that the two children had similar interests and the

same favorite color; and told the boy "he could be like her transgender child." *Id.* ¶ 79.

Williams told the boy "doctors can get it [gender] wrong sometimes." *Id.* Williams told the boy

that "she would never lie to him" and told the boy not to tell his parents about the discussions.

*Id.* Plaintiffs characterize this conduct as "grooming" and as a gross breach of trust and abuse of

her position as a public school teacher.[4] *Id.*

In March 2022, Williams began to discuss with her class her child's gender dysphoria

and explained that her child was once a boy, but is now a girl. *Id.* ¶ 82. On March 31, 2022 (the

Transgender Day of Visibility), Williams provided direct classroom instruction on gender

dysphoria and transgender transitioning. *Id.* ¶ 83. Williams explained to her students that

sometimes "parents are wrong" and parents and doctors "make mistakes" when they bring a

child home from the hospital. *Id.*

As part of direct classroom instruction that day, Williams played two videos and/or read

two books while video illustrations played: (1) When Aiden Became a Brother,

(https://www.youtube.com/watch?v=8F2_UR4y0iw); and (2) Introducing Teddy,

(https://www.youtube.com/watch?v=ddRmNpLYgCM). *Id.* ¶ 84. Plaintiffs allege that the clear

and obvious subject matter of these videos or books is gender dysphoria and transgender

transitioning. *Id.* Williams' instruction about gender dysphoria and transgender transitioning

caused confusion among some of the students. *Id.* ¶ 92. For example, one child asked her mom

"how do you know that I am a girl." *Id.*

These materials were not listed on the first-grade curriculum and parents were given no

notice or opportunity to opt their children out of having those materials presented to them in

school. *Id.* ¶ 85. Williams sought (and received) permission from Bielewicz to use the

videos/books as part of her classroom teaching on the morning of March 31, 2022, the same day

---

[4] The Parents did not allege any physical abuse of the student.

she later played the videos or read the books to the students in her class.  *Id.* ¶ 86.[5]  Williams sent

an email to all the elementary teachers, encouraging them to play the videos in their classrooms.

*Id.* ¶ 90.  At least two other elementary teachers did so, without providing notice to the parents.

*Id.*

The complaint alleges that Bielewicz "was fully aware that his permission would cause

an uproar among certain parents but he provided it anyway and did so without any notice to

parents."  *Id.* ¶ 86.  A group of parents determined that the videos/books "violated their express

direction as to what they as parents did not want taught to their child."  *Id.* ¶ 87.  In October

2021, these parents told Bielewicz they were not comfortable with their children "learning about

gender identity at this age,"  *id.* ¶ 88, and Bielewicz advised them those topics would not be

covered.  *Id.*

Plaintiffs allege that Williams' instruction about gender dysphoria and transgender

transitioning conflicts with their sincerely held religious and moral beliefs that "human beings

are created male or female and that the natural created order regarding human sexuality cannot

be changed regardless of individual feelings, beliefs, or discomfort with one's identity, and

biological reality, as either male or female."  *Id.* ¶ 140.  Plaintiffs also assert they have sincerely

held religious and moral beliefs that "parents have the non-delegable duty to direct the

upbringing and beliefs and religious training of their children."  *Id.* ¶ 141.  Plaintiffs contend that

defendants deliberately supplanted the parents' role to control the instruction of their young

children on transgender topics in accordance with their values.  *Id.* ¶ 143.

---

[5] The Parents allege that under the District's policy instruction on DEI topics would only be presented by
professional counselors, Complaint ¶ 47, and that Williams was not properly qualified or trained to provide that kind
of instruction.  Complaint ¶ 83. That allegation appears to implicate whether the District complied with its internal
policy, rather than a constitutional right.  The Parents have not asserted a constitutional right to have transgender
topics presented to their children by a trained professional; instead, they assert a constitutional right to decide
whether or not or how those topics are presented to their young children at all.  This matter, however, would be
background or relevant to issues about how the District may have treated the transgender topics in a different
manner than other DEI topics.

Upon learning about Williams' instruction on March 31, 2022, one plaintiff removed her child from Jefferson Elementary school and enrolled him in cyber school.  *Id.* ¶ 93.  One plaintiff met with Williams, voiced her objections, and explained that she would like to be the person responsible for discussing those topics with her child.  *Id.* ¶ 94.  Williams responded they would "need to agree to disagree" and stated "100% I have an agenda" and she had no intention of stopping her instruction.  *Id.*  Williams also claimed that Bielewicz and the Board approved the videos.  *Id.*

The Parents allege that they complained about Williams' instruction to administrators, as well as at three Board meetings, but got excuses and were "stonewalled."  *Id.* ¶ 93.  On April 5, 2022, Bielewicz confirmed he approved the videos on the morning of March 31, 2022, and explained he thought they were appropriate and Williams was qualified to provide instruction based on her own personal experiences.  *Id.* ¶ 97.  Bielewicz indicated that Steinhauer, Irvin and the Board agreed the instruction was appropriate after the fact.  *Id.*  One Plaintiff asserted her right as a parent to discuss that topic with her child and Bielewicz responded they would need to "agree to disagree" and stated that Williams might teach those subjects in the future.  *Id.*  At another meeting with parents on April 5, 2022, Bielewicz conceded he should "take a mark" (i.e., accept fault) for not notifying these parents despite their prior request and despite his prior representation that transgender topics would not be presented to first graders.  *Id.* ¶ 98.

Plaintiffs characterize Williams' excuse for introducing transgender topics – i.e., that she would be bringing her own child into the classroom on Bring Your Child to Work Day – as a purposefully deceptive ruse.  *Id.* ¶ 99.  Bielewicz confirmed to parents on April 5, 2022, that there was no change in the District's policy that teachers could not bring their kids to work on Bring Your Child To Work Day.  *Id.*  Subsequently, the District announced a policy change,

based on an objection by Williams, and permitted teachers to bring their children in that day.[6] *Id.* ¶ 100.

The Parents met with Steinhauer in early April 2022. Although Steinhauer made conciliatory statements (i.e., the video should have been approved by a higher level of the administration and it was reasonable for parents to have a choice), he has not announced any policy change to contradict the de facto policy that the transgender topics may continue to be taught without notice or opt out rights for parents. *Id.* ¶ 101. At a public meeting on April 19, 2022, Irvin defended Williams' instruction and use of the videos as consistent with District Policy I(J) (related to curriculum). *Id.* ¶ 102. Irvin did not discuss the parental rights in Policy I(F). *Id.* The Parents allege they were told by the administration that Williams could conduct this instruction now and in the future without a commitment to provide parental notification and opt out rights. *Id.* ¶ 8.

As noted, the issue was discussed at three school board meetings. At one school board meeting, Wyland (the Board President) gave a monologue in favor of Williams' instruction. *Id.* ¶ 8. The Parents allege that the conduct of the administration and Board constitutes a de facto policy permitting the teaching of gender dysphoria and transgender transitioning in elementary schools in the District without providing parental notification and opt out rights. *Id.* Defendants do not challenge the sufficiency of the allegations about the existence of a de facto policy.

In summary, there are two distinct grounds for liability set forth in the complaint: (1) Williams' pursuit of her own agenda about transgender topics throughout the school year, including showing the videos and reading the books, advising the first-graders in her class that parents may be mistaken about their children's gender, telling a child she would never lie, telling one child that child could dress and be groomed like a child of the opposite sex, and attempting

---

[6] The date of Bring Your Child to Work Day was not pled in the complaint.

to keep these efforts secret from the parents; and (2) the adoption by the District of the de facto policy to permit that conduct in the future.[7]  Plaintiffs seek a permanent injunction that: (1) prohibits the District from providing instruction in its elementary schools on gender dysphoria and transgender transitioning; or (2) requires the District to provide parental notice and opt out rights.  Plaintiffs also seek compensatory and punitive damages.

Plaintiffs filed a motion for preliminary injunction (ECF No. 5), which the parties amicably resolved by agreeing to a stipulated order (ECF No. 10).  The order provides, in essence, that the Parents will receive notice and the ability to have their children excused from instruction on the subject matters of gender identity and gender transitioning on the basis of their religious beliefs (ECF No. 12).

## III.   Legal Analysis

### A. Motion to strike

The individual defendants ask the court to strike as scandalous or impertinent the following paragraphs of the Complaint: ¶¶ 57-64 (relating to the Pledge of Allegiance); ¶¶ 65-67 (Black Lives Matter); ¶ 79 (grooming); and a portion of ¶ 100 about most students being absent on Take Your Child to Work Day.  Plaintiffs contend these averments are relevant to their legal theories.

Pursuant to Federal Rule of Civil Procedure 12(f), a court "may strike from a pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).  "An allegation is impertinent or immaterial if it ha[s] no possible relationship to the controversy ... and scandalous if it reflect[s] cruelly upon the [other party's] moral character, use[s] repulsive language, or detract[s] from the dignity of the court." *Lawrence v. City of*

---

[7] The record must be fully developed and each kind of conduct alleged may need to be separately and collectively analyzed under the appropriate level of scrutiny for the constitutional claim raised.  *See* supra at 15-19.

*Bethlehem*, No. 97-1824, 1998 WL 964214, at *4 (E.D. Pa. Oct. 30, 1998). Rule 12(f) motions to strike are "disfavored." *Donahue v. Borough of Collingdale*, No. CV 22-1695, 2022 WL 3577377, at *2 (E.D. Pa. Aug. 19, 2022). They are not often granted in the absence of prejudice to the moving party. *Id.*

The court concludes that the averments at ¶¶ 57-67 are at least background and relevant to Plaintiffs' allegation that Williams followed her own agenda rather than the District's curriculum. Paragraph 79 is directly relevant to Plaintiffs' claimed violations of their parental rights.[8] The motion to strike will be denied with respect to those averments.

The challenged portion of ¶ 100, about the absence of other children in Williams' classroom on Take Your Child to Work Day, could be construed as a comment about the social standing of Williams' child, which is not relevant to this case. The low attendance that day could be explained by other factors (such as students accompanying their own parents to work that day). The issues in this case involve the rights asserted by the Parents – which do not depend on the popularity of Williams' child. On the other hand, the complaint must be construed in the light most favorable to Plaintiffs. Reasonable inferences could be drawn from the challenged portion of ¶ 100 to support the interpretation that other parents chose not to send their children to school that day because they perceived Williams would use that day as an opportunity to continue her efforts to impose her agenda on their children. In that light, the averment may be relevant to the claims in this case. *See In re: Maxim Integrated Prod., Inc.*, No. 12-244, 2013 WL 12141373, at *20 (W.D. Pa. Mar. 19, 2013) (Conti, J.) ("When in doubt, the court should deny the motion to strike and 'the sufficiency of the allegations [should be] left for adjudication on the merits.'"). In sum, the motion to strike (ECF No. 16) will be denied.

---

[8] At this stage of the case, the court must regard the allegation in the Complaint as true. Defendants will have a full and fair opportunity to develop the record and challenge those facts on a developed record.

**B. Motions to dismiss**

**1.     Standard of Review**

The United States Court of Appeals for the Third Circuit recently reiterated the standard

for evaluating claims at the motion to dismiss stage:

> The plausibility of claims challenged at the motion-to-dismiss stage is analyzed
> through a three-step process. *See Connelly v. Lane Constr. Corp.*, 809 F.3d 780,
> 787 (3d Cir. 2016). The first step is the articulation of the elements of the claim.
> *See Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). The second step
> involves reviewing the complaint to disregard any " 'formulaic recitation[s] of the
> elements of a ... claim' or other legal conclusion," *Id.* at 789 (alteration in
> original) (quoting *Iqbal*, 556 U.S. at 681), as well as allegations that are "so
> threadbare or speculative that they fail to cross the line between the conclusory
> and the factual," *Id.* at 790 (citation omitted). The third step evaluates the
> plausibility of the remaining allegations – after assuming their veracity,
> construing them in the light most favorable to the plaintiff, and drawing all
> reasonable inferences in the plaintiff's favor. *See Id.* at 787, 790; *see also Iqbal*,
> 556 U.S. at 679; *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).
>
> If, after completing this process, the complaint alleges "enough fact[s] to raise a
> reasonable expectation that discovery will reveal evidence of" the necessary
> elements of a claim, then it plausibly pleads a claim. *Bell Atl. Corp. v. Twombly*,
> 550 U.S. 544, 556 (2007). But if "a complaint pleads facts that are merely
> consistent with a defendant's liability, it stops short of the line between possibility
> and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (citation and
> internal quotation marks omitted).

*Lasche v. New Jersey*, No. 20-2325, 2022 WL 604025, at *3–4 (3d Cir. Mar. 1, 2022) (vacating

dismissal of parental Free Exercise claims).   In compliance with this directive, the court's

analysis of the facts will omit plaintiffs' recitation of formulaic elements of the claims and

disregard any legal arguments set forth in the complaint.   At the motion to dismiss stage, the

court cannot consider the additional facts set forth in defendants' motions and briefs.   *See*

*Huggins v. Coatesville Area Sch. Dist.*, No. CIV.A. 07-4917, 2008 WL 4072801, at *4 n.6 (E.D.

Pa. Aug. 27, 2008) ("For purposes of the motion to dismiss, of course, the Court must look at the

allegations in the pleading, not the subsequent arguments in the briefs raising arguably new or

different 'facts.'").

### 2. Section 1983 Claims

#### a. General framework

To prevail on a § 1983 claim, a plaintiff must plead: (1) a deprivation of a right, privilege or immunity secured by the Constitution or laws of the United States; and (2) the conduct complained of was committed by a person acting under the color of state law.  42 U.S.C. § 1983.  In this case, defendants do not dispute that they acted under the color of state law.  Defendants vigorously assert, however, that they did not infringe the Parents' constitutional rights or, in the alternative, that they are entitled to qualified immunity.  Many of the individual defendants contend that the complaint fails to allege their personal involvement in the challenged conduct.

#### b. Constitutional provisions

There are two constitutional provisions at issue in this case – the Fourteenth Amendment and the First Amendment.  The Fourteenth Amendment to the United States Constitution provides, in relevant part:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. Amend. XIV.  The First Amendment to the United States Constitution provides, in relevant part:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof....

U.S. Const. Amend. I.

The protections in the Bill of Rights (including the Free Exercise clause) are made applicable to state actors through the incorporation doctrine under the Fourteenth Amendment.

*See Timbs v. Indiana*, 139 S. Ct. 682, 687 (Feb. 20, 2019) ("With only 'a handful' of exceptions, this Court has held that the Fourteenth Amendment's Due Process Clause incorporates the protections contained in the Bill of Rights, rendering them applicable to the States.").

**c. Level of scrutiny**

**(1) Kinds of scrutiny**

When a court analyzes a constitutional challenge to government action, it must determine the level of scrutiny to be applied; typically, strict scrutiny, intermediate scrutiny, or rational basis.[9] *Doe v. Pennsylvania Bd. of Probation and Parole*, 513 F.3d 95, 107 (3d Cir. 2008). Under the strict scrutiny standard, the action will be sustained only if it is narrowly tailored to serve a compelling state interest. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). Intermediate scrutiny requires that a classification be "substantially related to an important governmental objective." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). In the Equal Protection context, intermediate scrutiny applies to quasi-suspect classes like gender and illegitimacy. *Id.*; *See Lutz v. City of York, Pa.*, 899 F.2d 255, 270 (3d Cir. 1990) (applying intermediate scrutiny to Due Process challenge to cruising ordinance). Rational basis review is a deferential standard which "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). Under rational basis review, the state action will be upheld if it is rationally related to any legitimate state interest. *City of Cleburne*, 473 U.S. at 440.

As a practical matter, the level of scrutiny applied to the challenged conduct is often

---

[9] Other standards are sometimes used. *See, e.g., New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2129 (2022) (involving Second Amendment) ("Whether it came to defining the character of the right (individual or militia dependent), suggesting the outer limits of the right, or assessing the constitutionality of a particular regulation, *Heller* relied on text and history. It did not invoke any means-end test such as strict or intermediate scrutiny.").

outcome-determinative. *See Fisher v. Univ. of Texas at Austin*, 570 U.S. 297, 314 (2013) (observing that strict scrutiny must not be "strict in theory, but fatal in fact," but also "must not be strict in theory but feeble in fact"). "The appropriate standard depends on the nature of the claim and, specifically, the nature of the right allegedly infringed." *County of Butler v. Wolf*, 486 F. Supp. 3d 883, 895–96 (W.D. Pa. 2020). The Supreme Court cautions there must be a "careful description of the asserted fundamental liberty interest." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997).

### (2) The level of scrutiny for each claim

#### (a) Fourteenth Amendment Substantive Due Process claims

In *Doe #1 v. Delaware Valley School District*, 572 F. Supp.3d 38, 68 (M.D. Pa. 2021), the court recently summarized the level of scrutiny utilized to evaluate a Fourteenth Amendment Substantive Due Process claim:

> In evaluating a Substantive Due Process claim, a court must determine whether a government's intrusion on an individual's liberty interests is justified by adequate state interests. An infringement on a "fundamental" constitutional right is subject to a heightened or "strict" level of judicial scrutiny, whereas an encroachment on other rights or liberties must be analyzed under "the traditional standard of review, which requires only that the [challenged state action] be shown to bear some rational relationship to legitimate state purposes." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 37-40, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). *See also, Washington v. Glucksberg*, 521 U.S. 702, 728, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (where the asserted right is not a fundamental interest protected by the Due Process Clause, the Constitution requires that the state action "be rationally related to legitimate government interests.").

*Id.* at 68; In *Oberheim v. Bason*, 565 F. Supp.3d 607 (M.D. Pa. 2021), the court explained:

> If the underlying right allegedly infringed qualifies as a "fundamental right," courts apply strict scrutiny—that is, the government action is permissible only if "the infringement is narrowly tailored to serve a compelling state interest. Conversely, infringements on other rights or liberties, though still constitutionally scrutinized, need only satisfy the less-onerous "rational basis review"—that is, the government action will be upheld so long as it "rationally furthers some legitimate, articulated state purpose."

16

*Id.* at 618 (citations omitted).

### (b) Fourteenth Amendment Procedural Due Process claims

Procedural Due process implicates a flexible level of scrutiny that evaluates "such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976). The factors for a court to consider are: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of that interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Id.*

### (c) First Amendment Free Exercise of religion claims (incorporated into the Fourteenth Amendment)

The appropriate level of scrutiny for Free Exercise claims is unsettled. Under *Employment Division v. Smith*, 494 U.S. 872, 879 (1990), a Free Exercise claim can prompt either strict scrutiny or rational basis review depending on the nature of the challenged government action. As explained in *Tenafly Eruv Association, Inc. v. Borough of Tenafly*, 309 F.3d 144 (3d Cir. 2002):

> If a law is "neutral" and "generally applicable," and burdens religious conduct only incidentally, the Free Exercise Clause offers no protection. *Employment Div. v. Smith*, 494 U.S. 872, 879, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). *Smith* held that the Free Exercise Clause did not require a state to exempt the ingestion of peyote during a Native American Church ceremony from its neutral, generally applicable prohibition on using that drug. *Id.* at 882, 110 S.Ct. 1595. On the other hand, if the law is not neutral (i.e., if it discriminates against religiously motivated conduct) or is not generally applicable (i.e., if it proscribes particular conduct only or primarily when religiously motivated), strict scrutiny applies and the burden on religious conduct violates the Free Exercise Clause unless it is narrowly tailored to advance a compelling government interest. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532, 542, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993).

> Further, the Free Exercise Clause's mandate of neutrality toward religion prohibits government from "deciding that secular motivations are more important than religious motivations." *Fraternal Order of Police v. City of Newark*, 170 F.3d 359, 365 (3d Cir.1999).

*Id.* at 165.  In *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021) (invalidating city's policy banning Catholic adoption services from participating in its foster care program due to its religious beliefs about same sex marriage), the Supreme Court granted certiorari on the issue of whether *Smith* was wrongly decided.  The majority, however, did not reach the issue because it concluded the city's policy did not satisfy the threshold requirements of being neutral and generally applicable.  There were vigorous concurrences contending that *Smith* was wrongly decided and should be overturned in favor of a return to the standard in *Sherbert v. Verner*, 374 U.S. 398, 402 (1963).  Under the *Sherbert* standard, strict scrutiny would apply if a law imposes a substantial burden on the exercise of religion.  *See Id.* at 1890 (Alito, concurring).

### (d) Fourteenth Amendment Equal Protection claim

In the Equal Protection claim context, the level of scrutiny depends on the nature of the classification.  As explained in *Stepien v. Murphy*, 574 F. Supp.3d 229 (D.N.J. 2021):

> Strict scrutiny is appropriate if the challenged regulation targets a suspect class or burdens the exercise of a fundamental right. *Plyler v. Doe*, 457 U.S. 202, 216–17, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); *Artway v. Att'y Gen. of State of N.J.*, 81 F.3d 1235, 1267 (3d Cir. 1996).

> In other cases, rational-basis scrutiny is appropriate; the challenged regulation "need only be rationally related to a legitimate government goal." *Artway*, 81 F.3d at 1267.

*Id.* at 237.  Intermediate scrutiny applies to quasi-suspect classifications.  *Clark*, 486 U.S. at 461.

### (e) Plaintiffs' other constitutional claims

The level of scrutiny to be applied to Plaintiffs' Fourteenth Amendment claims of familial privacy and children's right to privacy is unsettled.  The parties did not cite, and this

court did not locate in its independent research, any decisions discussing the level of scrutiny to be applied under the circumstances of this case. In *Doe v. Miller*, 405 F.3d 700, 710 (8th Cir. 2005) (involving a residency restriction on sex offenders), the court noted the Supreme Court's admonition that analysis must begin with a careful description of the asserted right, explained that the right of family privacy cannot be defined generally, and held that the statute at issue did not trigger strict scrutiny. In *Carey v. Population Services, International*, 431 U.S. 678, 692 (1977), the Supreme Court noted the difficulty in defining the constitutional privacy rights of minors. The Court adopted a "significant state interest" test that is less rigorous than the "compelling state interest" test applied to restrictions on the privacy rights of adults. *Id.* at 693. The Court explained that lesser scrutiny is appropriate because: (1) the state has greater latitude to regulate the conduct of children; and (2) the right of privacy implicates independence in making certain kinds of important decisions and minors are regarded as having a lesser capability for making important decisions. *Id.* at 693 n. 15.

### (3) Summary of levels of scrutiny

At this stage, the defendants did not address what level of scrutiny should be involved. In fact, the defendants' view is that no scrutiny is necessary because Plaintiffs did not allege viable claims that their constitutional rights were violated. The level of scrutiny to be applied to the claims asserted in this case will need to be resolved after the record is fully developed.

### d. Claims asserted

With that background, the court will address each of the § 1983 claims asserted by Plaintiffs in this case.

### (1) Fourteenth Amendment Substantive Due Process claim – fundamental parental right

The elements of a § 1983 Fourteenth Amendment Substantive Due Process claim are: (i)

defendants acted under color of law; (ii) a protected property or liberty interest was at stake; (iii) the defendants had a duty of care toward the plaintiff; and (iv) a deprivation within the meaning of the Due Process clause occurred. *Roberts v. Mentzer*, 382 F. App'x 158, 166 (3d Cir. 2010) (citing *Fagan v. City of Vineland*, 22 F.3d 1296, 1310 (3d Cir. 1994)). As noted above, it is uncontested that the defendants are state actors. The defendants also do not contest that they owed a duty of care to the Plaintiffs.

### (a) The parental right at issue

The parties agree that the right of parents to make child-rearing decisions is a recognized liberty interest under the Fourteenth Amendment. (ECF No. 15 at 7). The parties, however, vigorously dispute the contours of that right. In *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228, 2242 (2022), the Supreme Court recently explained that the Due Process Clause "guarantee[s] some rights that are not mentioned in the Constitution, but any such right must be 'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty.'" *Id.* at 2242 (quoting *Glucksberg*, 521 U.S. at 721).

The parental right to custody, control and nurture of their children is deeply rooted and implicit in the United States' concept of ordered liberty. The Supreme Court repeatedly emphasized the fundamental nature of that parental right.

- In *Meyer v. Nebraska*, 262 U.S. 390 (1923) (state cannot ban teaching German language to children), the Supreme Court stated:

  While this court has not attempted to define with exactness the liberty thus guaranteed, the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, **to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience**, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.

*Id.* at 399 (emphasis added).

- In *Pierce v. Society of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510 (1925) (compulsory public education is unconstitutional), the Supreme Court stated:

  > The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the state to standardize its children by forcing them to accept instruction from public teachers only. The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.

  *Id.* at 535.

- In *Prince v. Massachusetts*, 321 U.S. 158 (1944) (child labor laws apply to Jehovah's Witnesses), the Court wrote:

  > It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder .... And it is in recognition of this that these decisions have respected the private realm of family life which the state cannot enter.

  *Id.* at 166.

- In *Wisconsin v. Yoder*, 406 U.S. 205 (1972) (compulsory education to age 16 violated rights of Amish), the Supreme Court reiterated:

  > The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition.

  *Id.* at 232.  The Supreme Court emphasized in *Yoder*:  "However read, the Court's holding in *Pierce* stands as a charter of the rights of parents to direct the religious upbringing of their children."  *Id.* at 233.

- In *Stanley v. Illinois*, 405 U.S. 645 (1972), the Court described the rights to conceive and to raise one's children as "essential," "basic civil rights of man" and "far more precious ... than property rights."  *Id.* at 651.

  In *Troxel v. Granville*, 530 U.S. 57 (2000), the Supreme Court discussed its precedents

about parental rights as follows:

> The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court. More than 75 years ago, in *Meyer v. Nebraska*, 262 U.S. 390, 399, 401, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), we held that the "liberty" protected by the Due Process Clause includes the right of parents to "establish a home and bring up children" and "to control the education of their own." Two years later, in *Pierce v. Society of Sisters*, 268 U.S. 510, 534–535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), we again held that the "liberty of parents and guardians" includes the right "to direct the upbringing and education of children under their control." We explained in *Pierce* that "[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Id.*, at 535, 45 S.Ct. 571. We returned to the subject in *Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), and again confirmed that there is a constitutional dimension to the right of parents to direct the upbringing of their children. "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Id.*, at 166, 64 S.Ct. 438.

> In subsequent cases also, we have recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children. *See, e.g., Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) ("It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children 'come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements' " (citation omitted)); *Wisconsin v. Yoder*, 406 U.S. 205, 232, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition"); *Quilloin v. Walcott*, 434 U.S. 246, 255, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978) ("We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected"); *Parham v. J. R.*, 442 U.S. 584, 602, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979) ( "Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children. Our cases have consistently followed that course"); *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (discussing "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child"); *Glucksberg*, supra, at 720, 117 S.Ct. 2258 ("In a long line of cases, we have held that, in addition to the specific freedoms protected by the Bill of Rights, the 'liberty' specially protected by the Due Process Clause includes the righ[t] ... to direct the education and upbringing of one's children" (citing *Meyer* and *Pierce*)). In light of this

extensive precedent, it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.

*Id.* at 65–66.

These repeated pronouncements from the Supreme Court are not simply platitudes or mere surplusage, which may be given lip service and brushed aside.  The Supreme Court clearly recognized that the right of parents to control the upbringing and education of their children is fundamental.  This right is deeply rooted in the nation's history and implicit in the concept of ordered liberty.

### (b) Interactions between parents and public schools

This case involves the assertion of parental rights in the context of a public school. In *Edwards v. Aguillard*, 482 U.S. 578 (1987), the Supreme Court summarized the social contract between parents and public schools:

> Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family. Students in such institutions are impressionable and their attendance is involuntary. *See, e.g., Grand Rapids School Dist. v. Ball*, 473 U.S. 373, 383, 105 S.Ct. 3216, 3222, 87 L.Ed.2d 267 (1985); *Wallace v. Jaffree*, 472 U.S. 38, 60, n. 51, 105 S.Ct. 2479, 2492, n. 51, 86 L.Ed.2d 29 (1985); *Meek v. Pittenger*, 421 U.S. 349, 369, 95 S.Ct. 1753, 1765, 44 L.Ed.2d 217 (1975); *Abington School Dist. v. Schempp*, 374 U.S. 203, 252–253, 83 S.Ct. 1560, 1587– 1588, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring). The State exerts great authority and coercive power through mandatory attendance requirements, and because of the students' emulation of teachers as role models and the children's susceptibility to peer pressure.

*Id.* at 584.  The Supreme Court recognizes the "importance of public schools in the preparation of individuals for participation as citizens, and in the preservation of the values on which our society rests."  *Ambach v. Norwick*, 441 U.S. 68, 76 (1979).

In *Yoder*, the Supreme Court explained that "a State's interest in universal education, however highly we rank it, is not totally free from a balancing process when it impinges on other fundamental rights and interests, such as those specifically protected by the Free Exercise Clause of the First Amendment and the traditional interest of parents with respect to the religious upbringing of their children . . . ." *Yoder*, 406 U.S. at 214. The Supreme Court has recognized that local school boards must be permitted to establish a curriculum to reflect community values, but cautioned "that the discretion of the States and local school boards in matters of education must be exercised in a manner that comports with the transcendent imperatives of the First Amendment." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 864 (1982).

### (c) The circuit split

The United States Court of Appeals for the Third Circuit has recognized, in the public school setting, the primacy of parental rights in the upbringing of their children. In *Gruenke*, the court explained:

> It is not educators, but parents who have primary rights in the upbringing of children. School officials have only a secondary responsibility and must respect these rights. State deference to parental control over children is underscored by the Court's admonitions that "[t]he child is not the mere creature of the State," *Pierce*, 268 U.S. at 535, 45 S.Ct. 571, and that it is the parents' responsibility to inculcate "moral standards, religious beliefs, and elements of good citizenship." *Yoder*, 406 U.S. at 233, 92 S.Ct. 1526.

*Gruenke*, 225 F.3d at 307. In *Gruenke*, a high school swim coach intruded into the suspected pregnancy of a student swimmer without informing the parents. The court cautioned: "Public schools must not forget that 'in loco parentis' does not mean 'displace parents.'" *Id.*

In *C.N. v. Ridgewood Board of Education*, 430 F.3d 159 (3d Cir. 2005), the Third Circuit Court of Appeals reaffirmed that "parents, not schools, have the primary responsibility to

inculcate moral standards, religious beliefs, and elements of good citizenship." *Id.* at 185 (citing *Gruenke*, 225 F.3d at 307). The court recognized that "introducing a child to sensitive topics before a parent might have done so herself can complicate and even undermine parental authority." *Id.*

The Third Circuit Court of Appeals recognized that parental rights are entitled to protection outside the school setting from misguided attempts to impose moral views by government officials. In *Miller v. Mitchell,* 598 F.3d 139, 150 (3d Cir. 2010), the court recognized a parent's Fourteenth Amendment Substantive Due Process right to shield her child from unwelcome moral views about teenage girls sending sexually suggestive photos (i.e., sexting). A local district attorney sought to require the girls' attendance at a program teaching that the minors' actions were morally wrong. The parent objected that these views contradicted the beliefs she wished to instill in her daughter. The court granted an injunction and explained:

> We agree that an individual District Attorney may not coerce parents into permitting him to impose on their children his ideas of morality and gender roles. An essential component of Jane Doe's right to raise her daughter—the "responsibility to inculcate moral standards, religious beliefs, and elements of good citizenship," *Gruenke*, 225 F.3d at 307—was interfered with by the District Attorney's actions.

*Id.* at 150–51. The court noted that the program was not part of the school curriculum.[10] *Id.* at 151.

Other circuit courts of appeals have concluded that parents forfeit any right to control their child's education if they choose to send their children to public school. In *Fields v. Palmdale School District*, 427 F.3d 1197 (9th Cir. 2005), <u>amended on denial of rehearing</u>, 447 F.3d 1187 (9th Cir. 2006) (holding that parental rights do not extend beyond the school door), the court stated, among other things:

---

[10] The court did not decide how this conduct would be analyzed if it had been included in the school curriculum.

parents have no due process or privacy right to override the determinations of public schools as to the information to which their children will be exposed while enrolled as students.

*Id.* at 1200;

Parents have a right to inform their children when and as they wish on the subject of sex; they have no constitutional right, however, to prevent a public school from providing its students with whatever information it wishes to provide, sexual or otherwise, when and as the school determines that it is appropriate to do so. Neither *Meyer* nor *Pierce* provides support for the view that parents have a right to prevent a school from providing any kind of information—sexual or otherwise—to its students.

*Id.* at 1206;

once parents make the choice as to which school their children will attend, their fundamental right to control the education of their children is, at the least, substantially diminished.

*Id.*;

In sum, we affirm that the *Meyer–Pierce* right does not extend beyond the threshold of the school door. The parents' asserted right "to control the upbringing of their children by introducing them to matters of and relating to sex in accordance with their personal and religious values and beliefs," by which they mean the right to limit what public schools or other state actors may tell their children regarding sexual matters, is not encompassed within the *Meyer–Pierce* right to control their children's upbringing and education.

*Id.* at 1207;

we hold that there is no free-standing fundamental right of parents "to control the upbringing of their children by introducing them to matters of and relating to sex in accordance with their personal and religious values and beliefs" and that the asserted right is not encompassed by any other fundamental right.

*Id.* at 1211; and

We conclude only that the parents are possessed of no constitutional right to prevent the public schools from providing information on that subject [sex] to their students in any forum or manner they select.

*Id.*

In denying rehearing, the Ninth Circuit Court of Appeals recognized the existence of the fundamental parental rights discussed in *Meyer* and *Pierce*:

> it appears to be that our opinion's reliance upon *Brown v. Hot, Sexy and Safer Productions, Inc.*, 68 F.3d 525 (1st Cir. 1995), was misplaced when we concluded that the parents' fundamental right "to make decisions concerning the care, custody and control of their children" does not override the right of public schools to determine the nature of the information they make available to their students. There can be no doubt that the Due Process Clause does protect the parents' right to control their children's upbringing. That right was recognized in two leading Supreme Court cases, *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), and *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). Our opinion does not in any way quarrel with or constrict the right established by those cases.

*Fields v. Palmdale Sch. Dist.*, 447 F.3d 1187, 1189–90 (9th Cir. 2006).  The court, however, reaffirmed the "central holding" of its original opinion, i.e., that the parental right did not allow parents to restrict the flow of information by a public school:

> the *Meyer–Pierce* right (and the closely related privacy right) does not include the "right to restrict the flow of information in the public schools." *Fields*, 427 F.3d at 1206 (quoting *Brown*, 68 F.3d at 533–34). Indeed, parents "do not have a fundamental [due process] right generally to direct how a public school teaches their child." *Id.*

*Id.* at 1190.

The Court of Appeals for the Third Circuit specifically rejected this limited view of parental rights.  *Ridgewood*, like *Fields*, involved a student survey about sexual practices in a public school.  The anonymous survey[11] of 7th through 12th graders at issue in *Ridgewood* "in no way indoctrinated the students in any particular outlook on these sensitive topics; at most, they may have introduced a few topics unknown to certain individuals."  *Ridgewood*, 430 F.3d at 185. The court recognized that "the Supreme Court has extended constitutional protection to parental decisions regarding certain matters."  *Id.*  The court concluded, however, that "the survey's

---

[11] The school district contended the survey was voluntary, but the court assumed for the purpose of summary judgment it was involuntary.  *Ridgewood*, 430 F.3d at 176.

interference with parental decision-making did not amount to a constitutional violation." *Id.* In its analysis, the court specifically rejected the reasoning in *Fields* and explained:

> In reaching this conclusion, we do not hold, as did the panel in *Fields v. Palmdale School District*, 427 F.3d 1197 (9th Cir. 2005), that the right of parents under the *Meyer–Pierce* rubric "does not extend beyond the threshold of the school door." *Id.* at 1207. Nor do we endorse the categorical approach to this right taken by the *Fields* court, wherein it appears that a claim grounded in *Meyer–Pierce* will now trigger only an inquiry into whether or not the parent chose to send their child to public school and if so, then the claim will fail. Instead, guided by *Gruenke*, wherein this Court stressed that it is primarily the parents' right "to inculcate moral standards, religious beliefs and elements of good citizenship," 225 F.3d at 307, we have determined only that, on the facts presented, the parental decisions alleged to have been usurped by the School Defendants are not of comparable gravity to those protected under existing Supreme Court precedent.

*Ridgewood*, 430 F.3d at 185 n.26.

In *Parker v. Hurley*, 514 F.3d 87 (1st Cir. 2008), the court followed *Fields*, and stated: "One ground of distinction [from *Yoder*] is that the plaintiffs have chosen to place their children in public schools and do not live, as the Amish do, in a largely separate culture." *Id.* at 100.[12] The plaintiffs in *Parker* filed a petition for certiorari, asking the Supreme Court to resolve the circuit split. *See* Brief for Petitioner, *Parker v. Hurley*, No. 07-1368, 2008 WL 1923279 at * 7 (2008) ("This court should resolve the split by accepting this case and ruling that the Third Circuit's view is correct."). The Supreme Court declined to accept that appeal. *Parker v. Hurley*, 555 U.S. 815 (2008).

### (d) Limits on parental rights

Even under the Third Circuit Court of Appeals' broader precedent, parental rights are not absolute or unlimited. In *Gruenke*, the court commented:

---

[12] As explained in more detail, *infra* at 38, it is debatable whether a real "choice" is involved if parents cannot afford to send their children to private school and are not able to provide adequate home schooling due to work commitments or lack of education. *See Edwards*, 482 U.S. at 584 (recognizing that for many, public school is effectively mandatory).

> Notwithstanding these near-absolutist pronouncements, the [Supreme] Court has also recognized that for some portions of the day, children are in the compulsory custody of state-operated school systems. In that setting, the state's power is "custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults." *Vernonia Sch. Dist. v. Acton*, 515 U.S. 646, 655, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995).

*Gruenke*, 225 F.3d at 304.  "Thus, there may be circumstances in which school authorities, in order to maintain order and a proper educational atmosphere in the exercise of police power, may impose standards of conduct on students that differ from those approved by some parents."  *Id.*  In *Combs v. Homer-Center School District*, 540 F.3d 231 (3d Cir. 2008) (involving a challenge to home schooling regulations), the court explained that parents "do not have a constitutional right to control each and every aspect of their children's education and oust the state's authority over that subject." *Id.* at 248.

The court in *Ridgewood* interpreted *Gruenke* to distinguish "between actions that strike at the heart of parental decision-making authority on matters of the greatest importance and other actions that, although perhaps unwise and offensive, are not of constitutional dimension." *Ridgewood,* 430 F.3d at 184.  In *J.S. ex rel. Snyder v. Blue Mountain School District*, 650 F.3d 915 (3d Cir. 2011), the court explained:

> the level of interference required to find a conflict between the school district's policy and the parents' liberty interest may vary depending on the significance of the subject at issue, and the threshold for finding a conflict will not be as high when the school district's actions "strike at the heart of parental decision-making authority on matters of the greatest importance."

*Id.* at 933–34 (quoting *Ridgewood*).

In *Parker*, the court noted that the impressionability of young school children is another relevant factor in the constitutional analysis.  *Parker*, 514 F.3d at 100-01.  Plaintiffs repeatedly emphasize that their children were only six or seven years old.  Defendants did not address how the age of the children impacts the constitutional analysis.  In *Ridgewood*, the court recognized

29

that public schools may require older students to state the arguments that could be made on both sides, to encourage critical thinking, but may not demand that a student profess beliefs with which the student disagrees. *Ridgewood*, 430 F.3d at 187. In *Miller* (which involved girls aged 11 and 12), the court commented:

> Minors often are more susceptible to external influences, and while this susceptibility may weigh in favor of certain educational or rehabilitative programs, it also cautions against allowing actors in the juvenile and criminal justice systems to venture outside the realm of their elected authority.

*Miller*, 598 F.3d at 152. In sum, the parental right to control the education and upbringing of a child loses some force as the child nears adulthood.

### (e) The dispute in this case rises to constitutional importance

There may be some cases in which it is difficult to determine whether the school's alleged infringement on parental rights rises to constitutional importance. Accepting as true the facts set forth in the complaint, this case is not one of them. Teaching a child how to determine one's gender identity at least plausibly is a matter of great importance that goes to the heart of parenting. *See, e.g., Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 522 (3d Cir. 2018) (gender identity implicates a person's "deep-core sense of self").

The Parents assert they have sincerely held religious and moral beliefs that "human beings are created male or female and that the natural created order regarding human sexuality cannot be changed regardless of individual feelings, beliefs, or discomfort with one's identity, and biological reality, as either male or female." Complaint ¶ 140. *See Genesis* 1:27 ("So God created mankind in his own image, in the image of God he created them; male and female he created them.").[13]

---

[13] The Parents' religious beliefs also implicate the First Amendment Free Exercise claim discussed *infra* at 46-47.

The transgender movement posits a distinctly different view of identity formation. In *Doe*, the court defined the applicable terminology:

> "Sex" is defined as the "anatomical and physiological processes that lead to or denote male or female." Typically, sex is determined at birth based on the appearance of external genitalia.
>
> "Gender" is a "broader societal construct" that encompasses how a "society defines what male or female is within a certain cultural context." A person's gender identity is their subjective, deep-core sense of self as being a particular gender. As suggested by the parenthetical in our opening paragraph, "cisgender" refers to a person who identifies with the sex that person was determined to have at birth. The term "transgender" refers to a person whose gender identity does not align with the sex that person was determined to have at birth.

*Doe*, 897 F.3d at 522. "Transgender individuals may experience 'gender dysphoria,' which is characterized by significant and substantial distress as a result of their birth-determined sex being different from their gender identity." *Id.* "'Social gender transition' refers to steps that transgender individuals take to present themselves as being the gender they most strongly identify with." *Id.* "For transgender individuals, an important part of social gender transition is having others perceive them as being the gender the transgender individual most strongly identifies with." *Id.*

In short, the Parents seek to teach their children that sex and gender are synonymous and immutable and that humans are created beings who must accept their place in a larger reality. The transgender movement asserts that human beings are autonomous, self-defining entities who can impose their internal beliefs about themselves on the exterior world. The contradictions between these worldviews are likely beyond the grasp of most first-graders. The Parents allege that Williams' instruction about gender dysphoria and transgender transitioning caused confusion among students and resulted in one child asking her mom "how do you know that I am a girl?" Complaint ¶ 92. Introducing and teaching a child about complex and sensitive gender identity

31

topics before the parent would have done so can undermine parental authority. *Ridgewood*, 430 F.3d at 185. A teacher instructing first graders that the child's parents' beliefs about gender identity may be wrong and the teacher's beliefs are correct directly repudiates parental authority. The instruction need not be "pro-transgender"; parental rights could also be implicated if a teacher instructed that an anti-transgender position is correct. Williams' alleged conduct, allegedly approved by the District, implicates the Parents' constitutional rights.

### (f) Narrowly tailored to serve a compelling interest

As discussed above, accepting the facts in the complaint as true, the parental right at issue in this case is fundamental. As pled, defendants' conduct appears to strike at the heart of parental decision making in a matter of greatest importance in their relationship with their children, i.e., forming their children's religious and moral beliefs and their identity. To burden a fundamental parental right, a school district must establish that its actions are narrowly tailored to serve a compelling interest. Based upon the facts pled and the reasonable inferences drawn from them, the defendants – not the Parents – may have the burden to demonstrate a "compelling interest" to override the fundamental parental rights at issue and that any infringement is "narrowly tailored" to serve that interest. *See Glucksberg*, 521 U.S. at 720-21 (government may infringe on the fundamental right to direct the education and upbringing of children only if it demonstrates infringement is "narrowly tailored to serve a compelling state interest").

The District argues, in essence, that there was no constitutional violation because the students were merely exposed to two books/videos about tolerance. (ECF No. 15 at 2). The District suggests (somewhat contradictorily) that: (1) Williams was entitled to promote acceptance of transgendered children[14]; (2) the District has untrammeled authority to choose its

---

[14] Defendants did not directly address whether Williams acted within her authority with respect to the allegations about "grooming" of a specific child, telling the first-graders that parents make mistakes about gender, or instructing

curriculum and, if children are exposed to sensitive information, the proper remedy is for the Parents to discuss those matters at home; and (3) it is not responsible for Williams' instruction because it was not in the curriculum. (ECF No. 15 at 2, 3, 14-15). At the motion to dismiss stage, the District's arguments lack merit. On a fully developed record, Defendants may raise factual disputes about Williams' conduct, the District's knowledge about and approval of her conduct, and the content of the books/videos. At this pleading stage, however, the facts alleged in the complaint must be accepted as true and all reasonable inferences drawn from those facts must be construed in favor of Plaintiffs.

Unless the school demonstrates that its conduct is narrowly tailored to achieve a compelling interest, a school's interest in promoting tolerance, while laudable, cannot override a fundamental parental right about teaching sensitive topics that go to the heart of the parents' relationship to their young children. *Meyer*, 262 U.S. at 401 ("a desirable end cannot be promoted by prohibited means"). In *Fulton*, the Supreme Court recently explained that the government's asserted "compelling need" must be scrutinized in light of the specific opt out request:

> Rather than rely on "broadly formulated interests," courts must "scrutinize[ ] the asserted harm of granting specific exemptions to particular religious claimants." *O Centro*, 546 U.S. at 431, 126 S.Ct. 1211. The question, then, is not whether the City has a compelling interest in enforcing its non-discrimination policies generally, but whether it has such an interest **in denying an exception to CSS**.

*Fulton,* 141 S. Ct. at 1881 (emphasis added). In other words, in this case the District must demonstrate why it has a compelling need to prevent these particular Plaintiffs from opting their children out of this particular instruction. Here, the District did not assert any compelling interest and cannot rely on a generalized interest in promoting tolerance to deny opt outs to the Plaintiffs. There are no allegations in the complaint or the motions to dismiss about bullying or

---

the children not to tell their parents about those conversations.

intolerance of transgender children in the District or, more specifically, in Williams' classroom or by Plaintiffs' children. The record will need to be developed for the District to show it has a compelling need – over the objections of the Parents: to expose six and seven year old children to the instruction about gender dysphoria and transgender transitioning; to tell the young children that their parents may be wrong about the student's gender; to cause confusion in a first-grader about how to determine that child's gender; to tell a young child that the teacher would never lie (implying that the child's parents may be lying); or to suggest to a child that he may be a transgender child.

The allegations in the complaint, if true, raise issues about whether any administrative inconvenience associated with providing notice and opt out rights could suffice as a justification for defendants' conduct. Similar administrative inconvenience results from notice and opt out rights already provided by the District to parents for other reasons, as set forth in ¶ 3 of the complaint. *See Burwell v. Hobby Lobby Stores, Inc*., 573 U.S. 682, 692 (2014) (regulation was not "least restrictive alternative" where system was available to accommodate objections to the contraceptive mandate by religious nonprofits and HHS provided no reason why the same system could not be made available when owners of for-profit corporations have similar objections).

The District argues that "the parental right to control the upbringing of a child <u>must</u> give way to a school's ability to control curriculum and the school environment." (ECF No. 15 at 7 (emphasis in original). The District's argument that parents' fundamental rights must <u>always</u> yield to the school's interests is not accepted in this circuit. In *Gruenke*, the Third Circuit Court of Appeals held the opposite – the school , absent a compelling interest, must yield to the parents:

> a school's policies might come into conflict with the fundamental right of parents
> to raise and nurture their child. But when such collisions occur, the primacy of the
> parents' authority must be recognized and should yield only where the school's
> action is tied to a compelling interest.

*Gruenke*, 225 F.3d at 305.  In *Gruenke*, the court further explained:  "Because public school officials are state actors, they must not lose sight of the fact that their professional association ethical codes, as well as state statutes, must yield to the Constitution."  225 F.3d at 307.

### (g) Notice and opt out

As explained above, parents, not schools, have the primary responsibility to inculcate moral standards, religious beliefs, and elements of good citizenship in their children. *Ridgewood*, 430 F.3d at 185.  With respect to important matters that strike at the heart of parenting (such as inculcation of religious beliefs or teachings contrary to the parents' religious beliefs), the fundamental rights of parents might override the interests of a public school; the school would need to show its actions are narrowly tailored to achieve a compelling interest.  *Id.*; *Gruenke*, 225 F.3d at 305.  At issue here are whether Parents have a right to expect that first-grade teachers will not expose their impressionable young children to sensitive gender identity topics against the parents' instructions; will not tell children that parents make mistakes about important matters such as their children's identity; will not tell children the teacher would never lie (implying that their parents may lie about a child's identity); will not advise children they may dress or be groomed as a different gender; and will not tell children not to talk to their parents about what they learn in school about those topics.  *See* Complaint ¶¶ 6, 78, 79, 83.

The parents' fundamental right to inculcate their important moral and religious values in their young children cannot be purely hypothetical – it must be enforceable.  Absent a compelling reason, it is plausible that parents' right to shield their young children from sensitive topics they consider religiously, morally or age inappropriate, particularly in early elementary

school, must be respected. Because of the young age of the children here, parental rights to decide when (and if) certain sensitive topics will be presented to their children may need to be measured against the reasons the District wants this kind of instruction to be provided over the objections of parents. *See Ridgewood*, 430 F.3d at 185 (introducing a child to sensitive topics before a parent might have done so can undermine parental authority).

To exercise their rights, the Parents assert they must have realistic advance notice when sensitive topics will be presented by the school. *See Ridgewood*, 430 F.3d at 176 ("A jury could reasonably think it unrealistic in this age of busy, working parents and busy, scheduled children that a letter warning of a survey on a date uncertain would be sufficient to allow a parent to act on an objection."). The parties refer to these principles in shorthand as the rights to "notice and opt out." The District provides expansive opt out rights to parents on a variety of topics. Complaint ¶¶ 37-38; District Policy I(F).

When fundamental parental rights are involved, the school at least may need to provide (absent compelling need) realistic notice and the practical ability for parents to shield their young children from sensitive topics the parents believe to be inappropriate. If a compelling need is not shown, the parents' fundamental right to inculcate moral standards and religious beliefs in their young children is implicated and may need to be protected and made effective in a practical manner. Whether defendants provided appropriate notice and ability to opt out in this case will need to be resolved on a developed record.

### (h) Discussion of persuasive precedents

Defendants rely heavily on the decision in *Parker*, 514 F.3d at 87. In that case, the First Circuit Court of Appeals held that parents failed to state claims for violation of their Free Exercise and parental Due Process rights based on the school district's inclusion in the

36

elementary school curriculum of materials intended to encourage respect for gay parents and couples.  As noted above, *Parker* followed the categorical approach set forth in *Fields*.  *Id.* at 100 (observing that plaintiffs chose to place their children in public schools and did not live in a largely separate culture like the Amish).  As explained above, this narrow view of parental rights in the school context was rejected by the Third Circuit Court of Appeals in *Ridgewood*, 430 F.3d at 185 n. 26.

This court, of course, is bound to follow Third Circuit precedent, but also finds the decisions in *Gruenke* and *Ridgewood* more persuasive.  *See Rhoades v. Penn-Harris-Madison Sch. Corp.*, 574 F. Supp.2d 888, 898 (N.D. Ind. 2008) ("This court agrees with *C.N.* that the approach in *Fields* would gut parental rights on the issue of education of any content other than choosing a school.").

The factual situation in *Parker* was materially different and its analysis is not compelling in the context of this case.  The books at issue in *Parker* were part of the school curriculum and were consistent with state-wide standards in Massachusetts, which had recently mandated the recognition of same-sex marriage.  *Parker*, 514 F.3d at 91-92.  The parents had notice about the books and the school's intent to promote toleration of same-sex marriage.  *Id.* at 106.  One student was not required to read the books.  *Id.*  The other student sat through a reading, but was not asked to affirm gay marriage.  *Id.*  The books did not endorse gay marriage or homosexuality or even address those topics explicitly, and the court concluded (at the motion to dismiss stage, before any discovery had been conducted) that there was "no evidence of systemic indoctrination."  *Id.*

The court in *Parker* never analyzed the opt out rights of parents or whether the school district's action was narrowly tailored to achieve a compelling state interest.  The court

recognized in *Parker* that the parents merely wanted to exempt their children rather than change the curriculum, *id.* at 102, but never grappled with the important distinction between those forms of relief. There is a critical difference between parents trying to impose their religious or moral views on <u>others</u> and trying to prevent the school from imposing views upon their <u>own</u> children that contradict the parents' religious or moral views. *See Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2431 (June 27, 2022) ("permitting private speech is not the same thing as coercing others to participate in it"). The court in *Parker* never analyzed that distinction and in fact, concluded that the parents' only remedy was to engage in political action to change the curriculum. *Id.* at 107.

The holding in *Parker* and *Fields* that parents forfeit their rights at the schoolhouse door and retain only the right to decide whether or not to send their children to public school may be fundamentally unfair to parents who in reality do not have that choice. Many people cannot afford to pay for private school for their children and may be working parents or may not be educationally or otherwise able to home school their children. For many, particularly those of limited means or education, public school is effectively mandatory. *Edwards*, 482 U.S. at 584. Constitutional rights should not be analyzed in a way that benefits only socially and economically advantaged persons. In sum, the court in *Parker* did not persuasively apply Supreme Court precedent about the fundamental nature of the parental rights at issue and how to balance those rights with the interests of a public school in a pluralistic society. *See Kennedy*, 142 S. Ct. at 2431 (rule suppressing religious expression "would undermine a long constitutional tradition under which learning how to tolerate diverse expressive activities has always been 'part of learning how to live in a pluralistic society.'").

The decision in *Jones v. Boulder Valley School District RE-2*, No. 20-CV-03399-RM-NRN, 2021 WL 5264188, at *2 (D. Colo. Oct. 4, 2021), is also distinguishable.  In that case, the school district attempted to teach tolerance and understanding of transgendered individuals through specialized programming as part of the school's curriculum.  Importantly, the school district provided notice and opt out rights to the parents who objected.[15]  *Id.*  Here, by contrast, accepting the facts pled as true, Williams' instruction was not part of the District's curriculum.  Thus, the decisions involving non-curriculur actions in *Gruenke* (swim coach intruding into suspected preganancy of a student swimmer); *Miller* (forcing child to attend program about the moral dangers of sexting); and *Ridgewood* (survey about student sex and drug habits) are more on point.  In addition, the Parents in this case allege: (1) they were not given notice (to the contrary, Bielewicz assured them that transgender topics would <u>not</u> be presented to first graders); (2) Williams did attempt to indoctrinate their children (i.e., that the Parents may be wrong and her teachings about gender identity were right); and (3) the District adopted a de facto policy that it will not provide notice or opt out rights in the future.

The better-reasoned persuasive precedent is *Glaser v. Marietta*, 351 F. Supp. 555 (W.D. Pa. 1972) (Weis, J.), which analyzed the applicable legal principles in the context of a less politically-charged issue -- the parental right to decide whether the parent's child could be subjected to corporal punishment.  Judge Weis, who was later appointed to the Third Circuit Court of Appeals and joined in the *Gruenke* decision, agreed that the school district had the power to enact regulations for student conduct and orderly control of classroom activities, including methods of enforcement, and that the regulations about corporal punishment adopted

---

[15] Opt outs were provided for "instructional events," but not for "organic classroom discussions" (i.e., when those topics arose unexpectedly in day to day discussions).  *Id.* at *7.  The allegations in this case do not involve "organic discussions," but instead allege a deliberate effort by Williams to advocate her transgender agenda to the students, to encourage a student to think he may be like her transgender child, and to hide that conduct from the Parents.

by the school district appeared reasonable, were supported by many parents, and did not constitute cruel and unusual punishment. *Glaser*, 351 F. Supp. at 558, 560. Those factors, however, did not end the analysis. Judge Weis recognized: "But when the regulations are confronted with the flat prohibition of a particular parent and an assertion of her fundamental rights to raise her child in the manner in which she chooses, then obviously the balancing process inherent in the *Yoder* and *Prince* cases becomes necessary." *Id.* at 560. Judge Weis rejected the argument that the exercise of judgment should be reserved for school administrators, not parents, and stated:

> We differ in the designation of the governing tribunal. The obligation is that of the parent primarily, not the state, not the school, and may be made by the parent absent weighty factors which we do not find to exist in this case. Where justification for the deprivation of a personal liberty cannot be shown, it may not be taken away by the state or its agency.

*Id.* at 561.

Judge Weis concluded it was "possible to harmonize the desires of those parents who approve of corporal punishment for their children in the school with those who take a different stand with respect to their offspring." *Id.* The court held that "the School District may enforce its rules on corporal punishment except as to a child whose parents have notified the appropriate authorities that such disciplinary method is prohibited." *Id.*

In this case, too, it may be necessary to engage in a balancing process to consider on a developed record whether the District asserted a need to present the transgender topics that can be harmonized with the desires of those parents who wish to decide for themselves whether and when to expose their young children to the topics of gender dysphoria and transgender transitioning. In a pluralistic society, absent a compelling need, a school district should have tolerance for differing parental views on sensitive topics and may at least need to provide notice

40

and opt out opportunities for "those who take a different stand with respect to their offspring." *Id.*

### (i)  The complaint alleges a Substantive Due Process violation against certain defendants

As discussed, Parents have a fundamental constitutional right to control the inculcation of values in their children.  The transgender topics at issue implicate a core parental interest in forming the identity of their children.  With respect to defendants Williams and Bielewicz, the complaint alleges that Williams told students that parents make mistakes about gender; instructed students not to discuss this topic with their parents; told a child she would never lie (implying the parents may be lying about the child's identity); targeted one student for repeated approaches about his becoming like her transgender child; and caused another child to be confused about how her parents determined her gender.  The complaint alleges that Williams knew that Plaintiffs did not want her to discuss these topics with their children or to target their children to align with her beliefs about a child's gender, but did so anyway.  Williams sought permission to show the books/videos on transgender topics -- and Bielewicz granted it -- despite both of them knowing the Parents were opposed to having their young children exposed to that kind of material.

There was no realistic opportunity for the Parents to exercise their rights, as they were not given notice or ability to opt out.  As alleged in the complaint, the transgender topics were intentionally presented and promoted to the children by their first-grade teacher.[16]  These topics were not part of the published school curriculum.  Bielewicz gave an ad hoc approval to Williams to show the transgender related videos on the same morning they were shown – with no notice to the Parents.  In these circumstances, Plaintiffs stated plausible Substantive Due Process claims against Williams and Bielewicz.

---

[16] This case does not involve unanticipated, brief discussions of transgender topics prompted by student questions (i.e., "organic classroom discussions" as discussed in *Jones*, 2021 WL 5264188 at *7).

Plaintiffs also asserted plausible Substantive Due Process claims against the District, Steinhauer, Irwin and Wyland.  The court cannot dismiss the Substantive Due Process claim against the District as a matter of law at this stage of the case.[17]  It is the District's responsibility to develop a curriculum and control the information that is presented to the children entrusted to its care.  Complaint ¶ 36; Policy I(J).  A public school teacher does not have a constitutional right to depart from the school's curriculum.  *See Mayer v. Monroe Cnty. Cmty. Sch. Corp*., 474 F.3d 477, 480 (7th Cir. 2007) (holding that "the first amendment does not entitle primary and secondary teachers, when conducting the education of captive audiences, to cover topics, or advocate viewpoints, that depart from the curriculum adopted by the school system.").  As explained in *Boring v. Buncombe County Board of Education*, 136 F.3d 364 (4th Cir. 1998):

> [T]he ultimate question for our resolution [is] whether a teacher has a constitutional right to define, at least in part, the school's curriculum, over the informed judgments of both school boards and parents....[T]he court properly concludes that [a teacher] does not. Of course, were it otherwise-that is were every public school teacher in America to have the constitutional right to design (even in part) the content of his or her individual classes, ... the Nation's school boards would be without the most basic authority to implement a uniform curriculum and schools would become mere instruments for the advancement of the individual and collective social agenda of their teachers.

*Id.* at 173 (Luttig, J., concurring).

The complaint does not simply allege actions by a rogue teacher.  Accepting the facts pled as true, Bielewicz was aware of the Parents' objections to Williams' non-curricular instruction about gender dysphoria and transgender transitioning and Steinhauer, Irwin and Wyland defended Williams' instruction.   The District and Steinhauer, Irvin and Wyland adopted

---

[17] A school district is akin to a municipality and may be liable under § 1983 if a failure to train its employees amounts to deliberate indifference to the constitutional rights of persons with whom those employees come in contact. *Logan v. Bd. of Educ. of Sch. Dist. of Pittsburgh*, 742 F. App'x 628, 632 (3d Cir. 2018).  In addition, Plaintiffs allege the District adopted a de facto policy that is the "moving force" of the violations of their rights. *Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658, 694 (1978).

a de facto policy that permitted that kind of instruction to continue in the future without parental notice or opt out rights.

### (j) Conclusion and summary about Substantive Due Process claim

In sum, viewing the facts pled in the complaint as true and drawing all reasonable inferences in the light most favorable to Plaintiffs, the court must conclude that the complaint is sufficient to assert a plausible Substantive Due Process claim against certain defendants (the District, Williams, Bielewicz, Steinhauer, Irvin and Wyland), i.e., those defendants acted under color of state law; a protected fundamental liberty interest is at stake; those defendants had a duty of care toward the Plaintiffs; and a deprivation within the meaning of the Due Process clause occurred.

### (2) Fourteenth Amendment Procedural Due Process claim

The elements of a § 1983 Fourteenth Amendment Procedural Due Process claim are: (1) the plaintiff was deprived of a protected liberty or property interest; (2) this deprivation was without due process; (3) the defendant subjected the plaintiff to this deprivation; (4) the defendant was acting under color of state law; and (5) the plaintiff suffered injury as a result. *Sample v. Diecks*, 885 F.2d 1099, 1113 (3d Cir. 1989). Some courts describe a Procedural Due Process claim as having only two elements: (1) "that he has a liberty or property interest which has been interfered with by the State;" and (2) the procedures that the State employed to deprive him of liberty or property were constitutionally insufficient." *Whitaker v. City of Phila.*, No. 5:20-CV-03413-JDW, 2021 WL 5769536, at *4 (E.D. Pa. Dec. 6, 2021), reconsideration denied, No. 5:20-CV-03413-JDW, 2022 WL 19263 (E.D. Pa. Jan. 3, 2022) (citing *Ky. Dept. of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)).

In this case, the Parents allege there was **no** notice or opportunity to opt out of instruction

about transgender topics in Williams' class or under the de facto policy.[18]  *See In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prod. Liab. Litig.*, 434 F. Supp.2d 323, 336 (E.D. Pa. 2006) (involving class actions) (noting that Supreme Court described "minimal Procedural Due Process protection" as consisting of the "best practicable" notice and a concomitant right to opt-out) (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812-13 (1985)).

The court's analysis of the Procedural Due Process claims in this case is largely duplicative of its Substantive Due Process analysis.[19]  The District is not arguing that it provided adequate process; instead it argues that the Parents do not have a protected liberty interest.  The District's defenses to the Substantive and Procedural Due Process claims, therefore, are essentially identical.  As explained above, viewing the facts pled as true, (1) the Parents have a fundamental liberty interest to control the upbringing of their children; (2) they allege a deprivation of that right without any notice or due process; (3) at least some of the defendants were personally involved in the deprivation[20]; (4) those defendants acted under color of state law; and (5) plaintiffs suffered an injury.

In sum, as pled the Procedural Due Process claim is plausible.

      **(3)**       **Fourteenth Amendment familial privacy claim**

Plaintiffs assert under § 1983 a Fourteenth Amendment right to familial privacy that is distinct from their Due Process claims.  In *Gruenke* (involving a school's swim coach who intruded into management of a teen pregnancy), the majority observed that the Supreme Court recognized a right to familial privacy and explained:

---

[18] At this stage, the Parents' allegation must be accepted as true and the District's argument that the Parents failed to exhaust their remedies under Policy I(F) (ECF No. 15 at 9-10) must await a fully-developed record.

[19] Of course, the Substantive Due Process claim may require an analysis of whether the Parents have fundamental rights that cannot be infringed regardless how much process is given.  *See Daniels v. Williams*, 474 U.S. 327, 331 (1986) (Substantive Due Process protects individual liberty against "certain government actions regardless of the fairness of the procedures used to implement them.").

[20] The court will analyze whether the complaint contains sufficient factual allegations against each named Defendant *infra* at 52-55.

> As the Court said in *Roberts v. United States Jaycees*, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), "[t]he Court has long recognized that, because the Bill of Rights is designed to secure individual liberty, it must afford the formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State." *Id.* at 618, 104 S.Ct. 3244. Familial relationships are the quintessential "personal bonds" that "act as critical buffers between the individual and the power of the State." *Id.* at 619–20, 104 S. Ct. 3244.

*Gruenke*, 225 F.3d at 305. In *Ridgewood*, the court concluded that the right to familial privacy is narrowly defined. The court explained that the familial privacy right was construed "to encompass only those instances where state official's actions were: (1) directly aimed at the parent-child relationship"; (2) implicated the "right of the family to remain together"; or (3) "eroded the family's solidarity internally and impaired the family's ability to function." *Ridgewood*, 430 F.3d at 184 (citations omitted).[21] The court cited *Pittsley v. Warish*, 927 F.2d 3, 8 (1st Cir. 1991), for the proposition that state actions which only incidentally affect the parental relationship will not support a violation. *Id.*

*Gruenke* involved a school's swim coach who suspected one of his swimmers was pregnant and required her to take a pregnancy test without informing her parents. In *Gruenke*, the majority held (at the summary judgment stage) that because the right to familial privacy was not clearly established, the teacher/coach was entitled to qualified immunity. The majority did not analyze the distinctions between the right to familial privacy and the right to direct the education and moral or religious upbringing of a child. There was a concurrence in *Gruenke* on the issue of interference with familial relations. Judge Roth explained that the right to familial privacy is implicated only by a "situation in which the state has attempted by statute or by a

---

[21] In *Parker*, the First Circuit Court of Appeals took the opposite approach, defining the parental right to control the upbringing of a child as a subset of a broader right to familial privacy. *Parker*, 514 F.3d at 102 ("The due process right of parental autonomy might be considered a subset of a broader Substantive Due Process right of familial privacy.").

court's procedural requirements to eliminate a parent's role in the custody or nurture of the child." *Id.* at 309.  Judge Roth would have held there was no violation of the right to familial privacy because the teacher/coach did not prevent the student or her parents from taking any action as a consequence of her pregnancy. *Id.* at 310.

The contours of the right to familial privacy are not well defined and would benefit from further briefing and factual development.  The elements of a familial privacy claim have not been identified.  There is at least a suggestion that the right to familial privacy may be implicated by an intrusion into the inculcation of moral values in children.  *See Gruenke,* 225 F.3d at 303-04 (discussing "right of parents to raise their children without undue state interference").  Whether Williams' conduct in exposing the children while in the classroom to ideas contrary to their Parents' moral or religious beliefs rises to a direct attack on the parent-child relationship or family integrity needs further development.  The complaint in this case, however, plausibly alleges an agenda to encourage young children to believe their parents could be wrong about their gender and an intrusion by Williams, with the permission of the District, into the values being conveyed within the family (particularly with respect to the "grooming" allegations and the instruction that children not tell their parents about the gender identity discussions).  The complaint does not support a reasonable inference that any other individual defendant interfered with Plaintiffs' familial privacy right.  The court will deny the motion to dismiss this claim with respect to Williams and the District and will grant the motion to dismiss with respect to all other defendants without prejudice to Plaintiffs' opportunity to amend their complaint.

**(4)** **First Amendment Free Exercise of Religion claim (incorporated into the Fourteenth Amendment)**

The Supreme Court recently reviewed the elements of a First Amendment Free Exercise claim in *Kennedy*, 142 S. Ct. at 2421–22.  A plaintiff can establish a Free Exercise violation in

various ways, including by showing that a government entity burdened a sincere religious practice pursuant to a policy that is not "neutral" or "generally applicable." *Id.* To overcome that showing, the government can satisfy "strict scrutiny" by demonstrating a compelling state interest and actions narrowly tailored in pursuit of that interest. *Id.* A government policy will not qualify as "neutral" if it: (1) is specifically directed at religious practice; (2) discriminates on its face; or (3) has as its object a religious exercise. *Id.* (citations omitted). A government policy will not be "generally applicable" if it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way, or if it provides a mechanism for individualized exemptions." *Id.* (citations omitted).

The Due Process and Free Exercise claims of the Parents in this case are intertwined. As explained above, the Parents assert sincerely held religious beliefs about sexual or gender identity and the desire to inculcate those beliefs in their children. Plaintiffs allege that Williams advocated her own agenda and beliefs about gender identity to their children, despite their objections, and allege that the District provides notice and opt out rights for numerous other, non-religious topics. In other words, accepting the allegations of the complaint as true, defendants' actions are not neutral and generally applicable. Strict scrutiny, therefore, may apply.[22] For the reasons set forth above in analyzing the Due Process claims, the motion to dismiss the Free Exercise claim will be denied.

### (5)     Fourteenth Amendment Equal Protection claim

Plaintiffs explain in their omnibus brief that they are asserting a § 1983 Fourteenth Amendment Equal Protection "class of one" claim based on the unequal application of the District's opt out policies. (ECF No. 28 at 24 n.32). The elements of an Equal Protection "class

---

[22] This court need not consider the "hybrid-rights theory" in *Smith*, 494 U.S. 872, as an alternative basis to apply strict scrutiny. *See Combs v. Homer-Center Sch. Dist.*, 540 F.3d 231, 247 (3d Cir. 2008) ("Until the Supreme Court provides direction, we believe the hybrid-rights theory to be dicta").

of one" claim are: (1) a public entity treated the plaintiff differently than others similarly situated; (2) the entity did so intentionally; and (3) there was no rational basis for the difference. *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006). The gravamen of plaintiffs' Equal Protection claim is that the District provided notice and opt out rights to parents for other topics such as the Holocaust, slavery, the 9/11 terrorist attacks, reproductive education, sex education, Black Lives Matter and Planned Parenthood. Complaint ¶ 3. The Parents argue that there is no rational basis to deny similar opt out rights to them for the topics of gender dysphoria and transgender transitioning. Complaint ¶ 145.

To establish a selective enforcement claim, plaintiffs must demonstrate that they were (1) treated differently from other, similarly situated persons and (2) this selective treatment was based on an unjustifiable standard, such as race, or religion, or some other arbitrary factor or to prevent the exercise of a fundamental right. *Harvard v. Cesnalis*, 973 F.3d 190, 205 (3d Cir. 2020). To be similarly situated, persons must be alike in all relevant respects, but need not be identically situated. *Id.* In *Harvard*, the court concluded (at the summary judgment stage) that a motorist who drove at highway speeds was similarly situated to the man hanging onto the hood of his car because that man was accused of engaging in violent behavior earlier in the incident. *Id.* at 206.

The Equal Protection claim appears to be duplicative of Plaintiffs' Due Process and Free Exercise claims – i.e., that the District treated them differently on the basis of their assertion of fundamental parental rights and religious beliefs. Plaintiffs did not point to any other factors. Of course, plaintiffs may pursue alternative legal theories, although they may not obtain duplicative relief. *See Berwyn Cap. Invs., Inc. v. Shore Venture Grp., LLC*, No. CIV. A. 01-691, 2001 WL 883278, at *1 (E.D. Pa. June 14, 2001).

48

In its independent research, the court did not find any decisions recognizing an Equal Protection claim under similar facts. Plaintiffs' citation to *Glaser*, 351 F. Supp. at 560-61, is misplaced. As discussed above, that decision involved Due Process, not Equal Protection. Plaintiffs' citation to *Long v. Holtry*, 673 F. Supp.2d 341, 352 (M.D. Pa. 2009), is similarly unavailing because that decision involved alleged unequal treatment of a foster parent due to personal animus of the defendant.

Accepting the facts pled as true, the complaint states a plausible claim that the disparate treatment in the de facto policy is based on the Parents' fundamental rights and religious beliefs. The motion to dismiss the Equal Protection "class of one" claim will be denied at this stage of the case.

### (6)     Fourteenth Amendment child's right to privacy claim

Plaintiffs assert a constitutional right on behalf of their children to have independence in making decisions regarding gender dysphoria and transgender transitioning. Plaintiffs characterize this as a right to privacy, citing *Ridgewood*, 430 F.3d at 179; or as a Substantive Due Process right, citing *Gruenke*, 225 F.3d at 302. (ECF No. 28 at 29). In essence, Plaintiffs argue that the young age of the children prevented them from countering the agenda advanced by Williams. The elements of a child's right to privacy claim were not articulated by the parties.

*Ridgewood* (which involved a survey about older students' personal lives) merely observed that privacy rights extend to minors and noted that the "right to avoid disclosure of personal matters is not absolute." *Ridgewood,* 430 F.3d at 179. The issue in *Gruenke* involved whether a high school student had a right to keep personal information (i.e., that she was pregnant) confidential. *Gruenke,* 225 F.3d at 302-03 (discussing "right of one to be free from disclosure of personal matters").

49

In this case, there is no allegation that the Plaintiffs' children were required to divulge their <u>own</u> personal information. To the contrary, the Parents' allegation is that Williams inappropriately shared personal information about <u>Williams'</u> family and <u>Williams'</u> child. There also may be an issue whether young children have the independence or ability to make informed decisions about transgender issues, which implicates the primacy of parental rights to make those decisions. Perhaps the allegations about "grooming" of a very young child may support some sort of infringement of the child's privacy rights, but the factual allegations in the complaint, as pled, are not sufficient to support a plausible claim.

In sum, the motion to dismiss count V will be granted without prejudice to Plaintiffs' opportunity to amend their complaint.

### (7) Declaratory judgment Claim

In Count 6, Plaintiffs seek declaratory judgment with respect to Plaintiffs' § 1983 claims and that defendants violated 22 Pa. Code § 4.4(d) by permitting Williams to provide instruction on transgender topics that were not in the published curriculum. The parties' briefs did not specifically address count 6 (ECF Nos. 15, 17, 28). Because certain § 1983 claims are not being dismissed, as discussed above, Plaintiffs' request in count 6 for declaratory judgment on those § 1983 claims will not be dismissed. Because the defendants did not address the pendant state law claim in count 6, it need not be resolved at this time. The motion to dismiss count 6 will be denied without prejudice.

### e.   Defense of qualified immunity

In *Gruenke*, the court explained that the test for determining whether an allegedly violated right is clearly established "is not whether the current precedents protect the specific

right alleged but whether the contours of current law put a reasonable defendant on notice that his conduct would infringe on the plaintiff's asserted right." *Gruenke*, 225 F.3d at 302. The court explained:

> Merely because the Supreme Court has not yet ruled on whether a school official's administration of a pregnancy test to a student violates her Fourth Amendment rights does not mean the right is not clearly established. Moreover, a review of current Fourth Amendment law in the public school context reveals not only that the right is clearly established, but also that Seip's conduct as alleged was objectively unreasonable.

*Id.* at 300. In *Gruenke*, which was decided in 2000, the court concluded that the swim coach was entitled to qualified immunity on the familial rights claim. *Id.* at 307. Although the general principles were articulated by the Supreme Court, they were not applied to the unique circumstances of that case, which involved a suspected pregnancy. *Id.* The qualified immunity defense was resolved in *Gruenke* at the summary judgment stage.

In light of the further development of the law, particularly in *Gruenke* and *Ridgewood*, the contours of Third Circuit precedent put a reasonable defendant on notice that the conduct alleged in this case (which must be accepted as true and construed in the light most favorable to Plaintiffs at this stage) would – absent a compelling interest – plausibly infringe the Parents' Substantive and Procedural Due Process and Free Exercise rights. The claims of qualified immunity are denied without prejudice with respect to those claims. As discussed above, the familial privacy, Equal Protection and child right to privacy claims are less clearly established. To the extent those claims survive, certain individual defendants may be entitled to qualified immunity on those claims, although any decision must await a fully-developed record.

### f.   Analysis of allegations against each named individual defendant

The complaint names numerous defendants.  Vague, conclusory allegations that "the defendants" violated Plaintiffs' constitutional rights are not actionable.  *See Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (civil rights plaintiff must state the conduct, time, place, and persons responsible for the alleged civil rights violations).   As explained in *Rode v. Dellarciprete*, 845 F.2d 1195 (3d Cir. 1988):

> [A] defendant in a civil rights action must have personal involvement in alleged wrongs ... Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity.

*Id.* at 1207.  In *Vo v. Wetzel*, No. 1:19-CV-00084-RAL, 2021 WL 6197743, at *8 (W.D. Pa. Dec. 31, 2021), aff'd, No. 22-1210, 2022 WL 1467978 (3d Cir. May 10, 2022), the court described the necessity to demonstrate each defendant's individual role as follows:

> A defendant in a § 1983 action "must have personal involvement in the alleged wrongs to be liable and cannot be held responsible for a constitutional violation which he or she neither participated in nor approved." *Saisi v. Murray*, 822 Fed. Appx. 47, 48 (3d Cir. 2020) (quoting *Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007)). It is the plaintiff's burden to "show that each and every defendant was 'personal[ly] involve[d]' in depriving him of his rights." *Kirk v. Roan*, 2006 WL 2645154, at *3 (M.D. Pa. Sept. 14, 2006) (quoting *Evancho v. Fischer*, 423 F.3d 347, 353 (3d Cir. 2006)). Allegations that broadly implicate multiple defendants without delineating individual conduct are legally insufficient. *See Van Tassel v. Piccione*, 608 Fed. Appx. 66, 69-70 (3d Cir. 2015).

*Id.* at *8.

It is also well established that a supervisor is not automatically liable for the actions of subordinates.  In *Weimer v. County of Fayette, Pennsylvania*, No. CV 17-1265, 2022 WL 2819025 (W.D. Pa. July 19, 2022), the court recently summarized the applicable standard:

> To establish [ ] supervisory liability against any individual Defendant, [a plaintiff] must:

>(1) identify the specific supervisory practice or procedure that the supervisor failed to employ and show that (2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that this unreasonable risk existed, (4) the supervisor was indifferent to the risk; and (5) the underling's violation resulted from the supervisor's failure to employ that supervisory practice or procedure.
>
>*Min v. Morris*, 737 F. Supp. 2d 332, 339 (E.D. Pa. 2010) (quoting *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 216 (3d Cir. 2001)). Additionally, "'it is not enough for a plaintiff to argue that the constitutionally cognizable injury would not have occurred if the superior had done more than he or she did.' Rather, the plaintiff must identify specific acts or omissions of the supervisor that evidence deliberate indifference and persuade the court that there is a 'relationship between the 'identified deficiency' and the 'ultimate injury.''" *Brown*, 269 F.3d at 216 (quoting *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989) (cleaned up)).

*Id.* at *21.

As explained above, the complaint sets forth two distinct theories of liability: (1) Williams' conduct through the school year, which was approved by the District; and (2) the adoption of the de facto policy. The court will discuss the sufficiency of the complaint as to each named individual defendant.

The allegations against Williams and Bielewicz were discussed at length above and support the remaining claims against those defendants in their individual capacities,[23] except that as explained above (*supra* at 44-46), the familial privacy claim against Bielewicz will be dismissed because there are no allegations that he was personally involved.

While there are no allegations that Steinhauer or Irvin was aware of Williams' exposure of students to transgender topics until April 2022, there are sufficient factual allegations to support claims against both Steinhauer and Irvin in developing the alleged de facto policy to

---

[23] To the extent any claims against Williams or Bielewicz relies on their participation in the de facto policy, the court notes there are no factual allegations to support an inference that Williams or Bielewicz were involved in developing the District's alleged de facto policy.

support Williams' instruction without parental notice and opt out.[24]   Similarly, there are sufficient factual allegations about Wyland's involvement and public statements at board meetings to support his involvement in the alleged de facto policy.  Complaint ¶ 103.

There are no factual allegations about the specific conduct of any of the other board members.  There are no allegations that any other board member was aware of Williams' instruction prior to April 2022.  There are no allegations about what any board member (other than Wyland) did with respect to the alleged de facto policy.  Vague, conclusory allegations that "the School Board Defendants" violated Plaintiffs' rights are not actionable.  *Evancho*, 423 F.3d at 353 (civil rights plaintiff must state the conduct, time, place, and persons responsible for the alleged civil rights violations).   The claims against defendants Fleisher, Ellwein, Freeman, Gentzel, Guth, Hackett, Johnson and Olbrich in their individual capacities will be dismissed without prejudice to Plaintiffs' opportunity to amend the complaint.

The claims against the teacher and administrators in their official capacities will be dismissed with prejudice because they are duplicative of the claims against the District. *Highhouse v. Wayne Highlands Sch. Dist.*, 205 F. Supp.3d 639, 646 (M.D. Pa. 2016) (dismissing claims against individual defendants in their official capacities because the School District is also named).  The claims against the Board members in their official capacities will also be dismissed with prejudice as duplicative of the claims against the District.  *See Zurchin v. Ambridge Area Sch. Dist.*, 300 F. Supp.3d 681, 692 (W.D. Pa. 2018) (potential liability of school district makes official capacity actions against school board members needlessly duplicative) (citations omitted).  Similarly, the claims against the "Mt. Lebanon School Board" will be dismissed with

---

[24] Responsibility to set policy rests with the superintendent, subject to final approval by the Board.  Complaint ¶ 36. The complaint alleges not only that Irvin approved of the policy, Complaint ¶ 101, but also that Irvin defended Williams' instruction at a public meeting, disingenuously described the content of the videos, and stated they were consistent with Policy I(J).  *Id.* ¶ 102.

prejudice as duplicative of the claims against "Mt. Lebanon School District." *See Foster v. Crestwood Sch. Dist.*, No. CV 3:16-1096, 2017 WL 1078195, at *6 (M.D. Pa. Mar. 22, 2017) (claim against school board is redundant of claim against school district) (citations omitted). Accordingly, defendant Mt. Lebanon School Board will be dismissed with prejudice and defendants Fleisher, Ellwein, Freeman, Gentzel, Guth, Hackett, Johnson and Olbrich in their individual capacities will be dismissed from the case without prejudice and the caption will be modified.

## IV. <u>Conclusion</u>

In summary, for the reasons set forth above, the court concludes that the factual allegations in the complaint present plausible claims that Parents have fundamental constitutional rights (pursuant to Substantive and Procedural Due Process under the Fourteenth Amendment and the First Amendment Free Exercise clause) that were violated by a public school teacher, over the Parents' objections and without notice and opt out rights, when the teacher promoted her own agenda to their first grade children about gender dysphoria and transgender transitioning, including showing videos or reading books about those topics, telling the children that the Parents may be wrong about the child's gender, telling a child she would never lie (implying the parents may be lying about the child's identity), telling the children to keep the discussions about transgender topics secret, and grooming a student to become a transgender child. The Equal Protection and familial privacy claims asserted by the Plaintiffs are plausible, but will benefit from further factual development.

In accordance with the foregoing analysis, the motion to strike (ECF No. 16) will be denied. Defendants' motions to dismiss (ECF Nos. 14, 16) will be GRANTED in part and

DENIED in part, as follows: count 1 (Substantive Due Process), count 2 (Procedural Due Process), and count 4 (Free Exercise and Equal Protection) will proceed against the District and defendants Williams, Bielewicz, Steinhauer, Irvin and Wyland in their individual capacities; and count 3 (familial privacy) will proceed against the District and Williams. The motion to dismiss Count 6 will be denied without prejudice and will proceed only against the District. The children's right to privacy claim in count 5 will be dismissed without prejudice to Plaintiffs' opportunity to file an amended complaint. The official capacity claims against the individual defendants and the claims against the Mt. Lebanon School Board will be dismissed with prejudice. The claims against defendants Fleisher, Ellwein, Freeman, Gentzel, Guth, Hackett, Johnson and Olbrich in their individual capacities will be dismissed without prejudice.

An appropriate Order follows.


Dated: October 27, 2022                    BY THE COURT:

                                           s/ Joy Flowers Conti
                                           Joy Flowers Conti
                                           Senior United States District Judge