UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEPHEN FOOTE., et al., | \* |
| Plaintiffs, | \* |
| v. | \* Civil Action No. 22-30041-MGM |
| TOWN OF LUDLOW, LUDLOW SCHOOL COMMITTEE, et al., | \* |
| Defendants. | \* |

ORDER ON DEFENDANTS' MOTION TO DISMISS
(Dkt. No. 25)

December 14, 2022

MASTROIANNI, U.S.D.J.

I.   INTRODUCTION

Stephen Foote and Marissa Silvestri ("Plaintiffs") have alleged that during the 2020-2021 school year, staff employed by Ludlow Public Schools (1) spoke about gender identity with two of their children, who were then eleven and twelve years old and students at Baird Middle School; (2) complied with the children's requests to use alternative names and pronouns; and (3) did not share information with Plaintiffs about the children's expressed preferences regarding their names and pronouns. Plaintiffs allege these actions, and inactions, violated their fundamental, parental rights protected by the Fourteenth Amendment to the United States Constitution. They filed this action pursuant to 42 U.S.C. § 1983 to seek redress for their alleged injuries.

Plaintiffs assert three claims against the Town of Ludlow; the Ludlow School Committee; Lisa Nemeth, Interim Superintendent; Todd Gazda, former Superintendent; Stacy Monette, Principal of Baird Middle School; Marie-Claire Foley, school counselor at Baird Middle School; and

Jordan Funke, former librarian at Baird Middle School (collectively "Defendants"). First, they allege Defendants violated their fundamental parental right to direct the education and upbringing of their children. Second, they allege Defendants violated their fundamental parental right to direct the medical and mental health decision-making for their children. Finally, they assert Defendants violated their fundamental right to familial privacy.

Defendants have moved for dismissal of Plaintiffs' claims.[1] The court grants Defendants' motion for the reasons that follow.

## II. MOTION TO DISMISS STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)); Fed. R. Civ. P. 12(b)(6). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. The court accepts all well-pleaded factual allegations and draws all reasonable inferences in Plaintiffs' favor, but "do[es] not credit legal labels or conclusory statements." *Cheng v. Neumann*, 51 F.4th 438, 443 (1st Cir. 2022). Dismissal is appropriate if the complaint fails to establish at least one "material element necessary to sustain recovery under some actionable legal theory." *Centro Medico del Turabo, Inc. v. Feliciano de Melecio,* 406 F.3d 1, 6 (1st Cir. 2005) (internal citation omitted).

---

[1] The court has also received and reviewed amici curiae memoranda submitted by GLBTQ Legal Advocates and Defenders and the Massachusetts Association of School Superintendents in support of Defendants and the Family Institute of Connecticut in support of Plaintiffs.

### III.  FACTUAL ALLEGATIONS[2]

During the 2020-2021 school year, Plaintiffs' children B.F. and G.F. were eleven and twelve years old and were students at Baird Middle School in Ludlow, Massachusetts. Early in the school year, school librarian Jordan Funke gave students in B.F.'s sixth grade class an assignment to make biographical videos. Funke invited students to include their gender identity and preferred pronouns in their videos. The students also received instruction about language that is inclusive of students with different gender identities.

In December 2020, B.F. spoke with a teacher and asked for help talking to Plaintiffs about concerns about depression, low self-esteem, poor self-image, and possible same-sex attraction. The teacher spoke with Silvestri, B.F.'s mother, and shared B.F.'s concerns with her. Shortly after that conversation, Silvestri sent an email to B.F.'s other teachers, Stacy Monette, Todd Gazda, and several members of the Ludlow School Committee. In her email, she stated that Plaintiffs were aware of the teacher's concerns about B.F.'s mental health, they would be getting B.F. professional help, and requested that no one receiving the email "have any private conversations with B.[F.] in regards to this matter." (Dkt. No. 22, Am. Compl. ¶ 70.)

On February 28, 2021, B.F. sent an email to Gazda, Marie-Claire Foley, and several teachers. In that email, B.F. identified as genderqueer and announced a new preferred name, one typically used by members of the opposite sex, and a list of preferred pronouns. Foley met with B.F. and, after their meeting, sent an email stating that B.F. was "still in the process of telling" Plaintiffs about B.F.'s gender identity and instructed school staff that they should not use B.F.'s new preferred name and pronouns when communicating with B.F.'s parents. Foley's position was consistent with a

---

[2] Plaintiffs' Amended Complaint included a section entitled "Factual Allegations" that contained a mix of "non-conclusory, non-speculative factual allegations" together with conclusory statements about the legal significance of various factual allegations. *Cheng*, 51 F.4th at 443. The court summarizes the factual allegations, which the court must credit at this stage, but omits the legal conclusions promoted by Plaintiffs. *Id.*

3

policy sanctioned by the School Committee, pursuant to which school personnel would only share information about a student's expressed gender identity with the student's parents if the student consented to such communication. After Foley sent her email, teachers at Baird Middle School began using B.F.'s new preferred name and pronouns.

In early March, the same teacher who had spoken with Silvestri in December informed Plaintiffs about B.F.'s email, despite the policy and B.F.'s request that Plaintiffs not be told. On March 8, 2021, Foley sent another email to school staff in which she reiterated that B.F. had expressly requested that Plaintiffs not be told about B.F.'s new first name. Several days later, Foley gave B.F. permission to use boys' bathrooms, girls' bathrooms, or gender-neutral bathrooms. Around this same time, G.F. also began using a different preferred name and school staff did not inform Plaintiffs.

On March 18, 2021, Monette met with Plaintiffs. During their meeting, Plaintiffs asserted that Defendants had disregarded their parental rights by not complying with Silvestri's December 2020 request that staff not engage with B.F. regarding mental health issues and by failing to notify them about their children's use of alternate names and pronouns. Plaintiffs also conveyed to Monette their belief that school staff were acting improperly by affirming B.F.'s and G.F.'s self-asserted gender identities. Monette refused to discuss the issues raised by Plaintiffs and ended the meeting abruptly.

Plaintiffs met with Gazda on March 21, 2021. During that meeting, they expressed concerns about negative consequences their children might experience as a result of being able to use names and pronouns associated with the opposite sex. They objected to the way school staff had disregarded their instructions and supported the children's use of different names and pronouns at school. Plaintiffs also told Gazda that they believed school staff violated their rights with respect to their children's student records by concealing information about their children from them.

In response, Gazda told Plaintiffs that school staff acted appropriately and consistently with policies approved by the School Committee when they began using the children's new names and pronouns without consulting with or notifying Plaintiffs. Gazda also asserted that school staff had not violated the Massachusetts regulation protecting parents' "rights of confidentiality, inspection, amendment, and destruction of student records" for students under the age of fourteen and not yet in ninth grade. 603 C.M.R. § 23.01. Gazda took the same positions when he met with Plaintiffs again on March 26, 2021.

Foley met with B.F. weekly throughout the spring of 2021. They discussed B.F.'s gender identity and mental health issues. During their conversations, Foley consistently affirmed B.F.'s gender identity. On some occasions, Foley expressed concern about whether Plaintiffs were providing appropriate care for B.F. and whether B.F. had sufficient support to stay safe. She asked whether B.F. was as comfortable discussing issues with the counselor chosen by Plaintiffs as with her and encouraged B.F. to speak with another counselor to increase sources of support. Foley did not communicate with Plaintiffs about B.F.'s gender identity or any other issues they discussed. B.F. also talked about gender identity with Funke. Funke was affiliated with an organization that shares resources related to gender and gender identity and Funke encouraged B.F. to visit the organization's website.

Later in the spring, Gazda publicly defended the Ludlow Public Schools policy. During School Committee meetings on May 25, 2021 and June 8, 2021, Gazda expressed support for the policy that instructed school staff to respect students' expressed gender identities and follow a student's preferences about whether to share information about the student's gender identity with the student's parents. He described the types of "parental rights" concerns raised by Plaintiffs as thinly-veiled intolerance and asserted that for some students who are transgender or gender nonconforming, school is the only safe place to express who they are.

5

## IV. STATE LAWS, REGULATIONS, AND GUIDANCE REGARDING GENDER IDENTITY

States enjoy a general power to regulate the schools they support. *Parker v. Hurley*, 514 F.3d 87, 102 (1st Cir. 2008). This includes the power to prescribe a curriculum designed to promote tolerance and provide a safe learning environment for all students. *Id.* While parents do not have to send their children to public school, those who make that choice "do not have a constitutional right to direct *how* a public school teaches their child." *Id.* (internal quotation marks omitted) (emphasis in original).

The Commonwealth of Massachusetts recognizes gender identity as a personal characteristic deserving of protection from discrimination. Since July 1, 2012, Massachusetts law has provided that "[n]o person shall be excluded from or discriminated against . . . in obtaining the advantages, privileges and courses of study of [a] public school on account of . . . gender identity." Mass. Gen. Laws ch. 76, § 5. As defined under Massachusetts law, "gender identity" means "a person's gender-related identity, appearance or behavior, whether or not that gender-related identity, appearance or behavior is different from that traditionally associated with the person's physiology or assigned sex at birth." Mass. Gen. Laws ch. 4, § 7.

A person's "gender-related identity may be shown by providing . . . any . . . evidence that the gender-related identity is sincerely held as part of a person's core identity; provided, however, that gender-related identity shall not be asserted for any improper purpose." *Id.*; *see also* 603 C.M.R. § 26.01. Neither the statute defining gender identity, nor the statute prohibiting schools from discriminating based on gender identity, limit the age at which a person can assert a gender identity that "is different from that traditionally associated with the person's physiology or assigned sex at birth." *Id.* Similarly, a separate provision of Massachusetts law related to minors and gender identity does not distinguish between children of different ages and, instead, provides a blanket prohibition against health care providers engaging in any practice, with any patient under the age of eighteen,

6

"that attempts or purports to impose change of an individual's . . . gender identity." Gen. Laws ch. 112, § 275.

The regulations implementing the anti-discrimination statute applicable to schools state that "[a]ll public school systems shall, through their curricula, encourage respect for the human and civil rights of all individuals regardless of . . . gender identity." 603 C.M.R. § 26.05. School committees are also required to "establish policies and procedures . . . that insure that all obstacles to equal access to school programs for all students regardless of . . . gender identity, are removed." 603 C.M.R. § 26.07(1). Although these laws and regulations were adopted before there was universal support for the values they protect, none were written to provide exceptions to permit parents to override a school's decision to support students who identify as transgender or gender nonconforming.

Additional, non-binding guidance for schools has been provided by the Massachusetts Department of Elementary and Secondary Education (DESE). The DESE Guidance provides that "[t]he responsibility for determining a student's gender identity rests with the student, or in the case of young students not yet able to advocate for themselves, with the parent." DESE, GUIDANCE FOR MASSACHUSETTS PUBLIC SCHOOLS CREATING A SAFE AND SUPPORTIVE SCHOOL ENVIRONMENT (hereafter "DESE Guidance"), https://www.doe.mass.edu/sfs/lgbtq/genderidentity.html#5. Schools are advised that "[t]here is no threshold medical or mental health diagnosis or treatment requirement that any student must meet in order to have his or her gender identity recognized and respected by a school." *Id.* The DESE Guidance also encourages schools to "engage the student, and in the case of a younger student, the parent, with respect to name and pronoun use." *Id.* Other than describing younger students as unable to advocate for themselves, the DESE Guidance does not advise schools to treat students of certain ages or grades differently from older students.

The DESE Guidance advises that not all transgender and gender nonconforming students are open about their gender identities with their families for reasons that can include safety concerns

7

and lack of acceptance. *Id.* When students self-identify to a school as transgender or gender nonconforming, the DESE Guidance advises that "[s]chool personnel should speak with the student first before discussing a student's gender nonconformity or transgender status with the student's parent or guardian" and "discuss with the student how the school should refer to the student, e.g., appropriate pronoun use, in written communication to the student's parent or guardian." *Id.* The provisions of the DESE Guidance related to communications with a student's family do not distinguish between older and younger students.

## V. DISCUSSION

Plaintiffs have alleged Defendants' conduct violated three different fundamental parental rights protected under the substantive due process clause of the Fourteenth Amendment: (1) the right to direct the education and upbringing of their children (Count I), (2) the right to make medical and mental health decisions for their children (Count II), and (3) the right to family integrity (Count III). Defendants have moved for dismissal, pursuant to Fed. R. Civ. P. 12(b)(6), of all three of Plaintiffs' claims, as to all Defendants. They assert that even when the court credits the well-pleaded factual allegations, Plaintiffs' Amended Complaint fails to identify a substantive due process claim cognizable under 42 U.S.C. § 1983. Defendants also argue that any claims asserted against the individual defendants should be dismissed pursuant to the doctrine of qualified immunity.

The court begins its analysis by assuming the truth of Plaintiffs' factual allegations and identifying any statements in the complaint that merely offer legal conclusions couched as fact, since such conclusory statements are not entitled to the presumption of truth. *See Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011). Many factual allegations set forth in Plaintiffs' Amended Complaint are followed by statements that draw a conclusion about the nature or significance of the alleged fact. For example, the Amended Complaint contains factual allegations

about Defendants' responses to B.F.'s and G.F.'s requests to use their preferred names and pronouns followed by brief descriptors identifying the actions as "social transitioning," "mental health treatment" and, in one instance, as "psychosocial treatment." (*See e.g.* Dkt. No. 22, Am. Compl. ¶¶ 42, 43, 45, 46, 56, 74, 78, 84.) At the hearing on Defendants' Motion to Dismiss, Plaintiffs were equivocal as to whether Defendants' actions constituted actual mental health treatment or if either of their children had an actual existing mental health condition related to gender identity. While Plaintiffs maintained that Defendants were providing mental health treatment when they "permit[ted] [B.F. and G.F.] to be identified as either nonbinary or the opposite sex of what their bodies are," the Amended Complaint alleges insufficient facts for the court to conclude that the conduct at issue constituted mental health treatment. (Dkt. No. 48, Tr. Oct. 17, 2022 Hr'g, 14.) Although "social transitioning," "mental health treatment," and "psychosocial treatment" all appear to be terms of art, Plaintiffs have not provided the context necessary for the court to infer the alleged conduct had clinical significance, as the Amended Complaint describes the terms in a conclusory manner and contains no allegations that either minor had a diagnosed mental health condition related to gender identity.

"Being transgender is . . . not a psychiatric condition, and implies no impairment in judgment, stability, reliability, or general social or vocational capabilities." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 594 (4th Cir. 2020), as amended (Aug. 28, 2020) (internal quotation marks omitted). Gender dysphoria is a recognized mental health disorder, but Plaintiffs have not alleged either child has been diagnosed with gender dysphoria, or even that Defendants erroneously believed the children suffered from gender dysphoria. *Id.* at 594-95. Plaintiffs have not alleged Defendants' actions were undertaken as part of a treatment plan for gender dysphoria or explained how referring to a person by their preferred name and pronouns, which requires no special training or skill, has clinical significance when there is no treatment plan or diagnosis in place. Similarly, there

9

are no non-conclusory allegations that social transitioning was actually occurring or includes supportive actions taken by third parties, as opposed to actions a person takes to understand or align their external gender presentation with their gender identity. Addressing a person using their preferred name and pronouns simply accords the person the basic level of respect expected in a civil society generally, and, more specifically, in Massachusetts public schools where discrimination on the basis of gender identity is not permitted. *See* Mass. Gen. Laws ch. 76, § 5. This is true regardless of an individual's age, provided the individual does not have a fraudulent purpose for using a new preferred name or pronouns. *Id.*

In the absence of supporting factual allegations, such as a relevant medically-recognized diagnosis and treatment plan, the court disregards Plaintiffs' conclusory statements describing the use of preferred names and pronouns as mental health treatment. Plaintiffs have failed to adequately allege that Defendants provided medical or mental health treatment to B.F. and G.F. simply by honoring their requests to use preferred names and pronouns at school. Accordingly, Plaintiffs have not adequately stated a claim that Defendants usurped their right to make medical and mental health treatment decisions for their children. Count II is, therefore, dismissed.

The court next considers whether the factual allegations are sufficient to state the substantive due process claims asserted in Counts I and III. The substantive due process guarantees of the Fourteenth Amendment protect individuals from arbitrary government actions that interfere with "those fundamental rights . . . which are . . . deeply rooted in this Nation's history and tradition." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (internal quotation marks omitted). The Due Process Clause protects against egregious abuses by government actors, but does not "impos[e] liability whenever someone cloaked with state authority causes harm" or guarantee that officials will use care when acting on behalf of the state. *County of Sacramento v. Lewis*, 523 U.S. 833, 848-49 (1998). The vehicle for enforcing the substantive rights guaranteed under the Fourteenth

Amendment is 42 U.S.C. § 1983, which "affords a private right of action in favor of persons whose federally assured rights are abridged by state actors." *Kando v. Rhode Island State Bd. of Elections*, 880 F.3d 53, 58 (1st Cir. 2018).

"To be cognizable, a substantive due process claim under 42 U.S.C. § 1983 must allege facts so extreme and egregious as to shock the contemporary conscience." *Abdisamad v. City of Lewiston*, 960 F.3d 56, 59-60 (1st Cir. 2020) (internal quotation marks omitted); *see also Martinez v. Cui*, 608 F.3d 54, 64 (1st Cir. 2010) ("[T]he shocks-the-conscience test . . . governs *all* substantive due process claims based on executive, as opposed to legislative, action."). "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Lewis*, 523 U.S. at 849.

At the motion to dismiss phase, substantive due process claims "must be carefully scrutinized to determine if the alleged facts support the conclusion that the state has violated an individual's constitutional rights." *Rivera v. Rhode Island*, 402 F.3d 27, 33 (1st Cir. 2005). Courts in the First Circuit take a "two-tiered approach" to substantive due process claims based on the behavior of state actors. *Martinez*, 608 F.3d at 64. Under this approach, a plaintiff must establish both conscience-shocking behavior by the defendant and "that a protected right was offended" by the defendant's conduct. *Id.* at 65. Generally, courts first determine whether the alleged conduct was sufficiently egregious because it is "[o]nly after 'show[ing] a constitutionally significant level of culpability' [that] a plaintiff [may] 'turn to establishing that a protected right was offended.'"[3] *Abdisamad*, 960 F.3d at 60 (quoting *Martinez*, 608 F.3d at 65).

---

[3] Prior to *Abdisamad*, the First Circuit stated that while courts have "typically looked first to whether the acts alleged were conscience-shocking," the two-tiered process need not be applied rigidly. *Harron v. Town of Franklin*, 660 F.3d 531, 536 (1st Cir. 2011). However, as the Supreme Court explained in *Lewis*, courts do not need to determine whether "to recogniz[e] a substantive due process right to be free of [the alleged] executive action" unless they first determine the "necessary condition of egregious behavior" has been satisfied. *Lewis*, 523 U.S. at 847 n.8. There is no reason to depart from the typical analytical framework in this case given the relatively vague manner in which Plaintiffs have described the asserted fundamental liberty interests allegedly violated by Defendants and connected those interests to historically-established fundamental rights and liberties. *See Glucksberg*, 521 U.S. at 721 (1997); *see also Martinez*, 608 F.3d at 65 n.9

11

During the hearing on Defendants' Motion to Dismiss, the court asked Plaintiffs to identify the specific allegations of conscience-shocking conduct supporting their claims. Plaintiffs argued generally that Defendants' adoption and implementation of a policy of withholding information about a student's gender identity deprived Plaintiffs of their rights to make decisions about the upbringing of their children and intentionally undermined the parent/child relationship in a manner that shocks the conscience. The court understands this conduct, as alleged, to be offered in support of Plaintiffs' claims in Counts I and III.

There is no precise definition for conscience-shocking behavior that can be applied mechanistically to Plaintiffs' allegations. *See DePoutot v. Raffaelly*, 424 F.3d 112, 118 (1st Cir. 2005). However, a "stunning" level of arbitrariness that goes beyond "[m]ere violations of state law" is required. *Pagán v. Calderón*, 448 F.3d 16, 32 (1st Cir. 2006) (internal quotation marks omitted). Bad faith may help tip the scale, but "the contemporary conscience is much more likely" to be shocked by conduct that was "intended to injure in some way unjustifiable by any government interest." *DePoutot*, 424 F.3d at 119 (internal quotation marks omitted). The nature of the right violated and the government's competing interests, if any, may inform the determination of whether particular behavior shocks the conscience. *See Martinez*, 608 F.3d at 66. "Indeed, '[a] hallmark of successful challenges is an extreme lack of proportionality, as the test is primarily concerned with violations of personal rights so severe[,] so disproportionate to the need presented, and so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience.'" *Harron v. Town of Franklin*, 660 F.3d 531, 536 (1st Cir. 2011) (quoting *González-Fuentes v. Molina*, 607 F.3d 864, 881 (1st Cir. 2010)) (alterations in original).

---

(describing the two-tiered approach as beginning with the level of culpability, while also observing "some tension between how *Lewis* and *Glucksberg* described the order in which courts should proceed to identify whether a plaintiff has identified a protected right").

Often, "an exact analysis of circumstances" is needed "before any abuse of power [can be] condemned as conscience shocking." *Lewis*, 523 U.S. at 850. Here, the circumstances certainly include the facts Plaintiffs have alleged about the conduct of various defendants. These include: inviting students to provide their preferred pronouns as part of a personal biography project; sharing information about gender identity with B.F.; failing to respond to Silvestri's December 2020 email; engaging in supportive discussions with B.F. about gender identity; facilitating B.F.'s and G.F.'s use of their preferred names and pronouns while at school; deciding not to notify Plaintiffs when B.F. and G.F. began using different preferred names and pronouns; and publicly describing the views of individuals, including parents, who oppose Ludlow Public School policies for supporting transgender and gender nonconforming students, as intolerant and hateful. The relevant circumstances also include Massachusetts laws and regulations regarding gender identity, which establish a significant government interest in providing students with a school environment in which they may safely express their gender identities,[4] regardless of their ages or the preferences of their parents. Plaintiffs have not challenged the constitutionality of these laws.

Plaintiffs have framed their claims in the context of their rights as parents to make decisions for their children without state interference. Defendants have framed their actions in the context of obligations under Massachusetts law to provide a nondiscriminatory environment to all their students. At the hearing on Defendants' motion, Plaintiffs acknowledged that Defendants were not permitted to discriminate on the basis of gender identity, but asserted that Defendants' adoption and implementation of a policy of withholding information about their children's gender identity from parents went beyond what the law required and intentionally undermined the parent/child relationship in a manner that shocks the conscience.

---

[4] Provided, of course, that there was no evidence that a student had asserted a particular gender identity for an improper purpose. *See* Mass. Gen. Laws ch. 4, § 7.

13

On its face, the Massachusetts non-discrimination statute does not require such a policy and it is disconcerting that school administrators or a school committee adopted and implemented a policy requiring school staff to actively hide information from parents about something of importance regarding their child. Indeed, in an earlier case, this court recognized that deception by school officials could shock the conscience where the conduct obscured risks to a person's bodily integrity and was not justified by any government interest. *See Hootstein v. Amherst-Pelham Reg. Sch. Comm.*, 361 F. Supp. 3d 94, 112 (D. Mass. 2019). In that case, the plaintiff alleged school officials made deceptive statements about the safety of school drinking water that obscured the risks he faced when he drank water at the school and the deception violated his right to bodily integrity.[5] *Id.* Here, the court must consider the specific facts of this case—including the government interest, if any, served by Defendants' conduct—to determine whether Plaintiffs have met their burden of identifying conscience-shocking conduct.

In December 2020, B.F. talked with a teacher about mental health concerns and possible same-sex attraction and expressed relief and gratitude when the teacher offered to talk with Plaintiffs about those concerns. The teacher then contacted B.F.'s mother (Silvestri), who responded by sending an email to B.F.'s teachers, Monette, Gazda, and members of the School Committee, in which she stated that Plaintiffs were getting B.F. professional help and requested that school staff not have any further private conversations with B.F. related to the concerns the teacher and B.F. had discussed. Two months later, B.F. identified as genderqueer, announced a new preferred name and list of preferred pronouns and, in contrast to December, did not ask for help talking with Plaintiffs. Instead, B.F. asked school staff to wait to use the new name and pronouns with Plaintiffs until after B.F. told Plaintiffs about them. Despite B.F.'s request and the alleged policy, the same teacher who

---

[5] The plaintiff in *Hootstein* was a grandparent proceeding pro se and only his own bodily integrity claim survived the motion to dismiss because, as a pro se litigant, he could not bring claims on behalf of others.

14

talked with Silvestri in December 2020 informed Silvestri about Plaintiff's gender identity. This contact with B.F.'s parents was made in violation of school policy and without administrative approval. Upon learning that B.F. was using a new name and pronouns at school, Plaintiffs met with Monette. They asserted school staff were acting illegally by allowing their children to use preferred names and pronouns without parental permission. Following that meeting, Defendants deferred to the preferences of B.F. and G.F. and did not share any information about their gender identities with Plaintiffs.

Massachusetts has identified a strong government interest in providing all students, regardless of age, with a school environment safe from discrimination based on gender identity. Under Massachusetts law, a person may establish their gender identity with "any . . . evidence that the gender-related identity is sincerely held as part of [the] person's core identity," except that "gender-related identity shall not be asserted for any improper purpose." Mass. Gen. Laws ch. 4, § 7; *see also* 603 C.M.R. § 26.01. There is no statutory limitation on the age at which an individual may assert a gender identity "different from that traditionally associated with the person's physiology or assigned sex at birth," and no exception that would allow a parent's beliefs to supersede a minor's sincerely held beliefs. *Id.; see also* Mass. Gen. Laws ch. 112, § 275 (barring gender conversion therapy for all minors).

Though non-binding, the DESE Guidance related to gender identity also provides relevant context for Defendants' actions. The DESE Guidance emphasizes the importance of creating a safe and supportive environment for students and encourages schools to work with students to develop plans for use of preferred names and pronouns. "[I]n the case of a younger student," DESE advises schools to create a plan with input from parents, but DESE has not defined younger students, other than by describing them as "not yet able to advocate for themselves." DESE Guidance, https://www.doe.mass. edu/sfs/lgbtq/genderidentity.html#5. The DESE Guidance also

15

encourages schools to consult with students who assert a different gender identity at school before disclosing information about a student's gender identity to the student's family.

Plaintiffs assert the Ludlow Public Schools adopted and implemented a policy that went beyond the DESE Guidance and rigidly prohibited any communication with parents about a student's gender identity unless the student consented and this policy shocked the conscience, at least when applied to students in middle school. The court agrees that the policy, as described by Plaintiffs, was based on a flawed interpretation of the DESE Guidance and ignored the plain language advising that parents be informed after the student is advised that such communication will occur. *See id.* ("School personnel should speak with the student first before discussing a student's gender nonconformity or transgender status with the student's parent or guardian."). Students and parents would almost certainly be better served by a more thoughtful policy that facilitated a supportive and safe disclosure by the student, with support and education available for students and parents, as needed and when accepted. Such a policy should also consider the many complicated and emotional issues and scenarios that may arise when this type of information is shared. Beliefs, understanding, and opinions surrounding this subject may evolve in a positive way with the benefit of information and honest dialogue. But, currently, the topic may also evoke negative or harmful reactions, which also must be considered. This is especially true when, as in this case, the students are old enough to independently assert their transgender or gender nonconforming identity, but still many years away from adulthood. Unlike the alleged Ludlow Public Schools policy, a policy that facilitates communication between students and parents would be consistent with the DESE Guidance and its recommendation to avoid surprising students when informing parents about the matter.

However, even if Defendants' policy was imperfect and contrary to the non-binding DESE Guidance, the alleged policy was consistent with Massachusetts law and the goal of providing

transgender and gender nonconforming students with a safe school environment. This case involves a difficult and developing issue; schools, and society as a whole, are currently grappling with this issue, especially as it relates to children and parents. *See Martinez*, 608 F.3d at 66 ("[W]hether behavior is conscience-shocking may be informed . . . by the nature of the right violated."). While the court is apprehensive about the alleged policy and actions of the Ludlow Public Schools with regard to parental notification, it cannot conclude the decision to withhold information about B.F. and G.F. from Plaintiffs was "so extreme, egregious, or outrageously offensive as to shock the contemporary conscience," given the difficulties this issue presents and the competing interests involved. *DePoutot*, 424 F.3d at 119. As conscience-shocking conduct is a necessary element for a substantive due process claim, the court ends its analysis here, without assessing whether Plaintiffs have adequately identified their protected rights and established they were offended under these facts. *See Abdisamad*, 960 F.3d at 60.

Finally, having determined that Plaintiffs' Amended Complaint should be dismissed on substantive grounds, it is not necessary for the court to address Defendants' arguments regarding qualified immunity. However, the court briefly notes that had Plaintiffs' Amended Complaint survived the substantive analysis, qualified immunity would warrant dismissal of the claims asserted against all individual defendants. *See id.* ("Individual government officials may be sued 'for federal constitutional or statutory violations under § 1983,' though 'they are generally shielded from civil damages liability under the principle of qualified immunity.'"). Qualified immunity shields individual government actors from liability unless the plaintiff can demonstrate both that the "the defendant violated the plaintiff's constitutional rights" and that "the right at issue was 'clearly established' at the time of the alleged violation." *Est. of Rahim by Rahim v. Doe*, 51 F.4th 402, 410 (1st Cir. 2022).

To satisfy the "clearly established" prong, a "plaintiff must 'identify either controlling authority or a consensus of persuasive authority sufficient to put [a state actor] on notice that his

conduct fell short of the constitutional norm.'" *Id.* (quoting *Conlogue v. Hamilton*, 906 F.3d 150, 155 (1st Cir. 2018)). While "there need not be a case directly on point," a plaintiff must be able to identify "precedents existing at the time of the incident [that] establish[ed] the applicable legal rule with sufficient clarity and specificity" that the defendant was on notice that their conduct would violate the rule. *McKenney v. Mangino*, 873 F.3d 75, 82-83 (1st Cir. 2017) (internal quotation marks omitted). Here, Plaintiffs would have to identify authority addressing sufficiently similar facts occurring where similar state laws applied. That authority would either need to be binding in Massachusetts or demonstrate a consensus among persuasive authorities such that the individual defendants should have known their actions violated Plaintiffs' parental rights protected by substantive due process.

Having reviewed all the cases cited by Plaintiffs, the court finds they do not meet this burden. First, the court observes that legal protections for gender identity are a recent development and a broad awareness of issues surrounding the topic of gender identity is still growing. Second, as discussed above, Defendants did not provide mental healthcare to Plaintiffs' children when supporting their use of preferred names and pronouns. Finally, consistent with principles established in *Meyer v. Nebraska*, 262 U.S. 390 (1923) and *Pierce v. Society of Sisters*, 268 U.S. 510 (1925), Plaintiffs' right to direct the upbringing of their children allows them to "choose between public and private schools," but does not give them a right "to interfere with the general power of the state to regulate education." *Parker*, 514 F.3d at 102. Here, the individual defendants' respective decisions not to share information with Plaintiffs about their children's gender identities complied with a Ludlow Public Schools policy which, though not required by, was consistent with Massachusetts laws that have not been challenged by Plaintiffs.

## VI. CONCLUSION

For the reasons discussed above, Defendants' Motion to Dismiss (Dkt. No. 25) is ALLOWED. Plaintiffs' Amended Complaint (Dkt. No. 22) is dismissed and this case may now be closed.

It is so Ordered.

    /s/ Mark G. Mastroianni
MARK G. MASTROIANNI
United States District Judge